ORAL ARGUMENT NOT YET SCHEDULED

No. 13-5270

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

NACS, NATIONAL RETAIL FEDERATION,
FOOD MARKETING INSTITUTE, MILLER
OIL CO., INC., BOSCOV'S DEPARTMENT STORE, LLC, and
NATIONAL RESTAURANT ASSOCIATION,

*Plaintiffs-Appellees*,

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Defendant-Appellant*.

_____

On appeal from the United States District Court for the District of Columbia
Judge Richard J. Leon, Civil No. 11-02075 (RJL)

_____

**BRIEF FOR DEFENDANT-APPELLANT
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM**

_____

Scott G. Alvarez, General Counsel
Richard M. Ashton, Deputy General Counsel
Katherine H. Wheatley, Associate General Counsel
Yvonne F. Mizusawa, Senior Counsel
Joshua P. Chadwick, Counsel
Board of Governors of the
    Federal Reserve System
Washington, D.C.  20551
Telephone:  (202) 452-3779
kit.wheatley@frb.gov

*Counsel for Defendant-Appellant*

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the Board of Governors of the Federal Reserve System states as follows:

(A) <u>Parties and Amici</u>:  The parties in this case are the Board of Governors of the Federal Reserve System ("Board"), a federal government agency, and a group of merchants and merchant trade groups that includes NACS (formerly the National Association of Convenience Stores); the National Retail Federation; the Food Marketing Institute; Miller Oil Company, Inc.; Boscov's Department Store, LLC; and the National Restaurant Association.

There are no intervenors in this case.  Amici in the district court included (i) a coalition of bank and credit union trade associations composed of The Clearing House Association L.L.C.; the American Bankers Association; the Consumer Bankers Association; the Credit Union National Association; The Financial Services Roundtable; the Independent Community Bankers of America; the Mid-Size Bank Coalition of America; the National Association of Federal Credit Unions; and the National Bankers Association; (ii) Senator Richard J. Durbin; and (iii) a merchant group composed of 7-Eleven, Inc.; Auntie

i

Anne's, Inc.; Burger King Corporation; CKE Restaurants, Inc.; International Dairy Queen, Inc.; Jack in the Box Inc.; Starbucks Corporation; and The Wendy's Company.

The coalition of bank and credit union trade associations that appeared as amici in the district court, The Clearing House Association L.L.C. *et al.*, have also appeared as amici in this Court with the consent of all parties.

(B) <u>Rulings Under Review</u>:  Under review in this case are the July 31, 2013 memorandum opinion and order of the district court, Judge Richard J. Leon, granting summary judgment to the plaintiffs, denying summary judgment to the Board, and vacating portions of the Board's regulations regarding debit interchange fees and payment card network exclusivity (but staying vacatur).  *See* JA 37; *NACS et al. v. Board of Governors of the Federal Reserve System*, --- F. Supp. 2d ----, No. 11-02075 (RJL), 2013 WL 3943489 (D.D.C. July 31, 2013).

(C) <u>Related Cases</u>:  This case has not previously been before this Court and there are no related cases.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................vi

GLOSSARY ........................................................................................xii

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF ISSUES ....................................................................2

STATEMENT OF FACTS .....................................................................3

   A.  Debit Cards ...............................................................................3

   B.  Section 920 of the Electronic Fund Transfer Act............................6

   C.  The Board's Rulemaking ............................................................8

      1. Network Exclusivity .............................................................9

      2. Interchange Fees ...............................................................11

   D.  The District Court Proceedings .................................................13

STANDARD OF REVIEW....................................................................14

SUMMARY OF ARGUMENT ...............................................................15

ARGUMENT ......................................................................................18

I.    The Board Reasonably Interpreted EFTA Section 920(b) in
      Formulating its Final Rule Regarding Network Exclusivity .........19

   A.  Section 920(b) Speaks to *Issuer and Network* Routing
      Restrictions and is Silent with Respect to Restrictions Caused
      by Merchants or Others ...........................................................21

1.  The Text of Section 920(b) Supports the Board's Reading ...... 23

    (i)  The "Debit Card" Definition ................................. 26

    (ii) Consistency/Surplusage ...................................... 29

2.  A Single Remark of Senator Durbin is Insufficient to
    Establish Congressional Intent ................................. 31

3.  The Board's Reading of Section 920(b) Indisputably
    Advances the Statutory Purpose ............................... 36

B.  The Board's Reasonable Interpretation of Section 920(b) is
    Entitled to Deference ......................................... 39

II.  The Board Properly Interpreted EFTA Section 920(a) in
     Formulating a Standard for Assessing Whether Interchange
     Fees are Reasonable and Proportional to Cost ................ 40

A.  Sections 920(a)(2) and (a)(3)(A) Vest Broad Discretion in the
    Board to Promulgate a Standard for Reasonable and
    Proportional Fees ............................................ 43

B.  In Setting the Reasonable and Proportional Standard, the Board
    Correctly Interpreted Section 920(a)(4)(B) as Permitting
    Consideration of Costs in Addition to Incremental ACS That
    are Not Prohibited by Section 920(a)(4)(B)(ii) ............... 46

    1.  The Board's Reading Follows from Basic Principles of
        Statutory Construction ................................... 46

        (i)  Non-Interlocking Language ............................ 46

        (ii) The "Which" Clause .................................. 50

    2.  The District Court's Misreading of the Statute Undermines
        Its Interpretation ...................................... 54

iv

3.  The District Court Erred by Giving Controlling Weight to a July 15, 2010 Floor Statement of the Bill's Sponsor, Which is Contrary to the Statutory Language ......................... 58

4. The Board Properly Included Four Specific Items of Cost Which are Integral to ACS and Not Prohibited by Section 920(a)(4)(B)(ii) ........................................................... 63

(i)  Fixed ACS Costs ................................................ 63

(ii)  Transaction Monitoring ..................................... 64

(iii) Fraud Losses ..................................................... 67

(iv) Network Processing Fees .................................... 68

C.  As Shown, the Board's Reasonable Interpretation of the Fee Provision is Entitled to Deference ................................ 70

CONCLUSION ........................................................ 71

CERTIFICATE OF COMPLIANCE ....................................... 73

ADDENDUM—STATUTES AND REGULATIONS ........................... 74

# TABLE OF AUTHORITIES

## Cases

*Aid Association for Lutherans v. U.S. Postal Service,*
  321 F.3d 1166 (D.C. Cir. 2003) ............................................................... 61

*Allied Local & Reg'l Mfrs. Caucus v. EPA,*
  215 F.3d 61 (D.C. Cir. 2000) ................................................................... 57

*Am. Fed'n of Gov't Emps. v. Gates,*
  486 F.3d 1316 (D.C. Cir. 2007) ............................................................... 45

*Barnhart v. Thomas,*
  540 U.S. 20 (2003) ................................................................................... 51

*Bruesewitz v. Wyeth LLC,*
  131 S. Ct. 1068 (2011) ............................................................................ 34

*Burlington N. & Santa Fe Ry. Co. v. White,*
  548 U.S. 53 (2006) ................................................................................... 47

*\*Cablevision Sys. v. FCC,*
  649 F.3d 695 (D.C. Cir. 2011) ..................................................... 39, 43, 70

*\*Catawba County v. EPA,*
  571 F.3d 20 (D.C. Cir. 2009) ....................................................... 44, 49, 54

*\*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
  467 U.S. 837 (1984) ..................................................... 14, 17, 21, 22, 44

*City of Arlington v. FCC,*
  133 S. Ct. 1863 (2013) ............................................................................ 22

Authorities upon which we chiefly rely are marked with asterisks.

vi

*Consumer Elecs. Ass'n v. FCC*,
  347 F.3d 291 (D.C. Cir. 2003) ..................................................43, 60, 61

*Duncan v. Walker*,
  533 U.S. 167 (2001) .........................................................................46, 52

*\*Entergy Corp. v. Riverkeeper*,
  556 U.S. 208 (2008)...........................................................................29, 49

*Gentiva Healthcare Corp. v. Sebelius*,
  No. 12-5179, 2013 U.S. App. LEXIS 14886 (D.C. Cir. July 23, 2013)....71

*George E. Warren Corp. v. EPA*,
  159 F.3d 616 (D.C. Cir. 1998) ...............................................................57

*Holland v. Nat. Mining Assoc.*,
  309 F.3d 808 (D.C. Cir. 2002) ...............................................................15

*In re Polar Bear Endangered Species Act Listing and Section 4(d)
Rule Litig.*,
  720 F.3d 354 (D.C. Cir. 2013) ...............................................................15

*Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB*,
  814 F.2d 697 (D.C. Cir. 1987) ...............................................................36

*\*Mayo Found. for Med. Educ. and Research v. United States*,
  131 S. Ct. 704 (2011) .......................................................................44, 54

*\*Mims v. Arrow Fin. Servs., LLC*,
  132 S. Ct. 740 (2012) .......................................................................32, 59

*Mingo Logan Coal Co. v. EPA*,
  714 F.3d 608 (D.C. Cir. 2013) ...............................................................32

*\*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ..................................................................29, 39, 71

*Nat'l Cable & Telecomms. Ass'n v. FCC,*
   567 F.3d 659 (D.C. Cir. 2009) ........................................ 33, 59

*NRA v. Reno,*
   216 F.3d 122 (D.C. Cir. 2000) ........................................ 39, 70

*NRDC v. EPA,*
   706 F.3d 428 (D.C. Cir. 2013) ............................................ 61

*Oncale v. Sundowner Offshore Servs.,*
   523 U.S. 75 (1998) ............................................................ 59

*Overseas Educ. Ass'n, Inc. v. FLRA,*
   876 F.2d 960 (D.C. Cir. 1989) ........................................ 33, 60

*Russello v. United States,*
   464 U.S. 16 (1983) ............................................................ 47

*Smiley* v. *Citibank (South Dakota), N.A.,*
   517 U.S. 735 (1996) .......................................................... 22

*TRW Inc. v. Andrews,*
   534 U.S. 19 (2001) ........................................................ 46, 52

*United States v. Menasche,*
   348 U.S. 528 (1955) .......................................................... 52

*United States v. Pritchett,*
   470 F.2d 455 (D.C. Cir. 1972) ............................................ 51

*United States v. Ron Pair Enters.,*
   489 U.S. 235 (1989) ...................................................... 52, 58

*Wagner v. FEC,*
   717 F.3d 1007 (D.C. Cir. 2013) .......................................... 23

*Whitman v. Am. Trucking Assocs.,*
   531 U.S. 457 (2001) .......................................................... 29

**Statutes**

5 U.S.C. § 702 ................................................................................ 1

15 U.S.C. § 1693*o*-2 ................................................................ 1, 3, 6

15 U.S.C. § 1693*o*-2(a) ................................................................ 41

15 U.S.C. § 1693*o*-2(a)(2) ........................................................ 7, 41

15 U.S.C. § 1693*o*-2(a)(3)(A) ........................................ 8, 40, 41, 44

15 U.S.C. § 1693*o*-2(a)(3)(B) ...................................................... 57

15 U.S.C. § 1693*o*-2(a)(4)(A) ........................................................ 8

15 U.S.C. § 1693*o*-2(a)(4)(B) ........................................................ 8

15 U.S.C. § 1693*o*-2(a)(4)(B)(i) ............................................... 47, 69

15 U.S.C. § 1693*o*-2(a)(4)(B)(ii) ........................................ 47, 51, 59

15 U.S.C. § 1693*o*-2(a)(5)(A) ...................................................... 65

15 U.S.C. § 1693*o*-2(a)(8)(B) ...................................................... 69

15 U.S.C. § 1693*o*-2(b)(1) ........................................................... 19

15 U.S.C. § 1693*o*-2(b)(1)(A) .................................................. 7, 23

15 U.S.C. § 1693*o*-2(b)(1)(B) .................................................. 7, 30

15 U.S.C. § 1693*o*-2(c)(2) ........................................................... 27

15 U.S.C. § 1693*o*-2(c)(5) ...................................................... 23, 27

15 U.S.C. § 1693*o*-2(c)(8) ............................................................. 7

15 U.S.C. §1693*o*-2(a) ................................................................ 41

28 U.S.C. § 1291 ............................................................................. 1

28 U.S.C. § 1331 ............................................................................. 1

28 U.S.C. § 2201 ....................................................................... 1

28 U.S.C. § 2202 ....................................................................... 1

Pub. L. No. 111-203, 124 Stat. 1376 (2010) ............................ 6

**Regulations**

12 C.F.R. § 235.3(b) ........................................................... 12, 40

12 C.F.R. § 235.6(a) ............................................................... 70

12 C.F.R. § 235.6(b) ............................................................... 70

12 C.F.R. § 235.7 ................................................................... 20

12 C.F.R. § 235.7(b) ............................................................... 30

12 C.F.R. § 235.9 ................................................................... 70

12 C.F.R. Part 235 ................................................................. 70

Appendix A to Part 235, Official Board Commentary ......... 20, 30, 38, 70

**Legislative Materials**

156 Cong. Rec. S3589 (daily ed. May 12, 2010) ..................... 62

156 Cong. Rec. S3696 (daily ed. May 13, 2010) ..................... 62

156 Cong. Rec. S3703 (daily ed. May 13, 2010) ..................... 35

156 Cong. Rec. S3704 (daily ed. May 13, 2010) ..................... 62

156 Cong. Rec. S3705 (daily ed. May 13, 2010) ..................... 35

156 Cong. Rec. S5925 (daily ed. July 15, 2010) ..................... 59

156 Cong. Rec. S5926 (daily ed. July 15, 2010) ................. 32, 34

H.R. 4,173, 111th Cong. (2009) ............................................. 35

H.R. Conf. Rep. No. 111-517 (2010) ...................................... 36

## Other Authorities

2A Sutherland Statutory Construction § 48:15 (7th ed. 2011)...............32

Adam J. Levitin, *Cross-Routing:  PIN and Signature Debit Interchangeability under the Durbin Amendment*, 2 Lydian J. 16 (Dec. 2010) ..............................................................................25

Fumiko Hayashi, Richard J. Sullivan, and Stuart E. Weiner, *A Guide to the ATM and Debit Card Industry:  2006 Update*, Federal Reserve Bank of Kansas City (2006).................................................31

H.W. Fowler, *A Dictionary of Modern English Usage* (2d ed. 1965) ..............................................................................50

*The Chicago Manual of Style* (16th ed. 2010)...........................................51

Victoria Finkle, *Down, But Not Out:  Visa Tries to Claw Back PIN Debit Business*, American Banker, August 10, 2012............................37

William Strunk Jr. and E.B. White, *The Elements of Style* (4th ed. 2000) ..............................................................................51

# GLOSSARY

| | |
|---|---|
| ACS | Authorization, clearance, and settlement |
| APA | Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* |
| Board | Board of Governors of the Federal Reserve System |
| Commentary | Official Board Commentary, Appendix A to 12 C.F.R. Part 235 |
| Dodd-Frank | Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) |
| EFTA | Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.* |
| Merchants | Plaintiffs-Appellees NACS *et al.* |
| Section 920 | Section 920 of the Electronic Fund Transfer Act, 15 U.S.C. § 1693*o*-2 |

## JURISDICTIONAL STATEMENT

This case is before the Court on appeal from the July 31, 2013 memorandum opinion and order of the United States District Court for the District of Columbia, Judge Richard J. Leon, granting summary judgment for the plaintiffs.  In the district court, plaintiffs challenged the Board's regulations regarding debit interchange fees, 12 C.F.R. § 235.3(b), and payment card network exclusivity, 12 C.F.R. § 235.7(a)(2), the promulgation of which was mandated by federal statute.  *See* 15 U.S.C. § 1693*o*-2.  Pursuant to the Administrative Procedure Act, 5 U.S.C. § 702, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, plaintiffs sought a declaration that the Board's regulations were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  The district court had jurisdiction pursuant to 28 U.S.C. § 1331.

On August 21, 2013, the Board timely filed its Notice of Appeal of the memorandum opinion and order.  *See* Docket Entry 2.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.  Section 920(b) of the Electronic Fund Transfer Act ("EFTA") directs the Board to prohibit "an issuer or payment card network" from restricting the number of networks on which a debit card transaction may be processed to a single network or to only affiliated networks.  As a result, the Board required card issuers to enable at least two unaffiliated networks on every debit card and precluded issuers and networks from deciding which of those networks must process a given transaction.  Did the Board comply with the statute?

2.  Sections 920(a)(2) and (a)(3)(A) of EFTA direct the Board to establish standards for assessing whether interchange transaction fees are "reasonable" and "proportional" to a card-issuing bank's cost with respect to an electronic debit transaction.  Section 920(a)(4)(B) sets a baseline of costs which the Board must consider—the issuing bank's incremental cost of authorizing, clearing, and settling a particular electronic debit transaction—and instructs the Board not to consider other costs incurred by an issuer which are not specific to a particular transaction.  Did the Board properly interpret the statute to permit it to consider an issuing bank's costs as to which the statute is silent?

2

## STATEMENT OF FACTS

The Board of Governors of the Federal Reserve System is a federal agency with supervisory responsibility for much of the banking activity in the United States.  By amendment to the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 ("Dodd-Frank"), Congress directed the Board to issue certain regulations regarding the processing of, and fees associated with, debit card transactions.  *See* 15 U.S.C. § 1693*o*-2.  That amendment and the resulting rules are the subject of this litigation.

## A.    Debit Cards

Although introduced in the late 1960s and early 1970s and initially used to withdraw cash or perform other banking activities at ATMs, debit cards have in recent years become the most frequently used noncash payment method in the United States.  *See* Joint Appendix ("JA") at 141.  Generally issued by banks or other depository institutions to their account holders as a method of accessing deposited funds, and offering benefits to both consumers and merchants, debit cards have come to be accepted at approximately eight million merchant locations in the United States.  *Id.*

3

The debit card system is commonly referred to as a "four party" system consisting of (1) the cardholder; (2) the bank or entity that issued the debit card (the "issuer"); (3) the merchant; and (4) the merchant's bank (the "acquirer"). *Id.* The "four party" description is something of a misnomer because the payment card network (e.g., Visa, MasterCard, STAR, PULSE, etc.) (the "network") acts as a fifth party. Most debit card transactions are authorized by one of two methods: PIN (Personal Identification Number) or signature. PIN debit networks, which evolved from ATM networks, differ from signature debit networks, which leverage credit card network infrastructure. *Id.*

In a typical debit transaction, the cardholder initiates a purchase by providing a debit card or debit card information to a merchant and generally either enters a PIN (for a PIN transaction) or signs an authorization (for a signature transaction). JA 141-42. An electronic "authorization" request for a specific dollar amount, along with the cardholder's account information, is then sent from the merchant to the acquirer to the network, which sends the request to the appropriate issuer. JA 142. The issuer verifies that the cardholder's account has sufficient funds to cover the transaction and that the card was not

4

reported as lost or stolen, among other things. *Id.* A message approving or declining the transaction is returned to the merchant by the reverse path (from the issuer, through the network, to the acquirer, to the merchant), usually within seconds of the authorization request. *Id.* The "clearing" of a debit card transaction—which results in the issuer posting the debit to the cardholder's account—is effected either through this authorization message (for PIN debit) or through a subsequent message (for signature debit). *Id.*

Various fees are associated with debit card transactions. The interchange transaction fee (the "interchange fee") is set by the network but paid by the acquirer to the issuer. Networks also collect fees from issuers and acquirers, including network "switch fees" that compensate the network for its role in processing card transactions. Finally, the acquirer charges the merchant a "merchant discount"—the difference between the face value of a transaction and the amount the acquirer transfers to the merchant—which includes the interchange fee, network switch fees charged to the acquirer, other acquirer costs, and an acquirer markup. *Id.*

Before the Board issued its Rule, networks reported that the average interchange fee for all debit card transactions (signature and PIN) was 44 cents per transaction, or 1.15 percent of the average transaction amount.  JA 143.  Under the Board's Rule, as explained below, fees are capped at 21 cents per transaction plus an *ad valorem* component, or approximately half of the pre-Rule level.  JA 168, 569.

## B.    Section 920 of the Electronic Fund Transfer Act

Section 1075 of Dodd-Frank, sponsored by Senator Richard J. Durbin, added a new section 920 to EFTA.  *See* Pub. L. No. 111-203, 124 Stat. 1376, 2068-2074 (2010), codified at 15 U.S.C. § 1693*o*-2 ("section 920").  Section 920 requires the Board to promulgate regulations prohibiting certain network exclusivity and routing arrangements and establishing standards for reasonable and proportional interchange fees for debit cards.  *Id.*

Section 920(b) relates to network exclusivity and routing and, pursuant to section 920(b)(1)(A), requires the Board to "prescribe regulations providing that an issuer or payment card network shall not directly or through any agent . . . restrict the number of payment card networks on which an electronic debit transaction may be processed to"

6

one such network, or to two or more affiliated networks.  15 U.S.C.

§ 1693*o*-2(b)(1)(A).  A companion provision, section 920(b)(1)(B),

requires the Board to "prescribe regulations providing that an issuer or

payment card network shall not, directly or through any agent . . .

inhibit the ability of any person who accepts debit cards for payments to

direct the routing of electronic debit transactions for processing over

any payment card network that may process such transactions."

15 U.S.C. § 1693*o*-2(b)(1)(B).

Section 920(a) relates to interchange fees, with section 920(a)(2)

broadly requiring that "[t]he amount of any interchange transaction fee

that an issuer may receive or charge with respect to an electronic debit

transaction shall be reasonable and proportional to the cost incurred by

the issuer with respect to the transaction."[1]  15 U.S.C. § 1693*o*-2(a)(2).

Section 920(a)(3)(A), in turn, requires the Board to issue regulations "to

establish standards for assessing whether the amount of any

interchange transaction fee described in paragraph (2) is reasonable

and proportional to the cost incurred by the issuer with respect to the

---

[1] "[I]nterchange transaction fee" is defined as "any fee established, charged or received by a payment card network for the purpose of compensating an issuer for its involvement in an electronic debit transaction."  15 U.S.C. § 1693*o*-2(c)(8).

transaction." 15 U.S.C. § 1693*o*-2(a)(3)(A). The statute does not define the terms "reasonable" and "proportional" to cost.

The statute provides some guidance regarding the reasonable and proportional fee standard. It states that the Board shall "(A) consider the functional similarity between— (i) electronic debit transactions; and (ii) checking transactions that are required within the Federal Reserve bank system to clear at par," 15 U.S.C. § 1693*o*-2(a)(4)(A), and "distinguish between— (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2)." 15 U.S.C. § 1693*o*-2(a)(4)(B). Beyond these provisions, the statute provides no guidance with respect to criteria the Board may take into account.

## C. The Board's Rulemaking

Upon the passage of Dodd-Frank, Board staff began meeting with stakeholders regarding section 920, including representatives of merchants and retailers, card-issuing banks, payment card networks,

8

and others.  The Board distributed surveys to covered issuers, payment-card networks, and acquirers to gather information to assist it in developing proposed rules.  *See* JA 98, *Debit Card Interchange Fees and Routing, Notice of Proposed Rulemaking*, 75 Fed. Reg. 81,722, 81,724 (Dec. 28, 2010) ("NPRM").

The Board issued the NPRM on December 28, 2010, *id.*, and subsequently received submissions from more than 11,500 commenters, including issuers, payment card networks, merchants, consumers, consumer advocates, trade associations, and members of Congress. JA 140.  The Board thoroughly reviewed all comments, survey data, and other relevant information, and conducted an open Board meeting before promulgating its final rule on July 20, 2011 ("Final Rule" or "Rule," codified at 12 C.F.R. Part 235).  *Id.*

### 1. Network Exclusivity

With respect to network exclusivity and routing arrangements, the Board issued two proposals for comment.  *See* JA 125-26.  Under Alternative A, an issuer or payment card network could not restrict the number of payment card networks over which an electronic debit transaction may be processed to fewer than two unaffiliated networks

9

without regard to authentication method.  By way of example, one signature and one unaffiliated PIN network would satisfy this alternative.  Alternative B would have required a debit card to have at least two unaffiliated payment card networks available for processing an electronic debit transaction for each method of authorization available to the cardholder.  *Id.*  Under this approach, a card capable of processing both signature and PIN transactions would need at least two unaffiliated signature networks and at least two unaffiliated PIN networks to comply.

After careful consideration, the Board adopted Alternative A, concluding that it was "most consistent with EFTA Section 920(b)(1)(A)."  JA 193.  In reaching its conclusion, the Board observed that the statute addresses only "issuer and payment card network" restrictions, that "[t]he plain language of the statute does not require that there be two unaffiliated payment cards available to the merchant for each method of authentication," and that "Alternative B and its requirement to enable multiple unaffiliated payment card networks on a debit card for each method of card authentication could potentially limit the development and introduction of new authentication methods."

10

*Id.* at 193-94.  The Board further found that Alternative B might have negative consumer effects in that it "could limit the cardholder's ability to obtain card benefits that are tied to a particular network," while "Alternative A would result in less consumer confusion," would minimize the compliance burden for small issuers in particular, and "would also present less logistical burden on the payment system overall."  *Id.*

As a result of the Rule's implementation of section 920(b), additional unaffiliated payment card networks were required to be added to more than 100 million debit cards.  *See infra* Section I(A)(3).

### 2. Interchange Fees

With respect to costs, the Board noted in the NPRM that "[t]he statute is silent with respect to costs that are specific to a particular transaction other than incremental costs incurred by an issuer for authorizing, clearing, and settling the transaction."  JA 110.  The Board specifically requested comment on which, if any, of those costs it should include in the fee standard.  JA 111.

The Rule permits each issuer to receive interchange fees that do not exceed a base amount of 21 cents per transaction plus an *ad*

11

*valorem* (i.e., percentage of the value of the transaction) component of 5 basis points.  12 C.F.R. § 235.3(b).  In setting the standard, the Board determined that "there exist costs that are not encompassed in either the set of costs the Board must consider under Section 920(a)(4)(B)(i), or the set of costs the Board may not consider under Section 920(a)(4)(B)(ii)."  JA 172.  "These costs, on which the statute is silent, are those that are specific to a particular electronic debit transaction but that are not incremental costs related to the issuer's role in the authorization, clearance and settlement."  *Id.*  The Board noted "the requirement that one set of costs be considered and another set of costs be excluded suggests that Congress left to the implementing agency discretion to consider costs that fall into neither category to the extent necessary and appropriate to fulfill the purposes of the statute."  *Id.*

As required by section 920(a)(4)(B)(i), the Board considered— and included—"[i]ssuer costs . . . related to the authorization, clearance, and settlement of a transaction," JA 150, including both fixed and variable authorization, clearance, and settlement ("ACS") costs such as network connectivity, software, hardware, equipment, and associated labor, network processing fees, the costs of processing chargebacks and

12

other non-routine transactions, and transaction monitoring costs.  *Id.*;
JA 175.  The Board included an allowance for fraud losses (the *ad
valorem* component) as an issuer cost incurred as a consequence of
effecting a transaction.  JA 150.  Several costs that may be incurred in
effecting a particular electronic debit transaction, such as costs relating
to consumer inquiries and rewards programs, were excluded for reasons
described in the Rule.  *Id.*; JA 175.  The Board excluded costs not
incurred to effect a particular electronic debit transaction, as required
by section 920(a)(4)(B)(ii), such as corporate overhead (e.g., senior
executive compensation), establishing the account relationship, card
production and delivery, marketing, research and development, and
network membership fees.  JA 150.

## D.   The District Court Proceedings

Plaintiffs NACS *et al*. ("Merchants") filed an action on November
29, 2011, challenging both the network exclusivity and routing
restrictions, 12 C.F.R. § 235.7(a)(2), and the fee standard, 12 C.F.R.
§ 235.3(b), under the APA and the Declaratory Judgment Act.  JA 34.
The parties cross-moved for summary judgment.  The Board argued
that the Rule complied in all respects with both the text and the

13

purpose of the statute, Congress's delegation of rulemaking authority,

and the principles set forth by the Supreme Court in *Chevron U.S.A.,*

*Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984).

The Merchants argued that sections 920(b)(1)(A) and 920(a)(4)(B)

unambiguously precluded the Board's interpretation.  A merchant

group, a coalition of bank and credit union trade associations, and

Senator Durbin filed amicus briefs.

In its July 31, 2013 opinion, the district court largely adopted the

Merchants' arguments, concluding that the Board's interpretation of the

statute with regard to both fees and routing choice failed at *Chevron*

step one and was "unambiguously foreclosed" by the statute.  JA 73, 91.

Although the district court announced its intention to vacate the Rule,

it stayed vacatur given that "regulated interests have already made

extensive commitments in reliance on" the regulation.  JA 92; *see also*

JA 97.  This appeal followed.

## STANDARD OF REVIEW

A court of appeals reviewing a district court's grant of summary

judgment under the Administrative Procedure Act "'review[s] the

administrative action directly, according no particular deference to the

14

judgment of the District Court.'" *In re Polar Bear Endangered Species Act Listing and Section 4(d) Rule Litig.*, 720 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Holland v. Nat. Mining Assoc.*, 309 F.3d 808, 814 (D.C. Cir. 2002)). In reviewing the agency's interpretation of the underlying statute, the court applies the two-step analysis set forth in *Chevron*. *Id.*

## SUMMARY OF ARGUMENT

The Court should uphold the Final Rule because the Board carried out the mandate of EFTA section 920 in complete fealty to the statute and its purpose.

*First*, the Board reasonably interpreted the network exclusivity provisions of section 920(b), which direct the Board to prohibit "*an issuer or payment card network*" from restricting the number of networks on which a debit card transaction may be processed to a single network or to only affiliated networks. Applying a straightforward reading of the statute, the Board put an end to so-called "network exclusivity" agreements and enhanced network competition by requiring card issuers to enable at least two unaffiliated networks on every debit card and prohibiting issuers and networks from directing which of those networks must process a given transaction. Additional

15

competing networks were added to millions of debit cards as a result,
materially advancing the statutory purpose of preserving and
enhancing network competition to the indisputable benefit of
Merchants.

The Merchants' insistence that the Board should have required
multiple routing options for each method of authentication enabled on a
card, without regard to limitations imposed by consumers or merchants
themselves, is based on a stilted reading of the statutory text and
definitions, relies heavily upon an unreliable fragment of legislative
history, and ignores the substantial impact of the Rule. Even accepting
that the Merchants' view represents one *possible* interpretation, it is
not the best—and is certainly not the *only*—reading of the statute,
which addresses only issuer and network restrictions on routing choice
and is silent with respect to limitations caused by merchants or
consumers. In these circumstances, the Board's reasonable
interpretation must prevail.

*Second*, under section 920(a), the Board promulgated a standard
for assessing whether interchange fees are reasonable and proportional
to cost that substantially slashes fees, as intended by Congress, to

16

approximately half of their pre-Rule levels.  In promulgating the standard, the Board properly (1) used issuers' incremental ACS costs as a baseline; (2) excluded other costs which are not specific to a particular electronic debit transaction; and (3) considered the functional similarity between electronic debit and checking transactions.  The Board determined that it permissibly may take into account costs as to which the statute is silent—those that are specific to a particular electronic debit transaction but not incremental ACS—because Congress did not "directly address[] the precise question" of how to treat those costs. *Chevron*, 467 U.S. at 843.

The Board properly concluded that the statute could reasonably be interpreted to permit consideration of costs beyond incremental ACS costs, rejecting the reading urged by the Merchants and the district court that would limit consideration solely to those incremental costs. Not only does the Merchants' reading fail to give separate significance to the touchstone of reasonableness and proportionality, but it reads section 920(a)(4)(B)(ii)'s exclusion of "other costs incurred by an issuer which are not specific to a particular electronic debit transaction" as simply the negative of incremental ACS costs.  The Board's

17

interpretation gives separate significance to the differing language used by Congress in the inclusion and exclusion clauses of section 920(a)(4)(B), and gives effect to each word in the exclusion clause, as required by settled principles of statutory construction. The Board correctly determined that a single floor statement by the bill's sponsor cannot be used to trump the statutory language chosen by all of Congress, and properly considered the similarities and differences between debit transactions and check. Last, the Board properly took into account four specific items of cost—fixed ACS, transaction monitoring, fraud losses, and network processing fees—which it reasonably concluded, after detailed analysis, are specific to particular electronic debit transactions and therefore may be included.

## ARGUMENT

The Court must determine whether the Board's interpretation of two provisions of section 920 of EFTA was unambiguously foreclosed by Congress, or whether it is, instead, a permissible construction of the statute. As demonstrated below, in each case, the Board exercised its rulemaking authority in complete fealty to the text and the purpose of the statute notwithstanding Congressional silence on important issues.

18

This is precisely what Congress expects when it delegates rulemaking authority to federal agencies, and the Board's interpretations are entitled to deference as a result.

## I. The Board Reasonably Interpreted EFTA Section 920(b) in Formulating its Final Rule Regarding Network Exclusivity

Section 920(b)(1) of EFTA provides in relevant part as follows:

### (A)  No exclusive network

The Board shall . . . prescribe regulations providing *that an issuer or payment card network shall not* directly or through any agent . . . *restrict* the number of payment card networks on which an electronic debit transaction may be processed to—

(i) 1 such network; or

(ii) 2 or more such networks which are owned, controlled, or otherwise operated by—

(I) affiliated persons; or

(II) networks affiliated with such issuer.

### (B)  No routing restrictions

The Board shall . . . prescribe regulations providing that an issuer or payment card network shall not, directly or through any agent . . . , inhibit the ability of any person who accepts debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions.

15 U.S.C. § 1693*o*-2(b)(1) (emphases added).  Consistent with both the text of the statute and its purpose of "preserving and enhancing"

19

network competition, *see* JA 442, the Board's Rule requires issuers to enable at least two unaffiliated payment card networks on every debit card and precludes issuers or payment card networks from directing which of those networks must process a given transaction. *See* 12 C.F.R. § 235.7 and Appendix A to Part 235, Official Board Commentary ("Commentary," included in the attached Addendum of Statutes and Regulations) at cmt. 7(a)-1. Under the Board's reasonable interpretation, an issuer that enables a signature debit network and one or more unaffiliated PIN debit networks complies with the statute because the issuer has not limited debit transactions involving one of its cards to operation on a single network or on only affiliated networks. *See id.* Similarly, a payment card network complies with the statutory command so long as it does not preclude a merchant from routing a particular transaction over any of the multiple networks that must be enabled on the debit card used for the transaction. *Id.* at cmt. 7(b)(1). As a result of the Rule, additional competing networks were added to millions of debit cards, indisputably enhancing network competition. *See infra* Section I(A)(3).

The Merchants' alternative reading, which would require an inviolate guarantee that multiple payment card networks be available to merchants in all instances and for all methods of authenticating the transaction—notwithstanding choices made by the merchant or the customer—is not the best, and is certainly not the *only*, reading of the statute. Congress expressly tasked the Board with prohibiting *issuer and payment card network* restrictions and did not require the Board to further expand its regulatory purview to address restrictions imposed by other parties to a transaction. At the very least, the statute neither compels the Merchants' reading nor forecloses the Board's reading and is silent with respect to the central issue in dispute. In these circumstances, the Board's reasonable interpretation is entitled to deference.

### A. Section 920(b) Speaks to *Issuer and Network* Routing Restrictions and is Silent with Respect to Restrictions Caused by Merchants or Others

Under the familiar *Chevron* framework, "[f]irst, always, is the question whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter." *Id.* "If, however, the court determines

Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." *Id.* at 843. To the contrary, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* The presumption underlying *Chevron* is that Congress "'understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows.'" *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013) (quoting *Smiley* v. *Citibank (South Dakota), N.A.*, 517 U.S. 735, 740–41 (1996)).

Here, the precise question at issue is whether Congress specifically addressed restrictions other than those imposed by payment card networks and card issuers—in particular, restrictions imposed by merchants or consumers that limit routing choice. Although the district court held that Congress unambiguously directed that merchants be guaranteed network routing choice for each method of authentication even if their own decisions or the decisions of consumers foreclose

22

otherwise available options, *see* JA 82-91, the statutory language does not demand that interpretation, and the Board's interpretation of the statute is the better reading.

### 1. The Text of Section 920(b) Supports the Board's Reading

It is axiomatic that the statutory analysis must "begin, as always, with the text of the statute." *Wagner v. FEC*, 717 F.3d 1007, 1010 (D.C. Cir. 2013) (internal quotation omitted). Here, the text of section 920(b) clearly permits the Board's reasonable interpretation.

The central provision, section 920(b)(1)(A), states that "the Board shall . . . prescribe regulations providing that *an issuer or payment card network* shall not directly or through any agent . . . restrict the number of payment card networks on which an electronic debit transaction may be processed to— (i) 1 such network; or (ii) 2 or more such [affiliated] networks." 15 U.S.C. § 1693*o*-2(b)(1)(A) (emphasis added). "Electronic debit transaction" is defined as "a transaction in which a person uses a debit card." 15 U.S.C. § 1693*o*-2(c)(5).

In formulating the Rule, the Board read section 920(b)(1)(A) in conformance with its plain text, as proscribing only the actions of an "issuer or payment card network" that restrict the processing of an

electronic debit transaction to a single network or to only affiliated networks. JA 193-94. Because the statute also states that an electronic debit transaction is entirely dependent on the use of the debit card that enables the transaction, the Board required that at least two unaffiliated payment card networks be available for use on each debit card. As enacted in the Rule, this straightforward reading put a decisive end to the "network exclusivity" agreements at which section 920(b)(1)(A) is squarely aimed and which previously "restrict[ed] the number of payment card networks on which an electronic debit transaction may be processed" to one network or to only affiliated networks. The Board did not read the statute to provide a guarantee of merchant routing choice for each possible authentication method enabled on a debit card because the statute nowhere requires this. *Id.*

Under the Board's reasonable interpretation, the fact that a merchant only accepts signature transactions (because, for example, the merchant prefers not to invest in PIN terminals at the point of sale), or that a consumer may direct the authentication method to be used in a particular transaction by entering or declining to provide a PIN (because, for example, the consumer values the security features of PIN

24

authentication or the cardholder benefits tied to a signature network),

does not alter the statutory obligation, which applies only to issuers and

payment card networks.  *Id.*  Indeed, the statute nowhere provides that

multiple routing options must be guaranteed to merchants in every

instance, including where the merchant has itself dictated the possible

authentication methods available.  *Cf.* JA 33, Am. Compl. ¶ 93

("Depending on the type of transaction the *consumer* chooses or the

*merchant's* point-of-sales capabilities, the merchant could be limited to

only one network for processing the transaction." (emphases added)).[2]

Although the district court disagreed, concluding that "Congress

adopted the network non-exclusivity and routing provisions to ensure

that [] multiple unaffiliated routing options were available for each

debit card transaction, regardless of the method of authentication,"

JA 87, the text of the statute provides no support for that assertion. At

---

[2]Although it is undoubtedly true that many merchants prefer signature
to PIN authorization because they do not want to incur the expense of
adopting PIN technology, or because signature transactions are more
compatible with their business model, even those who strongly support
the availability of multiple routing options for each authentication
method recognize that merchants could use PIN authorization "in
virtually every setting."  Adam J. Levitin, *Cross-Routing:  PIN and
Signature Debit Interchangeability under the Durbin Amendment*,
2 Lydian J. 16, n.15 (Dec. 2010).

25

best, the district court's is one of several possible interpretations, but the Board's interpretation is also permissible and is preferred.

Moreover, taken to its logical extreme, the district court's reading suggests that even an issuer that enables multiple signature and multiple PIN networks on its debit cards would be in violation of the statutory requirement if a merchant has failed to contract with sufficient payment card networks to ensure routing choice for a particular transaction. This cannot be what Congress intended when it proscribed "issuer or payment card network" restrictions. Cf. JA 441 (Sen. Durbin commenting that "[t]his was not intended to be a 'must carry' provision whereby issuers would be required to enable their cards with all networks, but rather a restriction on the ability of networks and issuers to inhibit a merchant's ability to direct the transaction over any of the networks that the issuer has enabled the card to use.").

*(i) The "Debit Card" Definition:* The district court began by concluding that "Congress's focus was on the number of networks over which each *transaction*—as opposed to each debit card—can be processed." JA 84. Noting the Board's argument that the law is silent with respect to the effect of merchant and consumer choice, the Court

26

concluded that "Congress resolved this uncertainty . . . by using the statutorily defined term 'electronic debit transaction.'" *Id.* As noted above, the statute defines "electronic debit transaction" as "a transaction in which a person uses a debit card." 15 U.S.C. § 1693*o*-2(c)(5).

The Board agrees with the district court's reading insofar as it recognizes that the definition of "electronic debit transaction" underscores the inextricable relationship between a transaction and the debit card (and its associated payment card networks) that enables the transaction. Where the Board parts with the district court's use of the statutory definitions is its further layering of the statutory definition of "debit card" to conclude that Congress unambiguously intended that merchant routing choice must be guaranteed in all instances regardless of routing restrictions caused by merchants or consumers. As the district court noted, "debit card" is defined as "any card, or other payment code or device, issued or approved for use through a payment card network to debit an asset account (regardless of the purpose for which the account is established), whether authorization is based on signature, PIN, or other means." 15 U.S.C. § 1693*o*-2(c)(2). Based on

27

the last clause of this definition, the district court held that "[t]he plain text of the statute thus supports the conclusion that Congress intended for each transaction to be routed over at least two competing networks for each authorization method."  JA 85.

The Board disagrees.  The natural reading of the last clause of the "debit card" definition—"whether authorization is based on signature, PIN, or other means"—suggests that it was included for the precise purpose one would expect of this definition, *to define what a debit card is*.  By virtue of this clause, the statute is clear that products such as PIN-only cards and cards that may use novel authentication technologies such as biometric fingerprint scans fall under the statute's purview.  Without this clause, there may have been ambiguity in the statute as to whether such debit products were covered.

There is no indication that Congress intended this ordinary definitional provision to carry the interpretive load that the Merchants and the district court would have it bear—that is, that the inclusion of this phrase in the statutory definition of "debit card" was intended to require the radical changes in the operation of payment card networks that would result from requiring multiple networks for every type of

28

authorization to be enabled on every card.  *See Whitman v. Am.*

*Trucking Assocs.*, 531 U.S. 457, 468 (2001) (Congress "does not alter the

fundamental details of a regulatory scheme in vague terms or ancillary

provisions—it does not, one might say, hide elephants in mouseholes.").

And, even if the Merchants and the district court have identified one

*possible* interpretation of the statute, it is certainly not the *only*

interpretation, and in these circumstances *Chevron* requires the

reviewing court "to accept the agency's construction of the statute, even

if the agency's reading differs from what the court believes is the best

statutory interpretation."  *Nat'l Cable & Telecomm. Ass'n v. Brand X*

*Internet Servs.*, 545 U.S. 967, 980 (2005).  The agency's construction

"governs if it is a reasonable interpretation of the statute—not

necessarily the only possible interpretation, nor even the interpretation

deemed most reasonable by the courts."  *Entergy Corp. v. Riverkeeper,*

556 U.S. 208, 218 (2008).

> *(ii)  Consistency/Surplusage:*  The Board's interpretation is

also entirely consistent with section 920(b)(1)(B), which requires the

Board to prohibit issuers and payment card networks from "inhibit[ing]

the ability of any person who accepts debit cards for payments to direct

the routing of electronic debit transactions for processing over any payment card network that may process such transactions." 15 U.S.C. § 1693*o*-2(b)(1)(B). The district court concluded that this provision "makes sense only if merchants have a *choice* between multiple networks," JA 89, a choice that the district court believed the Rule denied them. To the contrary, the Board's Rule specifically prohibits the practices this section addresses and effectively enhances competition as a result.

Many debit cards are enabled with multiple PIN networks (more so in light of the Rule, as discussed in Section I(A)(3) below) and, prior to the Board's regulation implementing section 920(b)(1)(B), "network rules typically allow[ed] issuers to specify routing priorities among the networks enabled on their cards" without regard to the merchant's preference. JA 192. As a result of the Rule, such routing priorities are now expressly prohibited. 12 C.F.R. § 235.7(b); *see also* Commentary at cmt. 7(b)-2 (providing examples of prohibited issuer or network practices regarding routing). Moreover, the Rule also precludes issuer or network practices that prevent merchants from "steering" consumers to one authentication method over another, by, for example,

"encouraging or discouraging a cardholder's use of a particular method of debit card authorization." *Id.*[3] These provisions offer significant protections to merchants and lead to neither internal inconsistency nor absurd results. The district court's conclusion regarding consistency and surplusage is therefore plainly erroneous and only serves to underscore its fundamentally flawed interpretation of the statute.

### 2. A Single Remark of Senator Durbin is Insufficient to Establish Congressional Intent

Without a convincing textual basis on which to rely, the Merchants successfully urged the district court to give particular weight to a floor statement made by the original sponsor of section 920, Senator Richard J. Durbin. In his floor statement to his Senate colleagues,[4] Senator Durbin remarked that section 920(b)(1) "is intended to enable each and every debit card transaction—no matter

---

[3] Steering customers to one authentication method over another—for example, by prompting a consumer to enter his or her PIN rather than signature at the point of sale—is an important way in which merchants facilitate competition between PIN and signature networks. *See, e.g.*, Fumiko Hayashi, Richard J. Sullivan, and Stuart E. Weiner, *A Guide to the ATM and Debit Card Industry: 2006 Update*, Federal Reserve Bank of Kansas City, 17 (2006), *available at* http://www.kc.frb.org/publicat/psr/BksJournArticles/ATMDebitUpdate.pdf.

[4] No similar statements were made in the House of Representatives, which had no floor debate on this provision of Dodd-Frank.

whether that transaction is authorized by signature, PIN, or
otherwise—to be run over at least two unaffiliated networks, and the
Board's regulations should ensure that that networks or issuers do not
try to evade the intent of this amendment by having cards that may run
on only two unaffiliated networks where one of those networks is
limited and cannot be used for many types of transactions."  156 Cong.
Rec. S5926 (daily ed. July 15, 2010).  The district court seized upon a
portion of this statement as conclusive proof that "*Congress* wanted
subsection (b)(1)(A) to ensure the availability of at least two competing
networks for each method of cardholder authentication," JA 86-87
(emphasis added), but the statement cannot bear the interpretive
weight that the district court would place upon it.

   We begin with the Supreme Court's admonition that "the views of
a single legislator, even a bill's sponsor, are not controlling." *Mims v.*
*Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 752 (2012); *see also Mingo*
*Logan Coal Co. v. EPA*, 714 F.3d 608, 616 (D.C. Cir. 2013) (quoting
*Mims*); *accord* 2A Sutherland Statutory Construction § 48:15 (7th ed.
2011) ("[s]tatements by sponsors must be evaluated cautiously").
Indeed, "[w]hile a sponsor's statements may reveal *his* understanding

32

and intentions, they hardly provide definitive insights into *Congress'* understanding of the meaning of a particular provision. . . . [M]embers of Congress, in voting on a measure, must be presumed to have relied on the meaning of the words read in context on a printed page. Moreover, a statute's sponsor may well be pursuing a political agenda in his floor discussion that judges are ill-equipped to detect." *Overseas Educ. Ass'n, Inc. v. FLRA*, 876 F.2d 960, 975 and n.39 (D.C. Cir. 1989) (emphases in original); *accord Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 665 (D.C. Cir. 2009) (declining to cabin agency discretion based on statements of legislative sponsor because "the principal concern of one congressman helps little in locating the limits of the language chosen by all members of both houses").

Moreover, even if this particular statement is read as supportive of the Merchants' position, Senator Durbin's statements as a whole are far less conclusive. In fact, Senator Durbin described the entirety of section 920(b) by explaining "[a]ll these provisions say is that Federal law now blocks payment card networks from engaging in certain specific enumerated anti-competitive practices, and the provisions describe precisely the boundaries over which payment card networks

33

cannot cross with respect to these specific practices." 156 Cong. Rec. S5926 (daily ed. July 15, 2010). This simple and reassuring description of section 920(b) cannot be squared with an interpretation of the language that requires sweeping revisions to the infrastructure and business model of large segments of the debit card industry.

In addition, in his comment letter to the Board in response to the NPRM, Senator Durbin discussed but took no position with respect to the two alternatives proposed by the Board, including the alternative ultimately selected providing that one signature network and at least one unaffiliated PIN network satisfies the statutory requirement. JA 440-42. Although not itself a tool of statutory construction, *see Bruesewitz v. Wyeth LLC*, 131 S. Ct. 1068, 1081 (2011), the comment letter serves to underscore the inherent unreliability of Senator Durbin's floor statement as evidence of the intent of both houses of Congress. Further underscoring the point is the comment letter of Congressman Gregory W. Meeks, who wrote that, "as one of the chief negotiators on this issue during the Dodd-Frank conference committee, I consider the proposal [favored by Merchants] *to be inconsistent with*

34

*the intent of the final legislation*. . . . I urge the Board to not overreach on these issues and to follow congressional intent."[5]

Finally, the legislative history of section 920 suggests that Congress did not demand as sweeping changes as the district court concluded were required. Indeed, Congress considered but ultimately rejected measures initially proposed by Senator Durbin that would have directed the Board to cap payment card network fees (along with the interchange fees paid to issuers discussed in Section II below) rather than the ultimate compromise measure that was enacted to "preserve and enhance" network competition in the hope that this would stabilize and perhaps reduce network fees. *See* 156 Cong. Rec. S3703 (daily ed. May 13, 2010). At the time of his proposal to cap network fees, Senator Durbin stated "I know this is a complex and in some ways a controversial amendment," *id.* at S3705, which would prove accurate in light of the fact that the House of Representatives' version of the bill did not address the issue. *See* H.R. 4,173, 111th Cong. (2009). In conference, a compromise was reached that excluded direct regulation

---

[5] *Available at* http://www.federalreserve.gov/SECRS/2011/February/20110228/R-1404/R-1404_022211_67476_559260342101_1.pdf (emphasis added).

of network fees based on cost and opted instead for the less intrusive regulatory hand reflected in section 920(b) as enacted.  *See* H.R. Conf. Rep. No. 111-517, at 704-11 (2010).

In the final analysis, given this contentious background, the Board could not have been expected to interpret the ambiguous compromise language of section 920(b) based on, and in strict conformity with, a single remark made by Senator Durbin on the Senate floor.  *See Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB*, 814 F.2d 697, 717 (D.C. Cir. 1987) (Buckley, J. concurring) (noting that use of fragmentary legislative history to determine Congressional intent has encouraged legislators to "salt the legislative record with unilateral interpretations of statutory provisions they were unable to persuade their colleagues to accept").

### 3. The Board's Reading of Section 920(b) Indisputably Advances the Statutory Purpose

In ruling that the Rule served to either "restrict [merchant] choice" or "preserve the status quo," such that it "not only fails to carry out Congress's intention; it effectively countermands it!," JA 86-87, the district court revealed its fundamental misunderstanding regarding the actual effect of the Rule.

The Merchants and Senator Durbin agree that section 920(b) was enacted for the purpose of "preserving and enhancing competition and choice in the debit system." JA 442. By requiring substantial diversification of the networks available to process electronic debit transactions, the Rule does just that. Indeed, as an expert analysis commissioned by merchants points out, nearly half of all debit cards in circulation—*well over 100 million*—permitted routing exclusively over Visa-affiliated networks (i.e., Visa signature debit and Visa-owned Interlink PIN debit) prior to the implementation of the Rule. JA 307. As a result of the Rule, however, those 100 million cards and all others in circulation are no longer subject to the exclusivity agreements that gave rise to this situation, *see id.*, and must now be enabled with at least two unaffiliated networks.[6]

Additionally, for the significant number of debit cards that employed only a single authentication method, the Rule now requires

---

[6] The impact on marketplace competition has been substantial. *See, e.g.*, Victoria Finkle, *Down, But Not Out: Visa Tries to Claw Back PIN Debit Business*, American Banker, August 10, 2012 ("Analysts estimate that [Visa], which had previously accounted for approximately 50-60% of the market, lost roughly half that share" as result of the Rule's prohibition against its "debit contracts with issuers that included exclusive use of both its signature and PIN debit networks.").

that at least two unaffiliated networks be made available.  *See id*. n.21

(noting prior to the Rule that "roughly 13% of debit cards [were] PIN

only and another 7% [were] signature only").  And, as the Board has

noted, under the Rule, merchants accepting PIN debit "have routing

choice with respect to PIN debit transactions in many cases where an

issuer chooses to participate in multiple PIN debit networks."  JA 194.

Finally, because the Rule also fully implements the section 920(b)(1)(B)

requirement that issuers and payment card networks not "inhibit the

ability of any person who accepts debit cards for payments to direct the

routing of electronic debit transactions for processing over any payment

card network that may process such transactions," merchants' routing

preferences among available networks and ability to "steer"

transactions toward particular authentication methods are now

protected against contrary issuer or network rules.  *See* Commentary at

cmt. 7(b)-2 (providing examples of practices prohibited by the Rule).

These facts irrefutably demonstrate that network competition and

choice have been both preserved and enhanced by the Rule in absolute

accord with the statutory purpose.

## B. The Board's Reasonable Interpretation of Section 920(b) is Entitled to Deference

It is well established that "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion" and that "[f]illing these gaps . . . involves difficult policy choices that agencies are better equipped to make than courts." *Brand X Internet Servs.*, 545 U.S. at 980.[7]  It is also well established that the second step of the *Chevron* analysis, to which courts must turn in the face of statutory ambiguity, is "'highly deferential'" to the agency.  *Cablevision Sys. v. FCC*, 649 F.3d 695, 709 (D.C. Cir. 2011) (quoting *NRA v. Reno*, 216 F.3d 122, 137 (D.C. Cir. 2000)).  As demonstrated above, section 920(b) is ambiguous in that it does not address the precise question at issue here.  Congress thereby entrusted the task of filling the statutory gap to the Board and the

---

[7] The policy issues weighed by the Board in addressing the statutory gap—including the potential for the Merchants' proposal to negatively affect consumers through consumer confusion and the potential loss of benefits tied to a particular network and to impede the development of promising new fraud-reducing authentication technologies such as biometric fingerprint scans—were substantial.  *See* JA 193-94; *see also* JA 441 (Sen. Durbin noting that "a key goal of the overall amendment is to incentivize the use of better authorization and authentication technologies than the current signature debit system").

Board's reasonable interpretation of the statute must trump the

alternative reading preferred by the Merchants and the district court.

## II. The Board Properly Interpreted EFTA Section 920(a) in Formulating a Standard for Assessing Whether Interchange Fees are Reasonable and Proportional to Cost

The second provision at issue in this appeal is the standard for

reasonable and proportional interchange fees codified at 12 C.F.R.

§ 235.3(b).  The Board's touchstone in promulgating the fee standard

was the broad mandate of sections 920(a)(2) and (a)(3)(A).  These

sections provide, in relevant part:

> **(2) Reasonable interchange transaction fees**
>
> The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction.
>
> **(3) Rulemaking required**
>
> **(A) In general**
>
> The Board shall prescribe regulations . . . to establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction.
>
> \*    \*    \*
>
> **(4) Considerations; consultation**
>
> In prescribing regulations under paragraph (3)(A), the Board shall—
>
> \*    \*    \*

40

(B) distinguish between—

    (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and

    (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2).

15 U.S.C. § 1693*o*-2(a).

It cannot be not disputed that the standards prescribed by the Board under section 920(a) for assessing reasonable and proportional interchange fees must be based on "the cost incurred by the issuer with respect to the [debit card] transaction," a standard that Congress repeated twice. *Id.* at § 1693*o*-2(a)(2), (a)(3)(A). With respect to the language of section 920(a) addressing the kinds of such costs that may be included in setting such a fee standard, the Board found that it (1) must consider including the incremental costs of an issuer for the authorization, clearance, and settlement (ACS) of a particular transaction, in accordance with section 920(a)(4)(B)(i); (2) must exclude other costs if they are not specific to a particular transaction, in accordance with section 920(a)(4)(B)(ii); and (3) may, but is not required to, include costs other than incremental ACS costs if they are specific to

41

a particular transaction—that is, costs that fit into neither of the above categories. JA 170, 172.

Following this interpretation, in setting the standard for reasonable and proportional interchange fees in the Final Rule, the Board considered all costs incurred by the issuer for ACS of particular transactions for which it had data. JA 173. Therefore, the Board necessarily included incremental ACS costs that it was required to consider. The Board determined that other ACS costs, including fixed and variable costs, were specific to a particular transaction and could permissibly be included, because no particular transaction could be effected without incurring those costs. The Board also included certain other types of issuer costs that the Board found are specific to a particular transaction, in particular, issuer costs of monitoring specific debit card transactions to determine whether the transactions met applicable requirements; costs of losses incurred by the issuer on specific debit card transactions caused by fraud; and fees issuers pay to a network for the network to process specific transactions.

These determinations are fully consistent with the statutory text and congressional intent, reasonable, and amply supported by the

42

record, and should be upheld.  The district court erred in concluding

that section 920(a)(4) unambiguously limits the Board's consideration in

establishing interchange fee standards to incremental ACS and

forecloses the Board's construction of the statute.

## A. Sections 920(a)(2) and (a)(3)(A) Vest Broad Discretion in the Board to Promulgate a Standard for Reasonable and Proportional Fees

An agency's authority to fill gaps is particularly wide-ranging

when accompanied by a broad grant of Congressional authority "to

achieve a particular objective," such as the Board's mandate to establish

standards for assessing interchange fees that are reasonable and

proportional to issuers' transaction costs.  *Cablevision Sys.*, 649 F.3d at

707; *see also Consumer Elecs. Ass'n v. FCC,* 347 F.3d 291, 299 (D.C. Cir.

2003) (Congress's "use of broad language . . . to solve [a] relatively

specific problem . . . militates strongly in favor of giving [a statute]

broad application").

EFTA sections 920(a)(2) and (a)(3)(A) reflect just such a broad

grant of authority to the Board to achieve reasonable and proportional

fees.  To determine whether fees are reasonable and proportional,

Congress easily could have directed the Board to consider a single factor

43

or set of factors.  It did not do so, but rather required the Board to promulgate regulations establishing "standards" for assessing whether fees were "reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C. § 1693*o*-2(a)(3)(A).  In so doing, Congress vested broad discretion in the Board to act as an arbiter in determining reasonable and proportional fees, and provided only limited guidance regarding factors the Board should consider. Indeed, in mandating in section 920(a)(3)(A) that the Board "prescribe regulations," Congress refers back to section 920(a)(2)'s touchstone that fees be "reasonable" and "proportional" to issuers' transactional costs, and not to the specific requirement in section 920(a)(4)(B) that the Board "distinguish between" costs to consider and prohibited costs. Moreover, neither the terms "reasonable" or "proportional," nor the phrase "costs incurred by the issuer with respect to the transaction" is defined, vesting discretion in the Board to fill those gaps.  *Mayo Found. for Med. Educ. and Research v. United States*, 131 S. Ct. 704, 711 (2011) (statute ambiguous where it failed to define a key term); *Chevron,* 467 U.S. at 843 (same); *Catawba County v. EPA,* 571 F.3d 20, 35 (D.C. Cir.

44

2009) (failure to define key terms "suggest[s] a congressional intent to leave unanswered questions to an agency's discretion and expertise").

The Board's Rule adopts a standard that gives meaning to these terms:  it considers all transactional costs other than those that are prohibited, and creates a cap that separates a reasonable fee from an unreasonable one, and that is set by reference to issuers' allowable costs—thereby making the fee proportional to costs.  JA 169.  By giving effect to all of these terms, the Board implemented the statutory mandate of sections 920(a)(2) and (a)(3)(A).  *Am. Fed'n of Gov't Emps. v. Gates*, 486 F.3d 1316, 1323 (D.C. Cir. 2007) (a reading of the statute that gives "each phrase independent meaning" is favored).

By contrast, rather than giving separate significance to the mandate of transactional costs incurred by the issuer as the test for including costs, the district court focused almost exclusively on the required and prohibited cost considerations in section 920(a)(4)(B). JA 64-82.  The district court viewed the Board's task as mechanically sifting costs into one of these two buckets.  But this approach fails to give separate significance to the overall mandate of reasonableness and proportionality to incurred transactional costs reflected in sections

45

920(a)(2) and (a)(3)(A), and thus reads these important provisions out of the statute in contravention of well-settled tenets of statutory construction. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("we are 'reluctant to treat statutory terms as surplusage in any setting'") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). The Board's result, which gives meaning to these terms, is favored and entitled to *Chevron* deference.

### B. In Setting the Reasonable and Proportional Standard, the Board Correctly Interpreted Section 920(a)(4)(B) as Permitting Consideration of Costs in Addition to Incremental ACS That are Not Prohibited by Section 920(a)(4)(B)(ii)

#### 1. The Board's Reading Follows from Basic Principles of Statutory Construction

*(i) Non-Interlocking Language:* Section 920(a)(4)(B) provides guidance to the Board in establishing a standard for assessing whether fees are reasonable and proportional to cost by directing the Board to consider some costs and forbidding it from considering others. The two groups of costs, though, do not define the universe of potential costs incurred by issuers with respect to electronic debit transactions, as shown by the non-interlocking language Congress chose to describe the two sets of costs.

46

Specifically, the statute requires the Board to consider "the

incremental cost incurred by the issuer for the role of the issuer in the

authorization, clearance, or settlement of a particular electronic debit

transaction . . . ." 15 U.S.C. § 1693*o*-2(a)(4)(B)(i). However, the

counterpart provision, identifying those costs "which . . . shall not be

considered," expressly employs different language: "other costs

incurred by an issuer which are not specific to a particular electronic

debit transaction . . . ." *Id.* § 1693*o*-2(a)(4)(B)(ii). Under ordinary rules

of statutory construction, it is presumed that Congress's use of different

words in the prohibited costs clause means that Congress intended a

different meaning than in the preceding clause. *Russello v. United

States,* 464 U.S. 16, 23 (1983) ("'[Where] Congress includes particular

language in one section of a statute but omits it in another section of

the same Act, it is generally presumed that Congress acts intentionally

and purposely in the disparate inclusion or exclusion.'") (internal

citations omitted); *accord Burlington N. & Santa Fe Ry. Co. v. White,*

548 U.S. 53, 63 (2006) (same). This is precisely the meaning the Board

attributed to the statute, stating "the requirement that one set of costs

be considered and another set of costs be excluded suggests that

47

Congress left to the [Board] discretion to consider costs that fall into neither category to the extent necessary and appropriate to fulfill the purposes of the statute." JA 172.

Had Congress meant that the *only* costs that could be considered in determining what was "reasonable" and "proportional" were the "incremental" costs identified in section 920(a)(4)(B)(i), as the district court concluded, there are any number of ways it could have said so: It could have written section 920(a)(4)(B)(ii) as simply excluding "all other costs"; it could have written section 920(a)(4)(B)(i) to say "consider *only* the incremental cost incurred" for authorization, clearance, or settlement and eliminated section 920(a)(4)(B)(ii) altogether; it could have provided in sections 920(a)(2) and (a)(3)(A) that issuers were limited to costs that were "reasonable and proportional to the incremental cost incurred by the issuer in authorization, clearance, or settlement of a transaction"; or it could have used interlocking language by stating that the Board must consider incremental ACS but may not consider any cost that is not incremental ACS, to name just a few obvious possibilities.

48

Congress chose none of these options, however, and instead described the costs the Board may not consider using different language than that used to describe costs the Board must consider.  In so doing, Congress necessarily created a statutory gap that is within the Board's discretion to fill.  *Entergy Corp.,* 556 U.S. at 222 ("[i]t is eminently reasonable to conclude that [the statute's] silence is meant to convey nothing more than a refusal to tie the agency's hands"); *Catawba County*, 571 F.3d at 36 ("we have consistently recognized that a congressional mandate in one section and silence in another often 'suggests not a prohibition but simply a decision not to mandate any solution in the second context, *i.e.*, to leave the question to agency discretion'" (internal citation omitted)).  The Board consistently recognized the existence of this statutory gap in the NPRM as well as in the Rule.  *See supra* pp. 11-12.

Here, the Board properly exercised the discretion conferred on it by statute by taking into account non-prohibited costs in addition to incremental ACS as reasonable and appropriate to set the required standard.  JA 172.  An example of this kind of cost is the equipment, hardware, software and associated labor involved in transaction

processing.  JA 175-76.  "Each transaction uses the equipment,
hardware, software and associated labor, and no particular transaction
can occur without incurring these costs."  JA 176.  Yet they may not be
incremental ACS costs, depending upon how "incremental" is defined.
*See* JA 173.  Congress does not specifically instruct the Board on how
these costs should be considered, nor did it prohibit their consideration.
Rather, the statute is silent, leaving to the Board's sound discretion
whether and how to treat this significant third category of costs in
seeking to meet the overall goal of ensuring that interchange fees are
"reasonable and proportional" to the issuer's cost.

*(ii)    The "Which" Clause:*  In addition to using non-interlocking
language, Congress's use of the phrase "which are not specific to a
particular electronic debit transaction" in section 920(a)(4)(B)(ii)
necessarily restricts the meaning of "other costs incurred by the issuer"
to non-transaction specific costs, as the Board found.  JA 172.  The
"which" clause is not simply descriptive, as the district court believed.
JA 66.

Using ordinary principles of statutory construction, the phrase
"other costs which are not specific to a particular electronic debit

50

transaction," § 1693*o*-2(a)(4)(B)(ii), cannot mean the same thing as "other costs."  JA 66.  Had Congress intended "which are not specific to a particular electronic debit transaction" to be merely descriptive, it would have set the "which" clause off with a comma or parentheses.  *See* H.W. Fowler, *A Dictionary of Modern English Usage* 698 (2d ed. 1965) ("A comma preceding *which* shows that the *which*-clause is non-defining, and the absence of such a comma shows that it is defining."); William Strunk Jr. and E.B. White, *The Elements of Style* 4 (4th ed. 2000) ("[r]estrictive clauses, by contrast [to non-restrictive clauses], are not parenthetic and are not set off by commas"); *accord The Chicago Manual of Style* 314 (16th ed. 2010) (same); *see also Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (in the statutory phrase "any other kind of substantial gainful work which exists in the national economy," the "which" phrase qualifies "substantial gainful work"); *United States v. Pritchett,* 470 F.2d 455, 459 (D.C. Cir. 1972) (interpreting the statutory phrase "while on duty," which was not set off by commas, to modify the immediately preceding phrase).

Where a "reading is . . . mandated by the grammatical structure of the statute," it is the duty of the court to give effect to the statute as

written. *United States v. Ron Pair Enters.,* 489 U.S. 235, 241 (1989).

Here the district court did the opposite, reading "[t]he non-restrictive

pronoun 'which' [in section 920(a)(4)(B)(ii) as] a descriptor, rather than

a qualifier . . . ." JA 66. Not only is the district court's reading contrary

to the grammatical structure, as shown above, but it renders the phrase

"which are not specific to a particular electronic debit transaction"

surplusage. Under the district court's interpretation, section

920(a)(4)(B)(ii) is read to mean "all other costs incurred by the issuer

that are not incremental ACS," or simply "other costs," and the court

ascribes no particular meaning to the phrase "which are not specific to a

particular electronic debit transaction." JA 66-67. This analysis

ignores another accepted precept of statutory construction: every word

in a statute is presumed to have meaning and is not mere surplusage.

*TRW*, 534 U.S. at 31; *Duncan*, 533 U.S. at 174; *United States v.*

*Menasche*, 348 U.S. 528, 538 (1955).

By contrast, the Board's reading gives effect to section 920(a)(4)(B)

as well as to the other provisions of section 920(a). As explained above,

the Board was focused, as required by Congress, on establishing a

standard that would be "reasonable" and "proportional" to the issuer's

52

cost incurred with respect to electronic debit transactions.  Section

920(a)(2), (3)(A).  If the Board considered *only* incremental ACS costs

covered in section 920(a)(4)(B)(i), the Board would be unable to fulfill

that mandate if issuers incurred costs with respect to electronic debit

transactions that were specific to a particular transaction (and thus not

prohibited from consideration under section 920(a)(4)(B)(ii)) but that

were also not incremental ACS costs.

Indeed, as the Board found, there are costs that fall within neither

of these categories.  As an example, fraud losses and costs incurred in

processing charge-backs are clearly costs that are specific to particular

transactions, because they are costs that would not occur but for the

particular transaction being reversed or refunded, and thus these

charges are not prohibited from consideration under section

920(a)(4)(B)(ii).  However, they are not an "incremental cost" incurred

by the issuer *for its role in* ACS, as required for mandatory

consideration under section 920(a)(4)(B)(i).  The Board reasonably

interpreted the statute to permit it to consider these costs in

establishing an interchange fee standard that is "reasonable" and

"proportional" to the issuer's overall cost incurred in electronic debit

transactions, as it was required to do under section 920(a)(3)(A).

JA 176, 177.

Moreover, the Board's approach ensures that it will comply with Congress's mandate in section 920(a)(4)(B)(i) to consider, at a minimum, incremental ACS costs. As discussed in the NPRM and the Rule, JA 111-10 and 172-73, there is no single accepted definition of "incremental," and neither that term nor ACS are defined in the statute, leaving interpretation of those terms to the Board's sound discretion. *Mayo Foundation*, 131 S. Ct. at 711; *Catawba County,* 571 F.3d at 35. By permitting consideration of all costs incurred in the course of effecting some electronic debit transaction, and, in particular, by considering fixed as well as variable ACS, the Board complied with Congress's mandate to consider, at a minimum, incremental ACS costs. JA 173. Accordingly, the Board correctly interpreted the statutory exclusion of section 920(a)(4)(B)(ii).

## 2. The District Court's Misreading of the Statute Undermines Its Interpretation

The district court pointed to two statutory provisions that it said supported its "reading of the statute": the directive to consider the "functional similarity" between electronic debit transactions and checks

54

which clear at par, section 920(a)(4)(A) and the information collection and disclosure provision, section 920(a)(3).  JA 70.  In each case, the court's analysis was flawed, and neither of these sections demands a reading that limits the Board's consideration of costs to incremental ACS, as the district court held.[8]

In arriving at the standard for reasonable and proportional fees, the Board considered, as it was required to do by section 920(a)(4)(A), the "functional similarity" with "checking transactions that are required within the Federal Reserve system to clear at par."  JA 144-47.  The Board reasonably concluded that it may take into account not only similarities, but also differences, between checking and electronic debit transactions because similarities "can be understood only by considering the differences between them as well."  JA 147.  Congress also plainly understood that there were significant differences between debit and check, because it permitted issuers to receive an interchange fee that is "reasonable and proportional" to the issuer's cost incurred in the transaction, a reimbursement that is not part of the check clearance system.

---

[8] A third statutory provision cited by the district court, section 920(a)(5)(A)(i), is discussed below at pp. 65-66.

The Board considered such similarities and differences, along with section 920(a)(4)(B) cost considerations, in deciding whether to include or exclude specific items of cost from the reasonable and proportional standard. *See, e.g.*, JA 174 (excluding costs of debit card production and delivery, marketing, R&D and compliance, among other reasons, because "analogous costs incurred by a payor's bank for its check service are not reimbursed by the payee's bank"); JA 175 (excluding customer inquiry costs in part because "[p]ayor's banks . . . do not receive reimbursement for these costs from the payee's bank."); JA 176 (including network processing fees, among other reasons, because "such an arrangement would be similar to traditional paper-check processing"). Thus, the Board fully complied with the requirements in section 920(a)(4)(A) that it consider the similarity to check.

The district court criticized this analysis, saying that it "defies common sense to read an explicit directive to consider 'functional similarity' as an authorization to consider *differences* as well." JA 72. But this criticism is misplaced, as this Court has repeatedly noted its "reluctance to infer from congressional silence an intention to preclude the agency from considering factors other than those listed in a statute."

56

*Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 78 (D.C. Cir. 2000) (citing *George E. Warren Corp. v. EPA,* 159 F.3d 616, 624 (D.C. Cir. 1998).

With respect to section 920(a)(3)(B), which authorizes the Board to collect any information it considers necessary to carry out the provisions of section 920(a) and requires periodic disclosure of aggregate ACS cost information, 15 U.S.C. § 1693o-2(a)(3)(B), the district court's reading is simply incorrect. In citing this provision as support for its reading of the statute that Congress intended to limit the Board's cost considerations to incremental ACS, the court wrongly read section 920(a)(3)(B) to be "limited to the same costs specified in subsection (a)(4)(B)(i)." JA 70 and n.32. But section 920(a)(3)(B) is not so limited. Instead, it permits the Board to collect from networks and issuers *any* "information as may be necessary to carry out the provisions" of subsection (a), and requires the Board to periodically disclose "such aggregate or summary information concerning the costs incurred . . . by issuers or payment card networks in connection with the authorization, clearance or settlement of electronic debit transactions as the Board considers appropriate and in the public interest." 15 U.S.C. § 1693o-

57

2(a)(3)(B). Nothing in the section limits the Board to collecting information about ACS, much less "incremental" ACS, as the district court mistakenly concluded, and the section supports the Board's reading that it may take into account non-prohibited costs in addition to incremental ACS.

### 3. The District Court Erred by Giving Controlling Weight to a July 15, 2010 Floor Statement of the Bill's Sponsor, Which is Contrary to the Statutory Language

In light of the express terminology used in section 920(a) relating to the Board's obligations in setting standards for interchange fees, the district court erred in giving controlling weight to a July 15, 2010 floor statement by Senator Durbin. JA 67-68. The district court held that the floor statement "confirm[ed] that Congress intended to bifurcate the universe of costs" into two categories, "incremental ACS costs" and "all other costs," JA 67, and rejected the Board's reasonable position "that the actual language of the statute overrides any floor statement by the bill's sponsor." JA 68; *cf. Ron Pair*, 489 U.S. at 242 ("[t]he plain meaning of legislation should be conclusive").

In contrast to the language adopted by Congress, which requires the Board to consider incremental ACS costs but not "*other costs*

58

*incurred by an issuer which are not specific to a particular electronic debit transaction*," 15 U.S.C. § 1693*o*-2(a)(4)(B)(ii) (emphasis added), Senator Durbin describes the cost considerations as "'the incremental cost incurred by the issuer for its role in the authorization, clearance, or settlement of a particular electronic debit transaction, *as opposed to other costs incurred by an issuer which are not specific to the authorization, clearance, or settlement of a particular electronic debit transaction.*'" JA 67 (quoting 156 Cong. Rec. S5925 (daily ed. July 15, 2010)) (emphasis in district court opinion). Thus, rather than summarize or restate the language actually used in the legislation, he describes the cost provisions using language different from the statutory text. Because it is contrary to the language enacted by Congress, and would therefore change the meaning of the statute, the district court erred in assigning controlling weight to the floor statement.

As discussed above, a single floor statement, even that of the bill's sponsor, is not controlling in discerning the meaning of statutory text. *See Mims*, 132 S. Ct. at 752 ("the views of a single legislator, even a bill's sponsor, are not controlling"); *see also Oncale v. Sundowner*

59

*Offshore Servs.*, 523 U.S. 75, 79 (1998) ("it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed"); *Nat'l Cable*, 567 F.3d at 665; *Overseas Educ. Ass'n,* 876 F.2d at 975 ("[f]ar less reliable, as sources of statutory meaning, are remarks made during floor debate").

Moreover, as this Court has explained, legislative history is only rarely used to narrow a broad statutory delegation of authority to an agency. *Consumer Elecs.*, 347 F.3d at 298 ("only rarely have we relied on legislative history to constrict the otherwise broad application of a statute indicated by its text"). As the Court explained, "'while such history can be used to clarify congressional intent even when a statute is superficially unambiguous, the bar is high.'" *Id.* (internal citation omitted). This is because "the Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application." *Id.*

Here, Congress's broad mandate to establish a standard for interchange fees that are "reasonable" and "proportional" to cost, *see supra* pp. 43-46, militates against reading the floor statement to constrain the Board's discretion, as the district court did. As in

60

*Consumer Electronics,* this is not the "very rare situation where the legislative history of a statute is more probative of congressional intent than the plain text." 347 F.3d at 298.

In the case relied upon by the district court in which this Court read the legislative history, in tandem with the text, to unambiguously foreclose an agency's interpretation, the legislative history was far more robust than a single floor statement. *See* JA 68 (citing *Aid Association for Lutherans v. U.S. Postal Service*, 321 F.3d 1166, 1176-78 (D.C. Cir. 2003) (quoting from two Senate Committee reports that confirmed the court's reading of the statutory text, and also holding that the agency's reading "leads to an absurd result.")); *cf. NRDC v. EPA,* 706 F.3d 428, 437 (D.C. Cir. 2013) (finding cited legislative history "unpersuasive" where agency relies on "a single congressman's statement"). Here, by contrast, there are no descriptive committee reports, but only a single floor statement suggesting that the universe of costs is bifurcated in language that differs importantly from the statutory text.

Finally, the legislative history does not one-sidedly support the district court's view, but also supports the Board's construction that it has discretion to consider non-prohibited costs in addition to

61

incremental ACS.  Senator Durbin himself repeatedly indicated his understanding that the Board would have the authority to establish a reasonable interchange fee.  *See* 156 Cong. Rec. S3589 (daily ed. May 12, 2010) (statement of Sen. Durbin) ("What we are asking for is to have an arbiter—in this case the Federal Reserve—determine whether the interchange fees, particularly for debit cards, are reasonable and proportional.").  In a May 13, 2010 floor statement, Senator Durbin reiterated "[t]he amendment requires that debit card interchange fees be reasonable and proportional.  I do not pick a number.  I do not set a fee.  We want to make sure they are proportional and reasonable to the cost incurred in processing the transaction."  156 Cong. Rec. S3696 (daily ed. May 13, 2010).  Later the same day, Senator Durbin stated "[t]his amendment . . . directs the Federal Reserve to ensure that debit fees on debit cards are reasonable and proportional to processing costs . . . .  We do not establish a rate.  That is left entirely to the Federal Reserve to review."  156 Cong. Rec. S3704 (daily ed. May 13, 2010).  Senator Durbin's statements support the Board's view that Congress delegated substantial gap-filling authority to the Board.

62

### 4. The Board Properly Included Four Specific Items of Cost Which are Integral to ACS and Not Prohibited by Section 920(a)(4)(B)(ii)

Finally, as shown below, the Board properly considered four specific cost items challenged by the Merchants in arriving at a standard for reasonable and proportional interchange fees. As shown, all four—fixed ACS costs, transaction monitoring, fraud losses, and network processing fees—are costs incurred by the issuer with respect to electronic debit transactions, and are specific to particular electronic debit transactions and therefore not prohibited by section 920(a)(4)(B)(ii). The district court misconstrued the statute in holding that these four cost items should have been excluded. JA 77-82.

*(i) Fixed ACS Costs*: In setting the standard, the Board considered—and included—issuer costs related to the authorization, clearance, and settlement of a transaction, including both fixed and variable ACS costs. JA 150 and 175. For the reasons described, *supra,* pp. 42, 53-54, the Board reasonably concluded that the statute does not prohibit consideration of fixed ACS costs, which are specific to a particular electronic debit transaction, and without which no electronic debit transaction could occur. JA 173. As described, by taking into

63

account both fixed and variable ACS costs, the Board concluded that it was necessarily considering incremental ACS costs as required by section 920(a)(4)(B)(i). *Id.*

The district court took issue with the Board's interpretation, finding that the term "incremental" in section 920(a)(4)(B)(i) "limits includable costs to 'variable, as opposed to fixed,' ACS costs." JA 68; *see also* JA 76-78 (same). But the district court's insistence that the Board's consideration must be limited to "variable" ACS costs was just another way of saying that the Board is limited to considering only those costs encompassed within section 920(a)(4)(B)(i). *Id.* This interpretation is wrong for the reasons described, *supra,* pp. 46-54.

*(ii)   Transaction Monitoring*: Second, as described in the Rule, the Board properly included transaction monitoring costs. These costs are an integral part of the authorization of specific electronic debit transactions. The issuer, as part of the authorization decision, confirms that a debit card is valid and authenticates the cardholder before a particular transaction is authorized. JA 176-77. As part of this process, the issuer may use programs that monitor transactions in order to assist in the authorization process by providing information to the

issuer before the issuer decides to approve or decline the transaction. These programs could include neural networks and fraud-risk scoring systems. While these transaction monitoring activities inherently include a fraud prevention component, they are part and parcel of the authorization process.

The district court failed to understand that transaction monitoring is an important component of authorization, finding that transaction monitoring costs are really simply "fraud-prevention activities" that Congress allowed "only as a separate adjustment to, rather than a component of, the interchange transaction fee." JA 78 (citing 15 U.S.C. § 1693*o*-2(a)(5)(A)). However, the Board reasonably interpreted section 920(a)(5)(A)(i) as permitting a separate adjustment, which was the subject of an interim final rule issued the same day as the Final Rule,[9] for issuer costs of preventing fraud in relation to electronic debit transactions as a whole, and not in relation to a

---

[9] *See* JA 558, *Debit Card Interchange Fees and Routing, Interim Final Rule and Request for Public Comment*, 76 Fed. Reg. 43,478 (July 20, 2011) ("Interim Final Rule"), codified at 12 C.F.R. § 235.4.

65

particular electronic debit transaction.  JA 177.[10]  To whatever extent

transaction monitoring costs include costs relating to reviewing account

activity for fraud as part of the authorization process, the Board

reasonably concluded that it was permissible to include those costs in

the fee standard rather than in the separate fraud adjustment.  The

language of section 920(a)(5)(A) differs significantly from section

920(a)(4)(B).  The costs considered in section 920(a)(5)(A)(i) are those of

preventing fraud "in relation to electronic debit transactions," rather

than costs of "a particular electronic debit transaction" referenced in

section 920(a)(4)(B).  Congress's elimination of the word "particular"

and its use of the more general phrase "in relation to," along with its

use of the plural "transactions," in section 920(a)(5)(A)(i), indicates that

it intended the Board's fraud-prevention adjustment to take into

account an issuer's fraud prevention costs over a broad spectrum of

transactions that are not linked to a particular transaction.  Thus, by

its plain terms, section 920(a)(5)(A) does not limit the Board's discretion

to include in the interchange fee standard transaction monitoring costs

---

[10] The Board based its fraud prevention adjustment in the Interim Final
Rule only on costs of fraud-prevention activities that prevent fraud at
times *other than* when the issuer is authorizing (or declining) a
transaction, and there was no double-counting.  JA 177.

that are integral to the authorization process and specific to a particular transaction.

***(iii) Fraud Losses***:  Third, the Board was well within its discretion in including an *ad valorem* adjustment permitting issuers to recover a portion of their fraud losses through interchange fees.  JA 177. As explained, fraud losses, which are distinct from the costs of fraud prevention that are allowed under section 920(a)(5)(A), discussed above, are generally the result of an issuer's authorization, clearance, or settlement of a particular electronic debit transaction that the cardholder later identifies as fraudulent, most commonly because of counterfeit card fraud, lost or stolen card fraud, or card-not-present fraud.  *Id.*  Because fraud losses are specific to a particular transaction, the Board reasonably determined that permitting issuers to recover at least a portion of their fraud losses through interchange fees is reasonable.  *Id.*

The district court disagreed, holding that "the costs associated with the consequences of ACS—as opposed to ACS costs themselves—are not to be considered under the plain language of the statute." JA 80.  The statutory language bears no such limitation.  As explained

above, the statutory provisions on costs relevant to the fee standard are not limited to ACS costs only, but rather encompass all costs "incurred by an issuer" for its "role" in the transaction.  Section 920(a)(2), (a)(3)(A).  Fraud losses fall easily within this category because they are often borne by the issuer as a result of its "role" in authorizing a transaction that later turns out to be fraudulent.  JA 177.  Moreover, they are quintessentially specific to a particular electronic debit transaction because the issuer would not have incurred the loss but for its authorization, clearance, and settlement of that specific transaction, so they are not excluded under section 920(a)(4)(B)(ii).  Accordingly, the district court erroneously concluded that the statute unambiguously barred consideration of fraud losses.

*(iv) Network Processing Fees*:  Last, the Board properly included in the interchange fee standard network processing fees, which are connectivity fees paid by an issuer to a network.  JA 176.  As the Board correctly reasoned, these fees are both specific to a particular transaction and incremental ACS costs.  These fees vary with the number of transactions processed and no particular electronic debit transaction can authorize, clear, or settle without them.  *Id.*; *see also*

68

JA 111.  Moreover, network processing fees, although paid by the issuer to the network, are incurred "for the role of the issuer" in ACS. 15 U.S.C. § 1693*o*-2(a)(4)(B)(i).  Issuers play a role in receiving authorization requests from networks, communicating the approval or denial ("clearing") message back to the networks, and receiving settlement information from the network.  JA 142.  None of this would be possible if the issuer could not connect to the network, for which it pays network processing fees.

The district court, mistakenly believing that these fees do not relate to the role of the issuer in ACS, erroneously found that the statute precludes recovery of network processing fees.  JA 80-81. Moreover, the court misinterpreted a statutory provision prohibiting circumvention or evasion of section 920(a) through network fees, which is a different issue.  *Id.*  The court found that inclusion of network processing fees in the fee standard runs afoul of section 920(a)(8), which allows the Board to prescribe regulations to ensure that "a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction" or to "circumvent or evade" regulations under section 920.  15 U.S.C. § 1693*o*-2(a)(8)(B).  The Board

69

implemented section 920(a)(8) in a separate section of the Rule by prohibiting "net compensation" to an issuer through the use of network fees, 12 C.F.R. § 235.6(b), and prohibiting "circumvent[ion] or eva[sion] [of] the interchange transaction fee restrictions . . . ." *Id.* § 235.6(a).[11] But the fees or other amounts "received by an issuer *from* a payment card network," *id.* § 235.6(b) (emphasis added), which are the subject in part of section 920(a)(8), have nothing to do with network processing fees an issuer pays *to a network* as part of ACS. Nothing in section 920(a)(8), therefore, prohibits the Board from taking network processing fees into account in setting the interchange fee standard.

## C. As Shown, the Board's Reasonable Interpretation of the Fee Provision is Entitled to Deference

As shown above, the district court erred in failing to proceed to the next step of the *Chevron* analysis, which is "'highly deferential'" to the agency. *Cablevision Sys.*, 649 F.3d at 709 (quoting *NRA*, 216 F.3d at 137). Under established Supreme Court and D.C. Circuit precedent, unless the Board's construction is "unambiguously foreclose[d]" by

---

[11] An example of such "circumvention or evasion" may be a situation where a payment card network decreases network processing fees paid by issuers by 50 percent while increasing similar fees charged to merchants or acquirers by the same amount. *See* 12 C.F.R. Part 235, App. A (Commentary) at cmt. 6(a)(2)(i).

section 920(a), the Court must defer to the Board's reasonable reading, even if other constructions are possible. *Brand X Internet*, 545 U.S. at 983; *see also Gentiva Healthcare Corp. v. Sebelius*, No. 12-5179, 2013 U.S. App. LEXIS 14886, at *8 (D.C. Cir. July 23, 2013). Even assuming for the sake of argument that the district court offered a possible reading, the statute does not unambiguously foreclose the Board's construction, as we have demonstrated. Rather, the Board reasonably interpreted the fee provision of the statute by using incremental ACS costs as a baseline, excluding prohibited costs, and taking into account non-prohibited costs as reasonable and appropriate, while utilizing the comparison to check. The Board's construction is consistent with the purposes of the statute because it strikes a balance between protecting merchants from their lack of bargaining power vis-a-vis networks and issuers, yet allows issuers to recover a reasonable portion of their costs. The Board's reading is entitled to deference.

## CONCLUSION

For all of the foregoing reasons, the Board respectfully requests that the judgment of the district court be reversed and that the case be remanded with instructions to enter judgment in favor of the Board.

Dated:  October 21, 2013          Respectfully submitted,


 /s/  Katherine H. Wheatley
Scott G. Alvarez, General Counsel
Richard M. Ashton
    Deputy General Counsel
Katherine H. Wheatley
    Associate General Counsel
Yvonne F. Mizusawa, Senior Counsel
Joshua P. Chadwick, Counsel
Board of Governors of the
    Federal Reserve System
Washington, D.C.  20551
Telephone:  (202) 452-3779
Facsimile:  (202) 736-5615
kit.wheatley@frb.gov

*Counsel for Defendant-Appellant*
*Board of Governors of the*
*Federal Reserve System*

72

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7) and

Circuit Rule32(a)(C), I hereby certify that the foregoing brief complies

with the type-volume limitation of Federal Rule of Appellate Procedure

32(a)(7)(B)(i).  The brief is set in 14-point Century Schoolbook type and,

according to the word processing system used to prepare the brief

(Microsoft Word 2010), contains 13,910 words, excluding those portions

of the brief exempted by Federal Rule of Appellate Procedure

32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).


 /s/  Joshua P. Chadwick
Joshua P. Chadwick

73

## ADDENDUM—STATUTES AND REGULATIONS

15 U.S.C. § 1693*o*-2 ...............................................................SA 1

12 C.F.R. Part 235...................................................................SA 6

USCA Case #13-5270     Document #1462215     Filed: 10/21/2013     Page 88 of 113

### § 1693o–2. Reasonable fees and rules for payment card transactions

**(a) Reasonable interchange transaction fees for electronic debit transactions**

**(1) Regulatory authority over interchange transaction fees**

The Board may prescribe regulations, pursuant to section 553 of title 5, regarding any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction, to implement this subsection (including related definitions), and to prevent circumvention or evasion of this subsection.

**(2) Reasonable interchange transaction fees**

The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction.

**(3) Rulemaking required**

**(A) In general**

The Board shall prescribe regulations in final form not later than 9 months after July 21, 2010, to establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction.

**(B) Information collection**

The Board may require any issuer (or agent of an issuer) or payment card network to provide the Board with such information as may be necessary to carry out the provisions of this subsection and the Board, in issuing rules under subparagraph (A) and on at least a bi-annual basis thereafter, shall disclose such aggregate or summary information concerning the costs incurred, and interchange transaction fees charged or received, by issuers or payment card networks in connection with the authorization, clearance or settlement of electronic debit transactions as the Board considers appropriate and in the public interest.

**(4) Considerations; consultation**

In prescribing regulations under paragraph (3)(A), the Board shall—

(A) consider the functional similarity between—

SA 1

USCA Case #13-5270     Document #1462215          Filed: 10/21/2013     Page 89 of 113

(i) electronic debit transactions; and

(ii) checking transactions that are required within the Federal Reserve bank system to clear at par;

(B) distinguish between—

(i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and

(ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2); and

(C) consult, as appropriate, with the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Director of the Office of Thrift Supervision, the National Credit Union Administration Board, the Administrator of the Small Business Administration, and the Director of the Bureau of Consumer Financial Protection.

**(5) Adjustments to interchange transaction fees for fraud prevention costs**

**(A) Adjustments**

The Board may allow for an adjustment to the fee amount received or charged by an issuer under paragraph (2), if—

(i) such adjustment is reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions involving that issuer; and

(ii) the issuer complies with the fraud-related standards established by the Board under subparagraph (B), which standards shall—

(I) be designed to ensure that any fraud-related adjustment of the issuer is limited to the amount described in clause (i) and takes into account any fraud-related reimbursements (including amounts from charge-backs) received from consumers, merchants, or payment card networks in relation to electronic debit transactions involving the issuer; and

(II) require issuers to take effective steps to reduce the occurrence of, and costs from, fraud in relation to electronic debit transactions, including through the development and implementation of cost-effective fraud prevention technology.

**(B) Rulemaking required**

**(i) In general**

The Board shall prescribe regulations in final form not later than 9 months after July 21, 2010, to establish standards for making adjustments under this paragraph.

**(ii) Factors for consideration**

In issuing the standards and prescribing regulations under this paragraph, the Board shall consider—

(I) the nature, type, and occurrence of fraud in electronic debit transactions;

(II) the extent to which the occurrence of fraud depends on whether authorization in an electronic debit transaction is based on signature, PIN, or other means;

(III) the available and economical means by which fraud on electronic debit transactions may be reduced;

(IV) the fraud prevention and data security costs expended by each party involved in electronic debit transactions (including consumers, persons who accept debit cards as a form of payment, financial institutions, retailers and payment card networks);

(V) the costs of fraudulent transactions absorbed by each party involved in such transactions (including consumers, persons who accept debit cards as a form of payment, financial institutions, retailers and payment card networks);

(VI) the extent to which interchange transaction fees have in the past reduced or increased incentives for parties involved in electronic debit transactions to reduce fraud on such transactions; and

(VII) such other factors as the Board considers appropriate.

**(6) Exemption for small issuers**

**(A) In general**

This subsection shall not apply to any issuer that, together with its affiliates, has assets of less than $10,000,000,000, and the Board shall exempt such issuers from regulations prescribed under paragraph (3)(A).

**(B) Definition**

For purposes of this paragraph, the term ''issuer'' shall be limited to the person holding the asset account that is debited through an electronic debit transaction.

**(7) Exemption for government-administered payment programs and reloadable prepaid cards**

**(A) In general**

This subsection shall not apply to an interchange transaction fee charged or received with respect to an electronic debit transaction in which a person uses—

(i) a debit card or general-use prepaid card that has been provided to a person pursuant to a Federal, State or local government-administered payment program, in which the person may only use the debit card or general-use prepaid card to transfer or debit funds, monetary value, or other assets that have been provided pursuant to such program; or

(ii) a plastic card, payment code, or device that is—

(I) linked to funds, monetary value, or assets which are purchased or loaded on a prepaid basis;

(II) not issued or approved for use to access or debit any account held by or for the benefit of the card holder (other than a subaccount or other method of recording or tracking funds purchased or loaded on the card on a prepaid basis);

USCA Case #13-5270          Document #1462215          Filed: 10/21/2013          Page 90 of 113

(III) redeemable at multiple, unaffiliated merchants or service providers, or automated teller machines;

(IV) used to transfer or debit funds, monetary value, or other assets; and

(V) reloadable and not marketed or labeled as a gift card or gift certificate.

**(B) Exception**

Notwithstanding subparagraph (A), after the end of the 1-year period beginning on the effective date provided in paragraph (9), this subsection shall apply to an interchange transaction fee charged or received with respect to an electronic debit transaction described in subparagraph (A)(i) in which a person uses a general-use prepaid card, or an electronic debit transaction described in subparagraph (A)(ii), if any of the following fees may be charged to a person with respect to the card:

(i) A fee for an overdraft, including a shortage of funds or a transaction processed for an amount exceeding the account balance.

(ii) A fee imposed by the issuer for the first withdrawal per month from an automated teller machine that is part of the issuer's designated automated teller machine network.

**(C) Definition**

For purposes of subparagraph (B), the term "designated automated teller machine network" means either—

(i) all automated teller machines identified in the name of the issuer; or

(ii) any network of automated teller machines identified by the issuer that provides reasonable and convenient access to the issuer's customers.

**(D) Reporting**

Beginning 12 months after July 21, 2010, the Board shall annually provide a report to the Congress regarding —

(i) the prevalence of the use of general-use prepaid cards in Federal, State or local government-administered payment programs; and

(ii) the interchange transaction fees and cardholder fees charged with respect to the use of such general-use prepaid cards.

**(8) Regulatory authority over network fees**

**(A) In general**

The Board may prescribe regulations, pursuant to section 553 of title 5, regarding any network fee.

**(B) Limitation**

The authority under subparagraph (A) to prescribe regulations shall be limited to regulations to ensure that—

(i) a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction; and

(ii) a network fee is not used to circumvent or evade the restrictions of this subsection and regulations prescribed under such subsection.

**(C) Rulemaking required**

The Board shall prescribe regulations in final form before the end of the 9-month period beginning on July 21, 2010, to carry out the authorities provided under subparagraph (A).

**(9) Effective date**

This subsection shall take effect at the end of the 12-month period beginning on July 21, 2010.

**(b) Limitation on payment card network restrictions**

**(1) Prohibitions against exclusivity arrangements**

**(A) No exclusive network**

The Board shall, before the end of the 1-year period beginning on July 21, 2010, prescribe regulations providing that an issuer or payment card network shall not directly or through any agent, processor, or licensed member of a payment card network, by contract, requirement, condition, penalty, or otherwise, restrict the number of payment card networks on which an electronic debit transaction may be processed to—

(i) 1 such network; or

(ii) 2 or more such networks which are owned, controlled, or otherwise operated by —

(I) affiliated persons; or

(II) networks affiliated with such issuer.

**(B) No routing restrictions**

The Board shall, before the end of the 1-year period beginning on July 21, 2010, prescribe regulations providing that an issuer or payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person who accepts debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions.

**(2) Limitation on restrictions on offering discounts for use of a form of payment**

**(A) In general**

A payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person to provide a discount or in-kind incentive for payment by the use of cash, checks, debit cards, or credit cards to the extent that—

(i) in the case of a discount or in-kind incentive for payment by the use of debit cards, the discount or in-kind incentive does not differentiate on the basis of the issuer or the payment card network;

(ii) in the case of a discount or in-kind incentive for payment by the use of credit cards, the discount or in-kind incentive does not differentiate on the basis of the issuer or the payment card network; and

(iii) to the extent required by Federal law and applicable State law, such dis-

USCA Case #13-5270    Document #1464215    Filed: 10/21/2013    Page 91 of 113

count or in-kind incentive is offered to all prospective buyers and disclosed clearly and conspicuously.

**(B) Lawful discounts**

For purposes of this paragraph, the network may not penalize any person for the providing of a discount that is in compliance with Federal law and applicable State law.

**(3) Limitation on restrictions on setting transaction minimums or maximums**

**(A) In general**

A payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability—

(i) of any person to set a minimum dollar value for the acceptance by that person of credit cards, to the extent that—

(I) such minimum dollar value does not differentiate between issuers or between payment card networks; and

(II) such minimum dollar value does not exceed $10.00; or

(ii) of any Federal agency or institution of higher education to set a maximum dollar value for the acceptance by that Federal agency or institution of higher education of credit cards, to the extent that such maximum dollar value does not differentiate between issuers or between payment card networks.

**(B) Increase in minimum dollar amount**

The Board may, by regulation prescribed pursuant to section 553 of title 5, increase the amount of the dollar value listed in subparagraph (A)(i)(II).

**(4) Rule of construction**

No provision of this subsection shall be construed to authorize any person—

(A) to discriminate between debit cards within a payment card network on the basis of the issuer that issued the debit card; or

(B) to discriminate between credit cards within a payment card network on the basis of the issuer that issued the credit card.

**(c) Definitions**

For purposes of this section, the following definitions shall apply:

**(1) Affiliate**

The term "affiliate" means any company that controls, is controlled by, or is under common control with another company.

**(2) Debit card**

The term "debit card"—

(A) means any card, or other payment code or device, issued or approved for use through a payment card network to debit an asset account (regardless of the purpose for which the account is established), whether authorization is based on signature, PIN, or other means;

(B) includes a general-use prepaid card, as that term is defined in section 1693l–1(a)(2)(A) of this title; and

(C) does not include paper checks.

**(3) Credit card**

The term "credit card" has the same meaning as in section 1602 of this title.

**(4) Discount**

The term "discount"—

(A) means a reduction made from the price that customers are informed is the regular price; and

(B) does not include any means of increasing the price that customers are informed is the regular price.

**(5) Electronic debit transaction**

The term "electronic debit transaction" means a transaction in which a person uses a debit card.

**(6) Federal agency**

The term "Federal agency" means—

(A) an agency (as defined in section 101 of title 31); and

(B) a Government corporation (as defined in section 103 of title 5).

**(7) Institution of higher education**

The term "institution of higher education" has the same meaning as in 1001[1] and 1002 of title 20.

**(8) Interchange transaction fee**

The term "interchange transaction fee" means any fee established, charged or received by a payment card network for the purpose of compensating an issuer for its involvement in an electronic debit transaction.

**(9) Issuer**

The term "issuer" means any person who issues a debit card, or credit card, or the agent of such person with respect to such card.

**(10) Network fee**

The term "network fee" means any fee charged and received by a payment card network with respect to an electronic debit transaction, other than an interchange transaction fee.

**(11) Payment card network**

The term "payment card network" means an entity that directly, or through licensed members, processors, or agents, provides the proprietary services, infrastructure, and software that route information and data to conduct debit card or credit card transaction authorization, clearance, and settlement, and that a person uses in order to accept as a form of payment a brand of debit card, credit card or other device that may be used to carry out debit or credit transactions.

**(d) Enforcement**

**(1) In general**

Compliance with the requirements imposed under this section shall be enforced under section 1693o of this title.

**(2) Exception**

Sections 1693m and 1693n of this title shall not apply with respect to this section or the requirements imposed pursuant to this section.

---

[1] So in original. Probably should be preceded by "sections".

USCA Case #13-5270   Document #1462215   Filed: 10/21/2013   Page 92 of 113

(Pub. L. 90–321, title IX, § 920, as added Pub. L. 111–203, title X, § 1075(a)(2), July 21, 2010, 124 Stat. 2068.)

### Prior Provisions

A prior section 920 of Pub. L. 90–321 was renumbered section 921 and is classified to section 1693p of this title.

Two other prior sections 920 of Pub. L. 90–321 were renumbered section 922 and are classified to sections 1693q and 1693r of this title.

### Effective Date

Section effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as a note under section 5301 of Title 12, Banks and Banking.

## PART 235—DEBIT CARD INTERCHANGE FEES AND ROUTING

Sec.
235.1  Authority and purpose.
235.2  Definitions.
235.3  Reasonable and proportional interchange fees.
235.4  Fraud-prevention adjustment.
235.5  Exemptions.
235.6  Prohibition on circumvention, evasion, or net compensation.
235.7  Limitation on payment card restrictions.
235.8  Reporting requirements and record retention.
235.9  Administrative enforcement.
235.10  Effective and compliance dates.
APPENDIX A TO PART 235—OFFICIAL BOARD COMMENTARY ON REGULATION II

AUTHORITY: 15 U.S.C. 1693o–2.

SOURCE: 76 FR 43466, July 20, 2011, unless otherwise noted.

SA 6

**Federal Reserve System**                                    **§ 235.2**

§ 235.1  **Authority and purpose.**

(a) *Authority.* This part is issued by the Board of Governors of the Federal Reserve System (Board) under section 920 of the Electronic Fund Transfer Act (EFTA) (15 U.S.C. 1693o–2, as added by section 1075 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376 (2010)).

(b) *Purpose.* This part implements the provisions of section 920 of the EFTA, including standards for reasonable and proportional interchange transaction fees for electronic debit transactions, standards for receiving a fraud-prevention adjustment to interchange transaction fees, exemptions from the interchange transaction fee limitations, prohibitions on evasion and circumvention, prohibitions on payment card network exclusivity arrangements and routing restrictions for debit card transactions, and reporting requirements for debit card issuers and payment card networks.

§ 235.2  **Definitions.**

For purposes of this part:

(a) *Account* (1) Means a transaction, savings, or other asset account (other than an occasional or incidental credit balance in a credit plan) established for any purpose and that is located in the United States; and

(2) Does not include an account held under a bona fide trust agreement that is excluded by section 903(2) of the Electronic Fund Transfer Act and rules prescribed thereunder.

(b) *Acquirer* means a person that contracts directly or indirectly with a merchant to provide settlement for the merchant's electronic debit transactions over a payment card network. An acquirer does not include a person that acts only as a processor for the services it provides to the merchant.

(c) *Affiliate* means any company that controls, is controlled by, or is under common control with another company.

(d) *Cardholder* means the person to whom a debit card is issued.

(e) *Control* of a company means—

(1) Ownership, control, or power to vote 25 percent or more of the outstanding shares of any class of voting security of the company, directly or in-

directly, or acting through one or more other persons;

(2) Control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) of the company; or

(3) The power to exercise, directly or indirectly, a controlling influence over the management or policies of the company, as the Board determines.

(f) *Debit card* (1) Means any card, or other payment code or device, issued or approved for use through a payment card network to debit an account, regardless of whether authorization is based on signature, personal identification number (PIN), or other means, and regardless of whether the issuer holds the account, and

(2) Includes any general-use prepaid card; and

(3) Does not include—

(i) Any card, or other payment code or device, that is redeemable upon presentation at only a single merchant or an affiliated group of merchants for goods or services; or

(ii) A check, draft, or similar paper instrument, or an electronic representation thereof.

(g) *Designated automated teller machine (ATM) network* means either—

(1) All ATMs identified in the name of the issuer; or

(2) Any network of ATMs identified by the issuer that provides reasonable and convenient access to the issuer's customers.

(h) *Electronic debit transaction* (1) Means the use of a debit card by a person as a form of payment in the United States to initiate a debit to an account, and

(2) Does not include transactions initiated at an ATM, including cash withdrawals and balance transfers initiated at an ATM.

(i) *General-use prepaid card* means a card, or other payment code or device, that is—

(1) Issued on a prepaid basis in a specified amount, whether or not that amount may be increased or reloaded, in exchange for payment; and

(2) Redeemable upon presentation at multiple, unaffiliated merchants for goods or services.

SA 7

(j) *Interchange transaction fee* means any fee established, charged, or received by a payment card network and paid by a merchant or an acquirer for the purpose of compensating an issuer for its involvement in an electronic debit transaction.

(k) *Issuer* means any person that authorizes the use of a debit card to perform an electronic debit transaction.

(l) *Merchant* means any person that accepts debit cards as payment.

(m) *Payment card network* means an entity that—

(1) Directly or indirectly provides the proprietary services, infrastructure, and software that route information and data to an issuer from an acquirer to conduct the authorization, clearance, and settlement of electronic debit transactions; and

(2) A merchant uses in order to accept as a form of payment a brand of debit card or other device that may be used to carry out electronic debit transactions.

(n) *Person* means a natural person or an organization, including a corporation, government agency, estate, trust, partnership, proprietorship, cooperative, or association.

(o) *Processor* means a person that processes or routes electronic debit transactions for issuers, acquirers, or merchants.

(p) *Route* means to direct and send information and data to an unaffiliated entity or to an affiliated entity acting on behalf of an unaffiliated entity.

(q) *United States* means the States, territories, and possessions of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any political subdivision of any of the foregoing.

## § 235.3 Reasonable and proportional interchange transaction fees.

(a) *In general.* The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the electronic debit transaction.

(b) *Determination of reasonable and proportional fees.* An issuer complies with the requirements of paragraph (a) of this section only if each interchange transaction fee received or charged by the issuer for an electronic debit transaction is no more than the sum of—

(1) 21 cents and;

(2) 5 basis points multiplied by the value of the transaction.

## § 235.4 Fraud-prevention adjustment.

(a) *In general.* Subject to paragraph (b) of this section, an issuer may receive or charge an amount of no more than 1 cent per transaction in addition to any interchange transaction fee it receives or charges in accordance with § 235.3.

(b) *Issuer standards.* (1) To be eligible to receive or charge the fraud-prevention adjustment in paragraph (a) of this section, an issuer must develop and implement policies and procedures reasonably designed to take effective steps to reduce the occurrence of, and costs to all parties from, fraudulent electronic debit transactions, including through the development and implementation of cost-effective fraud-prevention technology.

(2) An issuer's policies and procedures must address—

(i) Methods to identify and prevent fraudulent electronic debit transactions;

(ii) Monitoring of the volume and value of its fraudulent electronic debit transactions;

(iii) Appropriate responses to suspicious electronic debit transactions in a manner designed to limit the costs to all parties from and prevent the occurrence of future fraudulent electronic debit transactions;

(iv) Methods to secure debit card and cardholder data; and

(v) Such other factors as the issuer considers appropriate.

(3) An issuer must review, at least annually, its fraud-prevention policies and procedures, and their implementation and update them as necessary in light of—

(i) Their effectiveness in reducing the occurrence of, and cost to all parties from, fraudulent electronic debit transactions involving the issuer;

(ii) Their cost-effectiveness; and

(iii) Changes in the types of fraud, methods used to commit fraud, and available methods for detecting and

SA 8

preventing fraudulent electronic debit transactions that the issuer identifies from—

(A) Its own experience or information;

(B) Information provided to the issuer by its payment card networks, law enforcement agencies, and fraud-monitoring groups in which the issuer participates; and

(C) Applicable supervisory guidance.

(c) *Notification.* To be eligible to receive or charge a fraud-prevention adjustment, an issuer must annually notify its payment card networks that it complies with the standards in paragraph (b) of this section.

(d) *Change in Status.* An issuer is not eligible to receive or charge a fraud-prevention adjustment if the issuer is substantially non-compliant with the standards set forth in paragraph (b) of this section, as determined by the issuer or the appropriate agency under § 235.9. Such an issuer must notify its payment card networks that it is no longer eligible to receive or charge a fraud-prevention adjustment no later than 10 days after determining or receiving notification from the appropriate agency under § 235.9 that the issuer is substantially non-compliant with the standards set forth in paragraph (b) of this section. The issuer must stop receiving and charging the fraud-prevention adjustment no later than 30 days after notifying its payment card networks.

[77 FR 46280, Aug. 3, 2012]

**§ 235.5  Exemptions.**

(a) *Exemption for small issuers.* (1) *In general.* Except as provided in paragraph (a)(3) of this section, §§ 235.3, 235.4, and 235.6 do not apply to an interchange transaction fee received or charged by an issuer with respect to an electronic debit transaction if—

(i) The issuer holds the account that is debited; and

(ii) The issuer, together with its affiliates, has assets of less than $10 billion as of the end of the calendar year preceding the date of the electronic debit transaction.

(2) *Determination of issuer asset size.* A person may rely on lists published by the Board to determine whether an issuer, together with its affiliates, has

assets of less than $10 billion as of the end of the calendar year preceding the date of the electronic debit transaction.

(3) *Change in status.* If an issuer qualifies for the exemption in paragraph (a)(1) in a particular calendar year, but, as of the end of that calendar year no longer qualifies for the exemption because at that time it, together with its affiliates, has assets of $10 billion or more, the issuer must begin complying with §§ 235.3, 235.4, and 235.6 no later than July 1 of the succeeding calendar year.

(b) *Exemption for government-administered programs.* Except as provided in paragraph (d) of this section, §§ 235.3, 235.4, and 235.6 do not apply to an interchange transaction fee received or charged by an issuer with respect to an electronic debit transaction if—

(1) The electronic debit transaction is made using a debit card that has been provided to a person pursuant to a Federal, State, or local government-administered payment program; and

(2) The cardholder may use the debit card only to transfer or debit funds, monetary value, or other assets that have been provided pursuant to such program.

(c) *Exemption for certain reloadable prepaid cards*—(1) *In general.* Except as provided in paragraph (d) of this section, §§ 235.3, 235.4, and 235.6 do not apply to an interchange transaction fee received or charged by an issuer with respect to an electronic debit transaction using a general-use prepaid card that is—

(i) Not issued or approved for use to access or debit any account held by or for the benefit of the cardholder (other than a subaccount or other method of recording or tracking funds purchased or loaded on the card on a prepaid basis);

(ii) Reloadable and not marketed or labeled as a gift card or gift certificate; and

(iii) The only means of access to the underlying funds, except when all remaining funds are provided to the cardholder in a single transaction.

(2) *Temporary cards.* For purposes of this paragraph (c), the term "reloadable" includes a temporary non-reloadable card issued solely in

SA 9

connection with a reloadable general-use prepaid card.

(d) *Exception.* The exemptions in paragraphs (b) and (c) of this section do not apply to any interchange transaction fee received or charged by an issuer on or after July 21, 2012, with respect to an electronic debit transaction if any of the following fees may be charged to a cardholder with respect to the card:

(1) A fee or charge for an overdraft, including a shortage of funds or a transaction processed for an amount exceeding the account balance, unless the fee or charge is imposed for transferring funds from another asset account to cover a shortfall in the account accessed by the card; or

(2) A fee imposed by the issuer for the first withdrawal per calendar month from an ATM that is part of the issuer's designated ATM network.

### § 235.6 Prohibition on circumvention, evasion, and net compensation.

(a) *Prohibition of circumvention or evasion.* No person shall circumvent or evade the interchange transaction fee restrictions in §§ 235.3 and 235.4.

(b) *Prohibition of net compensation.* An issuer may not receive net compensation from a payment card network with respect to electronic debit transactions or debit card-related activities within a calendar year. Net compensation occurs when the total amount of payments or incentives received by an issuer from a payment card network with respect to electronic debit transactions or debit card-related activities, other than interchange transaction fees passed through to the issuer by the network, during a calendar year exceeds the total amount of all fees paid by the issuer to the network with respect to electronic debit transactions or debit card-related activities during that calendar year. Payments and incentives paid by a network to an issuer, and fees paid by an issuer to a network, with respect to electronic debit transactions or debit card related activities are not limited to volume-based or transaction-specific payments, incentives, or fees, but also include other payments, incentives or fees related to an issuer's provision of debit card services.

### § 235.7 Limitations on payment card restrictions.

(a) *Prohibition on network exclusivity*—(1) *In general.* An issuer or payment card network shall not directly or through any agent, processor, or licensed member of a payment card network, by contract, requirement, condition, penalty, or otherwise, restrict the number of payment card networks on which an electronic debit transaction may be processed to less than two unaffiliated networks.

(2) *Permitted arrangements.* An issuer satisfies the requirements of paragraph (a)(1) of this section only if the issuer allows an electronic debit transaction to be processed on at least two unaffiliated payment card networks, each of which does not, by rule or policy, restrict the operation of the network to a limited geographic area, specific merchant, or particular type of merchant or transaction, and each of which has taken steps reasonably designed to enable the network to process the electronic debit transactions that the network would reasonably expect will be routed to it, based on expected transaction volume.

(3) *Prohibited exclusivity arrangements by networks.* For purposes of paragraph (a)(1) of this section, a payment card network may not restrict or otherwise limit an issuer's ability to contract with any other payment card network that may process an electronic debit transaction involving the issuer's debit cards.

(4) *Subsequent affiliation.* If unaffiliated payment card networks become affiliated as a result of a merger or acquisition such that an issuer is no longer in compliance with paragraph (a) of this section, the issuer must add an unaffiliated payment card network through which electronic debit transactions on the relevant debit card may be processed no later than six months after the date on which the previously unaffiliated payment card networks consummate the affiliation.

(b) *Prohibition on routing restrictions.* An issuer or payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement,

condition, penalty, or otherwise, inhibit the ability of any person that accepts or honors debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions.

(c) *Compliance dates*—(1) *General*. Except as otherwise provided in paragraphs (c)(2), (c)(3), and (c)(4) of this section, the compliance date of paragraph (a) of this section is April 1, 2012.

(2) *Restrictions by payment card networks*. The compliance date of paragraphs (a)(1) and (a)(3) of this section for payment card networks is October 1, 2011.

(3) *Debit cards that use transaction qualification or substantiation systems*. Issuers shall comply with the requirements of paragraph (a) of this section by April 1, 2013, for electronic debit transactions using debit cards that use point-of-sale transaction qualification or substantiation systems for verifying the eligibility of purchased goods or services.

(4) *General-use prepaid cards*. Issuers shall comply with the requirements of paragraph (a) of this section with respect to general-use prepaid cards as set out below.

(i) With respect to non-reloadable general-use prepaid cards, the compliance date is April 1, 2013. Non-reloadable general-use prepaid cards sold prior to April 1, 2013 are not subject to paragraph (a) of this section.

(ii) With respect to reloadable general-use prepaid cards, the compliance date is April 1, 2013. Reloadable general-use prepaid cards sold prior to April 1, 2013 are not subject to paragraph (a) of this section unless and until they are reloaded, in which case the following compliance dates apply:

(A) With respect to reloadable general-use prepaid cards sold and reloaded prior to April 1, 2013, the compliance date is May 1, 2013.

(B) With respect to reloadable general-use prepaid cards sold prior to April 1, 2013, and reloaded on or after April 1, 2013, the compliance date is 30 days after the date of reloading.

## § 235.8 Reporting requirements and record retention.

(a) *Entities required to report*. Each issuer that is not otherwise exempt from the requirements of this part under § 235.5(a) and each payment card network shall file a report with the Board in accordance with this section.

(b) *Report*. Each entity required to file a report with the Board shall submit data in a form prescribed by the Board for that entity. Data required to be reported may include, but may not be limited to, data regarding costs incurred with respect to an electronic debit transaction, interchange transaction fees, network fees, fraud-prevention costs, fraud losses, and transaction value, volume, and type.

(c) *Record retention*. (1) An issuer subject to this part shall retain evidence of compliance with the requirements imposed by this part for a period of not less than five years after the end of the calendar year in which the electronic debit transaction occurred.

(2) Any person subject to this part having actual notice that it is the subject of an investigation or an enforcement proceeding by its enforcement agency shall retain the records that pertain to the investigation, action, or proceeding until final disposition of the matter unless an earlier time is allowed by court or agency order.

## § 235.9 Administrative enforcement.

(a) (1) Compliance with the requirements of this part shall be enforced under—

(i) Section 8 of the Federal Deposit Insurance Act, by the appropriate Federal banking agency, as defined in section 3(q) of the Federal Deposit Insurance Act (12 U.S.C. 1813(q)), with respect to—

(A) National banks, federal savings associations, and federal branches and federal agencies of foreign banks;

(B) Member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than federal branches, federal Agencies, and insured state branches of foreign banks), commercial lending companies owned or controlled by foreign banks, and organizations operating under section 25 or 25A of the Federal Reserve Act;

SA 11

(C) Banks and state savings associations insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System), and insured state branches of foreign banks;

(ii) The Federal Credit Union Act (12 U.S.C. 1751 *et seq.*), by the Administrator of the National Credit Union Administration (National Credit Union Administration Board) with respect to any federal credit union;

(iii) The Federal Aviation Act of 1958 (49 U.S.C. 40101 *et seq.*), by the Secretary of Transportation, with respect to any air carrier or foreign air carrier subject to that Act; and

(iv) The Securities Exchange Act of 1934 (15 U.S.C. 78a *et seq.*), by the Securities and Exchange Commission, with respect to any broker or dealer subject to that Act.

(2) The terms used in paragraph (a)(1) of this section that are not defined in this part or otherwise defined in section 3(s) of the Federal Deposit Insurance Act (12 U.S.C. 1813(s)) shall have the meaning given to them in section 1(b) of the International Banking Act of 1978 (12 U.S.C. 3101).

(b) *Additional powers.* (1) For the purpose of the exercise by any agency referred to in paragraphs (a)(1)(i) through (a)(1)(iv) of this section of its power under any statute referred to in those paragraphs, a violation of this part is deemed to be a violation of a requirement imposed under that statute.

(2) In addition to its powers under any provision of law specifically referred to in paragraphs (a)(1)(i) through (a)(1)(iv) of this section, each of the agencies referred to in those paragraphs may exercise, for the purpose of enforcing compliance under this part, any other authority conferred on it by law.

(c) *Enforcement authority of Federal Trade Commission.* Except to the extent that enforcement of the requirements imposed under this title is specifically granted to another government agency under paragraphs (a)(1)(i) through (a)(1)(iv) of this section, and subject to subtitle B of the Consumer Financial Protection Act of 2010, the Federal Trade Commission has the authority to enforce such requirements. For the purpose of the exercise by the Federal Trade Commission of its functions and powers under the Federal Trade Commission Act, a violation of this part shall be deemed a violation of a requirement imposed under the Federal Trade Commission Act. All of the functions and powers of the Federal Trade Commission under the Federal Trade Commission Act are available to the Federal Trade Commission to enforce compliance by any person subject to the jurisdiction of the Federal Trade Commission with the requirements of this part, regardless of whether that person is engaged in commerce or meets any other jurisdictional tests under the Federal Trade Commission Act.

§ 235.10   Effective and compliance dates.

Except as provided in § 235.7, this part becomes effective and compliance is mandatory on October 1, 2011.

APPENDIX A TO PART 235—OFFICIAL BOARD COMMENTARY ON REGULATION II

INTRODUCTION

The following commentary to Regulation II (12 CFR part 235) provides background material to explain the Board's intent in adopting a particular part of the regulation. The commentary also provides examples to aid in understanding how a particular requirement is to work.

SECTION 235.2   DEFINITIONS

*2(a) Account*

1. *Types of accounts.* The term "account" includes accounts held by any person, including consumer accounts (*i.e.,* those established primarily for personal, family or household purposes) and business accounts. Therefore, the limitations on interchange transaction fees and the prohibitions on network exclusivity arrangements and routing restrictions apply to all electronic debit transactions, regardless of whether the transaction involves a debit card issued primarily for personal, family, or household purposes or for business purposes. For example, an issuer of a business-purpose debit card is subject to the restrictions on interchange transaction fees and is also prohibited from restricting the number of payment card networks on which an electronic debit transaction may be processed under § 235.7.

2. *Bona fide trusts.* This part does not define the term bona fide trust agreement; therefore, institutions must look to state or other applicable law for interpretation. An account

SA 12

**Federal Reserve System**                                    **Pt. 235, App. A**

held under a custodial agreement that qualifies as a trust under the Internal Revenue Code, such as an individual retirement account, is considered to be held under a trust agreement for purposes of this part.

3. *Account located in the United States*. This part applies only to electronic debit transactions that are initiated to debit (or credit, for example, in the case of returned goods or cancelled services) an account located in the United States. If a cardholder uses a debit card to debit an account held outside the United States, then the electronic debit transaction is not subject to this part.

### 2(b) Acquirer

1. *In general*. The term "acquirer" includes only the institution that contracts, directly or indirectly, with a merchant to provide settlement for the merchant's electronic debit transactions over a payment card network (referred to as acquiring the merchant's electronic debit transactions). In some acquiring relationships, an institution provides processing services to the merchant and is a licensed member of the payment card network, but does not settle the transactions with the merchant (by crediting the merchant's account) or with the issuer. These institutions are not "acquirers" because they do not provide credit to the merchant for the transactions or settle the merchant's transactions with the issuer. These institutions are considered processors and in some circumstances may be considered payment card networks for purposes of this part (*See* §§ 235.2(m), 235.2(o), and commentary thereto).

### 2(c) Affiliate

1. *Types of entities*. The term "affiliate" includes any bank and nonbank affiliates located in the United States or a foreign country.

2. *Other affiliates*. For commentary on whether merchants are affiliated, see comment 2(f)–7.

### 2(d) Cardholder

1. *Scope*. In the case of debit cards that access funds in transaction, savings, or other similar asset accounts, "the person to whom a card is issued" generally will be the named person or persons holding the account. If the account is a business account, multiple employees (or other persons associated with the business) may have debit cards that can access the account. Each employee that has a debit card that can access the account is a cardholder. In the case of a prepaid card, the cardholder generally is either the purchaser of the card or a person to whom the purchaser gave the card, such as a gift recipient.

### 2(e) Control [Reserved]

### 2(f) Debit Card

1. *Card, or other payment code or device*. The term "debit card" as defined in § 235.2(f) applies to any card, or other payment code or device, even if it is not issued in a physical form. Debit cards include, for example, an account number or code that can be used to access funds in an account to make Internet purchases. Similarly, the term "debit card" includes a device with a chip or other embedded mechanism, such as a mobile phone or sticker containing a contactless chip that links the device to funds stored in an account, and enables an account to be debited. The term "debit card," however, does not include a one-time password or other code if such password or code is used for the purposes of authenticating the cardholder and is used in addition to another card, or other payment code or device, rather than as the payment code or device.

2. *Deferred debit cards*. The term "debit card" includes a card, or other payment code or device, that is used in connection with deferred debit card arrangements in which transactions are not immediately posted to and funds are not debited from the underlying transaction, savings, or other asset account upon settlement of the transaction. Instead, the funds in the account typically are held and made unavailable for other transactions for a period of time specified in the issuer-cardholder agreement. After the expiration of the time period, the cardholder's account is debited for the value of all transactions made using the card that have been submitted to the issuer for settlement during that time period. For example, under some deferred debit card arrangements, the issuer may debit the consumer's account for all debit card transactions that occurred during a particular month at the end of the month. Regardless of the time period between the transaction and account posting, a card, or other payment code or device, that is used in connection with a deferred debit arrangement is considered a debit card for purposes of the requirements of this part.

3. *Decoupled debit cards*. Decoupled debit cards are issued by an entity other than the financial institution holding the cardholder's account. In a decoupled debit arrangement, transactions that are authorized by the card issuer settle against the cardholder's account held by an entity other than the issuer, generally via a subsequent ACH debit to that account. The term "debit card" includes any card, or other payment code or device, issued or approved for use through a payment card network to debit an account, regardless of whether the issuer holds the account. Therefore, decoupled

71

debit cards are debit cards for purposes of this part.

4. *Hybrid cards.*

i. Some cards, or other payment codes or devices, may have both credit- and debit-like features ("hybrid cards"). For example, these cards may enable a cardholder to access a line of credit, but select certain transactions for immediate repayment (*i.e.*, prior to the end of a billing cycle) via a debit to the cardholder's account, as the term is defined in §235.2(a), held either with the issuer or at another institution. If a card permits a cardholder to initiate transactions that debit an account or funds underlying a prepaid card, the card is considered a debit card for purposes of this part. Not all transactions initiated by such a hybrid card, however, are electronic debit transactions. Rather, only those transactions that debit an account as defined in this part or funds underlying a prepaid card are electronic debit transactions. If the transaction posts to a line of credit, then the transaction is a credit transaction.

ii. If an issuer conditions the availability of a credit or charge card that permits preauthorized repayment of some or all transactions on the cardholder maintaining an account at the issuer, such a card is considered a debit card for purposes of this part.

5. *Virtual wallets.* A virtual wallet is a device (*e.g.*, a mobile phone) that stores several different payment codes or devices ("virtual cards") that access different accounts, funds underlying the card, or lines of credit. At the point of sale, the cardholder may select from the virtual wallet the virtual card he or she wishes to use for payment. The virtual card that the cardholder uses for payment is considered a debit card under this part if the virtual card that initiates a transaction meets the definition of debit card, notwithstanding the fact that other cards in the wallet may not be debit cards.

6. *General-use prepaid card.* The term "debit card" includes general-use prepaid cards. See §235.2(i) and related commentary for information on general-use prepaid cards.

7. *Store cards.* The term "debit card" does not include prepaid cards that may be used at a single merchant or affiliated merchants. Two or more merchants are affiliated if they are related by either common ownership or by common corporate control. For purposes of the "debit card" definition, franchisees are considered to be under common corporate control if they are subject to a common set of corporate policies or practices under the terms of their franchise licenses.

8. *Checks, drafts, and similar instruments.* The term "debit card" does not include a check, draft, or similar paper instrument or a transaction in which the check is used as a source of information to initiate an electronic payment. For example, if an account holder provides a check to buy goods or serv-

ices and the merchant takes the account number and routing number information from the MICR line at the bottom of a check to initiate an ACH debit transfer from the cardholder's account, the check is not a debit card, and such a transaction is not considered an electronic debit transaction. Likewise, the term "debit card" does not include an electronic representation of a check, draft, or similar paper instrument.

9. *ACH transactions.* The term "debit card" does not include an account number when it is used by a person to initiate an ACH transaction that debits that person's account. For example, if an account holder buys goods or services over the Internet using an account number and routing number to initiate an ACH debit, the account number is not a debit card, and such a transaction is not considered an electronic debit transaction. However, the use of a card to purchase goods or services that debits the cardholder's account that is settled by means of a subsequent ACH debit initiated by the card issuer to the cardholder's account, as in the case of a decoupled debit card arrangement, involves the use of a debit card for purposes of this part.

*2(g) Designated Automated Teller Machine (ATM) Network*

1. *Reasonable and convenient access clarified.* Under §235.2(g)(2), a designated ATM network includes any network of ATMs identified by the issuer that provides reasonable and convenient access to the issuer's cardholders. Whether a network provides reasonable and convenient access depends on the facts and circumstances, including the distance between ATMs in the designated network and each cardholder's last known home or work address, or if a home or work address is not known, where the card was first issued.

*2(h) Electronic Debit Transaction*

1. *Debit an account.* The term "electronic debit transaction" includes the use of a card to debit an account. The account debited could be, for example, the cardholder's asset account or the account that holds the funds used to settle prepaid card transactions.

2. *Form of payment.* The term "electronic debit transaction" includes the use of a card as a form of payment that may be made in exchange for goods or services, as a charitable contribution, to satisfy an obligation (*e.g.*, tax liability), or for other purposes.

3. *Subsequent transactions.* The term "electronic debit transaction" includes both the cardholder's use of a debit card for the initial payment and any subsequent use by the cardholder of the debit card in connection with the initial payment. For example, the term "electronic debit transaction" includes using the debit card to return merchandise or cancel a service that then results in a

**Federal Reserve System**                                                      **Pt. 235, App. A**

debit to the merchant's account and a credit to the cardholder's account.

4. *Cash withdrawal at the point of sale.* The term ''electronic debit transaction'' includes a transaction in which a cardholder uses the debit card both to make a purchase and to withdraw cash (known as a ''cash-back transaction'').

5. *Geographic limitation.* This regulation applies only to electronic debit transactions that are initiated at a merchant located in the United States. If a cardholder uses a debit card at a merchant located outside the United States to debit an account held in the United States, the electronic debit transaction is not subject to this part.

*2(i) General-Use Prepaid Card*

1. *Redeemable upon presentation at multiple, unaffiliated merchants.* A prepaid card is redeemable upon presentation at multiple, unaffiliated merchants if such merchants agree to honor the card.

2. *Selective authorization cards.* Selective authorization cards, (*e.g.,* mall cards) are generally intended to be used or redeemed for goods or services at participating retailers within a shopping mall or other limited geographic area. Selective authorization cards are considered general-use prepaid cards, regardless of whether they carry the mark, logo, or brand of a payment card network, if they are redeemable at multiple, unaffiliated merchants.

*2(j) Interchange Transaction fee*

1. *In general.* Generally, the payment card network is the entity that establishes and charges the interchange transaction fee to the acquirers or merchants. The acquirers then pay to the issuers any interchange transaction fee established and charged by the network. Acquirers typically pass the interchange transaction fee through to merchant-customers.

2. *Compensating an issuer.* The term ''interchange transaction fee'' is limited to those fees that a payment card network establishes, charges, or receives to compensate the issuer for its role in the electronic debit transaction. By contrast, payment card networks generally charge issuers and acquirers fees for services the network performs. Such fees are not interchange transaction fees because the payment card network is charging and receiving the fee as compensation for services it provides.

3. *Established, charged, or received.* Interchange transaction fees are not limited to those fees for which a payment card network sets the value. A fee that compensates an issuer is an interchange transaction fee if the fee is set by the issuer but charged to acquirers by virtue of the network determining each participant's net settlement position.

*2(k) Issuer*

1. *In general.* A person issues a debit card by authorizing the use of debit card by a cardholder to perform electronic debit transactions. That person may provide the card directly to the cardholder or indirectly by using a third party (such as a processor, or a telephone network or manufacturer) to provide the card, or other payment code or device, to the cardholder. The following examples illustrate the entity that is the issuer under various card program arrangements. For purposes of determining whether an issuer is exempted under §235.5(a), however, the term issuer is limited to the entity that holds the account being debited.

2. *Traditional debit card arrangements.* In a traditional debit card arrangement, the bank or other entity holds the cardholder's funds and authorizes the cardholder to use the debit card to access those funds through electronic debit transactions, and the cardholder receives the card directly or indirectly (*e.g.,* through an agent) from the bank or other entity that holds the funds (except for decoupled debit cards, discussed below). In this system, the bank or entity holding the cardholder's funds is the issuer.

3. *BIN-sponsor arrangements.* Payment card networks assign Bank Identification Numbers (BINs) to member-institutions for purposes of issuing cards, authorizing, clearing, settling, and other processes. In exchange for a fee or other financial considerations, some members of payment card networks permit other entities to issue debit cards using the member's BIN. The entity permitting the use of its BIN is referred to as the ''BIN sponsor'' and the entity that uses the BIN to issue cards is often referred to as the ''affiliate member.'' BIN sponsor arrangements can follow at least two different models:

i. *Sponsored debit card model.* In some cases, a community bank or credit union may provide debit cards to its account holders through a BIN sponsor arrangement with a member institution. In general, the bank or credit union will authorize its account holders to use debit cards to perform electronic debit transactions that access funds in accounts at the bank or credit union. The bank or credit union's name typically will appear on the debit card. The bank or credit union may directly or indirectly provide the cards to cardholders. Under these circumstances, the bank or credit union is the issuer for purposes of this part. If that bank or credit union, together with its affiliates, has assets of less than $10 billion, then that bank or credit union is exempt from the interchange transaction fee restrictions. Although the bank or credit union may distribute cards through the BIN sponsors, the BIN sponsor does not enter into the agreement with the cardholder that authorizes the cardholder to use the card to perform electronic debit

SA 15

transactions that access funds in the account at the bank or credit union, and therefore the BIN sponsor is not the issuer.

ii. *Prepaid card model.* A member institution may also serve as the BIN sponsor for a prepaid card program. Under these arrangements, a program manager distributes prepaid cards to the cardholders and the BIN-sponsoring institution generally holds the funds for the prepaid card program in an omnibus or pooled account. Either the BIN sponsor or the prepaid card program manager may keep track of the underlying funds for each individual prepaid card through sub-accounts. While the cardholder may receive the card directly from the program manager or at a retailer, the BIN sponsor authorizes the cardholder to use the card to perform electronic debit transactions that access the funds in the pooled account and the cardholder's relationship generally is with the BIN sponsor. Accordingly, under these circumstances, the BIN sponsor, or the bank holding the pooled account, is the issuer.

4. *Decoupled debit cards.* In the case of decoupled debit cards, an entity other than the bank holding the cardholder's account enters into a relationship with the cardholder authorizing the use of the card to perform electronic debit transactions. The entity authorizing the use of the card to perform electronic debit transaction typically arranges for the card to be provided directly or indirectly to the cardholder and has a direct relationship with the cardholder with respect to the card. The bank holding the cardholder's account has agreed generally to permit ACH debits to the account, but has not authorized the use of the debit card to access the funds through electronic debit transactions. Under these circumstances, the entity authorizing the use of the debit card, and not the account-holding institution, is considered the issuer. An issuer of a decoupled debit card is not exempt under §235.5(a), even if, together with its affiliates, it has assets of less than $10 billion, because it is not the entity holding the account to be debited.

*2(l) Merchant [Reserved]*

*2(m) Payment Card Network*

1. *In general.* An entity is a considered a payment card network with respect to an electronic debit transaction for purposes of this rule if it routes information and data to the issuer from the acquirer to conduct authorization, clearance, and settlement of the electronic debit transaction. By contrast, if an entity receives transaction information and data from a merchant and authorizes and settles the transaction without routing the information and data to another entity (*i.e.*, the issuer or the issuer's processor) for authorization, clearance, or settlement, that entity is not considered a payment card network with respect to the electronic debit transaction.

2. *Three-party systems.* In the case of a three-party system, electronic debit transactions are processed by an entity that acts as system operator and issuer, and may also act as the acquirer. The entity acting as system operator and issuer that receives the transaction information from the merchant or acquirer also holds the cardholder's funds. Therefore, rather than directing the transaction information to a separate issuer, the entity authorizes and settles the transaction based on the information received from the merchant. As these entities do not connect (or ''network'') multiple issuers and do not route information to conduct the transaction, they are not ''payment card networks'' with respect to these transactions.

3. *Processors as payment card networks.* A processor is considered a payment card network if, in addition to acting as processor for an acquirer and issuer, the processor routes transaction information and data received from a merchant or the merchant's acquirer to an issuer. For example, if a merchant uses a processor in order to accept any, some, or all brands of debit cards and the processor routes transaction information and data to the issuer or issuer's processor, the merchant's processor is considered a payment card network with respect to the electronic debit transaction. If the processor establishes, charges, or receives a fee for the purpose of compensating an issuer, that fee is considered an interchange transaction fee for purposes of this part.

4. *Automated clearing house (ACH) operators.* An ACH operator is not considered a payment card network for purposes of this part. While an ACH operator processes transactions that debit an account and provides for interbank clearing and settlement of such transactions, a person does not use the ACH system to accept as a form of payment a brand of debit card.

5. *ATM networks.* An ATM network is not considered a payment card network for purposes of this part. While ATM networks process transactions that debit an account and provide for interbank clearing and settlement of such transactions, a cash withdrawal from an ATM is not a payment because there is no exchange of money for goods or services, or payment made as a charitable contribution, to satisfy an obligation (*e.g.*, tax liability), or for other purposes.

*2(n) Person [Reserved]*

*2(o) Processor*

1. *Distinction from acquirers.* A processor may perform all transaction-processing functions for a merchant or acquirer, but if it does not acquire (that is, settle with the merchant for the transactions), it is not an

**Federal Reserve System**

**Pt. 235, App. A**

acquirer. The entity that acquirers electronic debit transactions is the entity that is responsible to other parties to the electronic debit transaction for the amount of the transaction.

2. *Issuers.* A processor may perform services related to authorization, clearance, and settlement of transactions for an issuer without being considered to be an issuer for purposes of this part.

*2(p) Route*

1. An entity routes information if it both directs and sends the information to an unaffiliated entity (or affiliated entity acting on behalf of the unaffiliated entity). This other entity may be a payment card network or processor (if the entity directing and sending the information is a merchant or an acquirer) or an issuer or processor (if the entity directing and sending the information is a payment card network).

*2(q) United States [Reserved]*

SECTION 235.3 REASONABLE AND PROPORTIONAL INTERCHANGE TRANSACTION FEES

*3(a) [Reserved]*

*3(b) Determining Reasonable and Proportional Fees*

1. *Two components.* The standard for the maximum permissible interchange transaction fee that an issuer may receive consists of two components: a base component that does not vary with a transaction's value and an *ad valorem* component. The amount of any interchange transaction fee received or charged by an issuer may not exceed the sum of the maximum permissible amounts of each component and any fraud-prevention adjustment the issuer is permitted to receive under § 235.4 of this part.

2. *Variation in interchange fees.* An issuer is permitted to charge or receive, and a network is permitted to establish, interchange transaction fees that vary in their base component and *ad valorem* component based on, for example, the type of transaction or merchant, provided the amount of any interchange transaction fee for any transaction does not exceed the sum of the maximum permissible base component of 21 cents and 5 basis points of the value of the transaction.

3. *Example.* For a $39 transaction, the maximum permissible interchange transaction fee is 22.95 cents (21 cents plus 5 basis points of $39). A payment card network may, for example, establish an interchange transaction fee of 22 cents without any *ad valorem* component.

SECTION 235.4 FRAUD-PREVENTION ADJUSTMENT

*4(b) Issuer Standards*

SECTION 235.4 FRAUD-PREVENTION ADJUSTMENT

*4(a) [Reserved]*

*4(b)(1) Issuer standards*

1. An issuer's policies and procedures should address fraud related to debit card use by unauthorized persons. Examples of use by unauthorized persons include, but are not limited to, the following:

i. A thief steals a cardholder's wallet and uses the debit card to purchase goods, without the authority of the cardholder.

ii. A cardholder makes a purchase at a merchant. Subsequently, the merchant's employee uses information from the debit card to initiate a subsequent transaction, without the authority of the cardholder.

iii. A hacker steals cardholder account information from the issuer or a merchant processor and uses the stolen information to make unauthorized card-not-present purchases or to create a counterfeit card to make unauthorized card-present purchases.

2. An issuer's policies and procedures must be designed to reduce fraud, where cost effective, across all types of electronic debit transactions in which its cardholders engage. Therefore, an issuer should consider whether its policies and procedures are effective for each method used to authenticate the card (*e.g.*, a chip or a code embedded in the magnetic stripe) and the cardholder (*e.g.*, a signature or a PIN), and for different sales channels (e.g., card-present and card-not-present).

3. An issuer's policies and procedures must be designed to take effective steps to reduce both the occurrence of and costs to all parties from fraudulent electronic debit transactions. An issuer should take steps reasonably designed to reduce the number and value of its fraudulent electronic debit transactions relative to its non-fraudulent electronic debit transactions. These steps should reduce the costs from fraudulent transactions to all parties, not merely the issuer. For example, an issuer should take steps to reduce the number and value of its fraudulent electronic debit transactions relative to its non-fraudulent transactions whether or not it bears the fraud losses as a result of regulations or network rules.

4. For any given issuer, the number and value of fraudulent electronic debit transactions relative to non-fraudulent transactions may vary materially from year to year. Therefore, in certain circumstances, an issuer's policies and procedures may be effective notwithstanding a relative increase in the transactions that are fraudulent in a

75

SA 17

particular year. However, continuing increases in the share of fraudulent transactions would warrant further scrutiny.

5. In determining which fraud-prevention technologies to implement or retain, an issuer must consider the cost-effectiveness of the technology, that is, the expected cost of the technology relative to its expected effectiveness in controlling fraud. In evaluating the cost of a particular technology, an issuer should consider whether and to what extent other parties will incur costs to implement the technology, even though an issuer may not have complete information about the costs that may be incurred by other parties, such as the cost of new merchant terminals. In evaluating the costs, an issuer should consider both initial implementation costs and ongoing costs of using the fraud-prevention method.

6. An issuer need not develop fraud-prevention technologies itself to satisfy the standards in §235.4(b). An issuer may implement fraud-prevention technologies that have been developed by a third party that the issuer has determined are appropriate under its own policies and procedures.

*Paragraph 4(b)(2) Elements of fraud-prevention policies and procedures.*

1. *In general.* An issuer may tailor its policies and procedures to address its particular debit card program, including the size of the program, the types of transactions in which its cardholders commonly engage, fraud types and methods experienced by the issuer, and the cost of implementing new fraud-prevention methods in light of the expected fraud reduction.

*Paragraph 4(b)(2)(i). Methods to identify and prevent fraudulent debit card transactions.*

1. *In general.* Examples of policies and procedures reasonably designed to identify and prevent fraudulent electronic debit transactions include the following:

i. Practices to help determine whether a card is authentic and whether the user is authorized to use the card at the time of a transaction. For example, an issuer may specify the use of particular authentication technologies or methods, such as dynamic data, to better authenticate a card and cardholder at the time of the transaction, to the extent doing so does not inhibit the ability of a merchant to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions. (*See* §235.7 and commentary thereto.)

ii. An automated mechanism to assess the risk that a particular electronic debit transaction is fraudulent during the authorization process (*i.e.*, before the issuer approves or declines an authorization request). For example, an issuer may use neural networks to identify transactions that present increased risk of fraud. As a result of this analysis, the issuer may decide to decline to authorize these transactions. An issuer may not be able to determine whether a given transaction in isolation is fraudulent at the time of authorization, and therefore may have implemented policies and procedures that monitor sets of transactions initiated with a cardholder's debit card. For example, an issuer could compare a set of transactions initiated with the card to a customer's typical transactions in order to determine whether a transaction is likely to be fraudulent. Similarly, an issuer could compare a set of transactions initiated with a debit card and common fraud patterns in order to determine whether a transaction or future transaction is likely to be fraudulent.

iii. Practices to support reporting of lost and stolen cards or suspected incidences of fraud by cardholders or other parties to a transaction. As an example, an issuer may promote customer awareness by providing text alerts of transactions in order to detect fraudulent transactions in a timely manner. An issuer may also report debit cards suspected of being fraudulent to their networks for inclusion in a database of potentially compromised cards.

*Paragraph 4(b)(2)(ii). Monitoring of the issuer's volume and value of fraudulent electronic debit transactions.*

1. Tracking its fraudulent electronic debit transactions over time enables an issuer to assess whether its policies and procedures are effective. Accordingly, an issuer must include policies and procedures designed to monitor trends in the number and value of its fraudulent electronic debit transactions. An effective monitoring program would include tracking issuer losses from fraudulent electronic debit transactions, fraud-related chargebacks to acquirers, losses passed on to cardholders, and any other reimbursements from other parties. Other reimbursements could include payments made to issuers as a result of fines assessed to merchants for non-compliance with Payment Card Industry (PCI) Data Security Standards or other industry standards. An issuer should also establish procedures to track fraud-related information necessary to perform its reviews under §235.4(b)(3) and to retain and report information as required under §235.8.

*Paragraph 4(b)(2)(iii). Appropriate responses to suspicious electronic debit transactions.*

1. An issuer may identify transactions that it suspects to be fraudulent after it has authorized or settled the transaction. For example, a cardholder may inform the issuer that the cardholder did not initiate a transaction or transactions, or the issuer may learn of a fraudulent transaction or possibly

**Federal Reserve System**                                                          **Pt. 235, App. A**

compromised debit cards from the network, the acquirer, or other parties. An issuer must implement policies and procedures designed to provide an appropriate response once an issuer has identified suspicious transactions to reduce the occurrence of future fraudulent electronic debit transactions and the costs associated with such transactions. The appropriate response may differ depending on the facts and circumstances, including the issuer's assessment of the risk of future fraudulent electronic debit transactions. For example, in some circumstances, it may be sufficient for an issuer to monitor more closely the account with the suspicious transactions. In other circumstances, it may be necessary to contact the cardholder to verify a transaction, reissue a card, or close an account. An appropriate response may also require coordination with industry organizations, law enforcement agencies, and other parties, such as payment card networks, merchants, and issuer or merchant processors.

*Paragraph 4(b)(2)(iv). Methods to secure debit card and cardholder data.*

1. An issuer must implement policies and procedures designed to secure debit card and cardholder data. These policies and procedures should apply to data that are transmitted by the issuer (or its service provider) during transaction processing, that are stored by the issuer (or its service provider), and that are carried on media (*e.g.*, laptops, transportable data storage devices) by employees or agents of the issuer. This standard may be incorporated into an issuer's information security program, as required by Section 501(b) of the Gramm-Leach-Bliley Act.

*Paragraph 4(b)(3) Review of and updates to policies and procedures.*

1. i. An issuer's assessment of the effectiveness of its policies and procedures should consider whether they are reasonably designed to reduce the number and value of fraudulent electronic debit transactions relative to non-fraudulent electronic debit transactions and are cost effective. (*See* comment 4(b)(1)–3 and comment 4(b)(1)–5).

ii. An issuer must also assess its policies and procedures in light of changes in fraud types (*e.g.*, the use of counterfeit cards, lost or stolen cards) and methods (*e.g.*, common purchase patterns indicating possible fraudulent behavior), as well as changes in the available methods of detecting and preventing fraudulent electronic debit transactions (*e.g.*, transaction monitoring, authentication methods) as part of its periodic review of its policies and procedures. An issuer's review of its policies and procedures must consider information from the issuer's own experience and that the issuer otherwise identified itself; information from payment

card networks, law enforcement agencies, and fraud-monitoring groups in which the issuer participates; and supervisory guidance. For example, an issuer should consider warnings and alerts it receives from payment card networks regarding compromised cards and data breaches.

2. An issuer should review its policies and procedures and their implementation more frequently than annually if the issuer determines that more frequent review is appropriate based on information obtained from monitoring its fraudulent electronic debit transactions, changes in the types or methods of fraud, or available methods of detecting and preventing fraudulent electronic debit transactions. (*See* §235.4(b)(1)(ii) and commentary thereto.)

3. In light of an issuer's review of its policies and procedures, and their implementation, the issuer may determine that updates to its policies and procedures, and their implementation, are necessary. Merely determining that updates are necessary does not render an issuer ineligible to receive or charge the fraud-prevention adjustment. To remain eligible to receive or charge a fraud-prevention adjustment, however, an issuer should develop and implement such updates as soon as reasonably practicable, in light of the facts and circumstances.

*4(c) Notification.*

1. Payment card networks that plan to allow issuers to receive or charge a fraud-prevention adjustment can develop processes for identifying issuers eligible for this adjustment. Each issuer that wants to be eligible to receive or charge a fraud-prevention adjustment must notify annually the payment card networks in which it participates of its compliance through the networks' processes.

SECTION 235.5  EXEMPTIONS FOR CERTAIN ELECTRONIC DEBIT TRANSACTIONS

1. *Eligibility for multiple exemptions.* An electronic debit transaction may qualify for one or more exemptions. For example, a debit card that has been provided to a person pursuant to a Federal, State, or local government-administered payment program may be issued by an entity that, together with its affiliates, has assets of less than $10 billion as of the end of the preceding calendar year. In this case, an electronic debit transaction made using that card may qualify for the exemption under §235.5(a) for small issuers or for the exemption under §235.5(b) for government-administered payment programs. A payment card network establishing interchange fees for transactions that qualify for more than one exemption need only satisfy itself that the issuer's transactions qualify for at least one of the exemptions in order to

SA 19

exempt the electronic debit transaction from the interchange fee restrictions.

2. *Certification process.* Payment card networks that plan to allow issuers to receive higher interchange fees than permitted under §§235.3 and 235.4 pursuant to one of the exemptions in §235.5 could develop their own processes for identifying issuers and products eligible for such exemptions. Section 235.5(a)(2) permits payment card networks to rely on lists published by the Board to help determine eligibility for the small issuer exemption set forth in §235.5(a)(1).

*5(a) Exemption for Small Issuers*

1. *Asset size determination.* An issuer would qualify for the small-issuer exemption if its total worldwide banking and nonbanking assets, including assets of affiliates, other than trust assets under management, are less than $10 billion, as of December 31 of the preceding calendar year.

2. *Change in status.* If an exempt issuer becomes covered based on its and its affiliates assets at the end of a calendar year, that issuer must begin complying with the interchange fee standards (§235.3), the fraud-prevention adjustment standards (to the extent the issuer wishes to receive a fraud-prevention adjustment) (§235.4), and the provisions prohibiting circumvention, evasion, and net compensation (§235.6) no later than July 1.

*5(b) Exemption for Government-Administered Payment Programs*

1. *Government-administered payment program.* A program is considered government-administered regardless of whether a Federal, State, or local government agency operates the program or outsources some or all functions to third parties so long as the program is operated on behalf of the government agency. In addition, a program may be government-administered even if a Federal, State, or local government agency is not the source of funds for the program it administers. For example, child support programs are government-administered programs even though a Federal, State, or local government agency is not the source of funds. A tribal government is considered a local government for purposes of this exemption.

*5(c) Exemption for Certain Reloadable Prepaid Cards*

1. *Subaccount clarified.* A subaccount is an account within an account, opened in the name of an agent, nominee, or custodian for the benefit of two or more cardholders, where the transactions and balances of individual cardholders are tracked in such subaccounts. An account that is opened solely in the name of a single cardholder is not a subaccount.

2. *Reloadable.* A general-use prepaid card is "reloadable" if the terms and conditions of

the agreement permit funds to be added to the general-use prepaid card at any time after the initial purchase or issuance. A general-use prepaid card is not "reloadable" merely because the issuer or processor is technically able to add functionality that would otherwise enable the general-use prepaid card to be reloaded.

3. *Marketed or labeled as a gift card or gift certificate.* i. Electronic debit transactions made using a reloadable general-use prepaid card are not exempt from the interchange fee restrictions if the card is marketed or labeled as a gift card or gift certificate. The term "marketed or labeled as a gift card or gift certificate" means directly or indirectly offering, advertising or otherwise suggesting the potential use of a general-use prepaid card as a gift for another person. Whether the exclusion applies generally does not depend on the type of entity that makes the promotional message. For example, a card may be marketed or labeled as a gift card or gift certificate if anyone (other than the purchaser of the card), including the issuer, the retailer, the program manager that may distribute the card, or the payment network on which a card is used, promotes the use of the card as a gift card or gift certificate. A general-use prepaid card is marketed or labeled as a gift card or gift certificate even if it is only occasionally marketed as a gift card or gift certificate. For example, a network-branded general purpose reloadable card would be marketed or labeled as a gift card or gift certificate if the issuer principally advertises the card as a less costly alternative to a bank account but promotes the card in a television, radio, newspaper, or Internet advertisement, or on signage as "the perfect gift" during the holiday season.

ii. The mere mention of the availability of gift cards or gift certificates in an advertisement or on a sign that also indicates the availability of exempted general-use prepaid cards does not by itself cause the general-use prepaid card to be marketed as a gift card or a gift certificate. For example, the posting of a sign in a store that refers to the availability of gift cards does not by itself constitute the marketing of otherwise exempted general-use prepaid cards that may also be sold in the store along with gift cards or gift certificates, provided that a person acting reasonably under the circumstances would not be led to believe that the sign applies to all cards sold in the store. (*See, however,* comment 5(c)-4.ii.)

4. *Examples of marketed or labeled as a gift card or gift certificate.*

i. The following are examples of marketed or labeled as a gift card or gift certificate:

A. Using the word "gift" or "present" on a card or accompanying material, including documentation, packaging and promotional displays;

B. Representing or suggesting that a card can be given to another person, for example, as a ''token of appreciation'' or a ''stocking stuffer,'' or displaying a congratulatory message on the card or accompanying material;

C. Incorporating gift-giving or celebratory imagery or motifs, such as a bow, ribbon, wrapped present, candle, or a holiday or congratulatory message, on a card, accompanying documentation, or promotional material;

ii. The term does not include the following:

A. Representing that a card can be used as a substitute for a checking, savings, or deposit account;

B. Representing that a card can be used to pay for a consumer's health-related expenses—for example, a card tied to a health savings account;

C. Representing that a card can be used as a substitute for travelers checks or cash;

D. Representing that a card can be used as a budgetary tool, for example, by teenagers, or to cover emergency expenses.

5. *Reasonable policies and procedures to avoid marketing as a gift card.* The exemption for a general-use prepaid card that is reloadable and not marketed or labeled as a gift card or gift certificate in §235.5(c) applies if a reloadable general-use prepaid card is not marketed or labeled as a gift card or gift certificate and if persons involved in the distribution or sale of the card, including issuers, program managers, and retailers, maintain policies and procedures reasonably designed to avoid such marketing. Such policies and procedures may include contractual provisions prohibiting a reloadable general-use prepaid card from being marketed or labeled as a gift card or gift certificate, merchandising guidelines or plans regarding how the product must be displayed in a retail outlet, and controls to regularly monitor or otherwise verify that the general-use prepaid card is not being marketed as a gift card. Whether a general-use prepaid card has been marketed as a gift card or gift certificate will depend on the facts and circumstances, including whether a reasonable person would be led to believe that the general-use prepaid card is a gift card or gift certificate. The following examples illustrate the application of §235.5(c):

i. An issuer or program manager of prepaid cards agrees to sell general-purpose reloadable cards through a retailer. The contract between the issuer or program manager and the retailer establishes the terms and conditions under which the cards may be sold and marketed at the retailer. The terms and conditions prohibit the general-purpose reloadable cards from being marketed as a gift card or gift certificate, and require policies and procedures to regularly monitor or otherwise verify that the cards are not being marketed as such. The issuer or program manager sets up one promotional display at

the retailer for gift cards and another physically separated display for exempted products under §235.5(c), including general-purpose reloadable cards, such that a reasonable person would not believe that the exempted cards are gift cards. The exemption in §235.5(c) applies because policies and procedures reasonably designed to avoid the marketing of the general-purpose reloadable cards as gift cards or gift certificates are maintained, even if a retail clerk inadvertently stocks or a consumer inadvertently places a general-purpose reloadable card on the gift card display.

ii. Same facts as in comment 5(c)–5.i, except that the issuer or program manager sets up a single promotional display at the retailer on which a variety of prepaid cards are sold, including store gift cards and general-purpose reloadable cards. A sign stating ''Gift Cards'' appears prominently at the top of the display. The exemption in §235.5(c) does not apply with respect to the general-purpose reloadable cards because policies and procedures reasonably designed to avoid the marketing of exempted cards as gift cards or gift certificates are not maintained.

iii. Same facts as in comment 5(c)–5.i, except that the issuer or program manager sets up a single promotional multi-sided display at the retailer on which a variety of prepaid card products, including store gift cards and general-purpose reloadable cards are sold. Gift cards are segregated from exempted cards, with gift cards on one side of the display and exempted cards on a different side of a display. Signs of equal prominence at the top of each side of the display clearly differentiate between gift cards and the other types of prepaid cards that are available for sale. The retailer does not use any more conspicuous signage suggesting the general availability of gift cards, such as a large sign stating ''Gift Cards'' at the top of the display or located near the display. The exemption in §235.5(c) applies because policies and procedures reasonably designed to avoid the marketing of the general-purpose reloadable cards as gift cards or gift certificates are maintained, even if a retail clerk inadvertently stocks or a consumer inadvertently places a general-purpose reloadable card on the gift card display.

iv. Same facts as in comment 5(c)–5.i, except that the retailer sells a variety of prepaid card products, including store gift cards and general-purpose reloadable cards, arranged side-by-side in the same checkout lane. The retailer does not affirmatively indicate or represent that gift cards are available, such as by displaying any signage or other indicia at the checkout lane suggesting the general availability of gift cards. The exemption in §235.5(c) applies because policies and procedures reasonably designed to avoid marketing the general-purpose

reloadable cards as gift cards or gift certificates are maintained.

6. *On-line sales of prepaid cards.* Some web sites may prominently advertise or promote the availability of gift cards or gift certificates in a manner that suggests to a consumer that the web site exclusively sells gift cards or gift certificates. For example, a web site may display a banner advertisement or a graphic on the home page that prominently states "Gift Cards," "Gift Giving," or similar language without mention of other available products, or use a web address that includes only a reference to gift cards or gift certificates in the address. In such a case, a consumer acting reasonably under the circumstances could be led to believe that all prepaid products sold on the web site are gift cards or gift certificates. Under these facts, the web site has marketed all such products as gift cards or gift certificates, and the exemption in § 235.5(c) does not apply to any products sold on the web site.

7. *Temporary non-reloadable cards issued in connection with a general-use reloadable card.* Certain general-purpose prepaid cards that are typically marketed as an account substitute initially may be sold or issued in the form of a temporary non-reloadable card. After the card is purchased, the cardholder is typically required to call the issuer to register the card and to provide identifying information in order to obtain a reloadable replacement card. In most cases, the temporary non-reloadable card can be used for purchases until the replacement reloadable card arrives and is activated by the cardholder. Because the temporary non-reloadable card may only be obtained in connection with the reloadable card, the exemption in § 235.5(c) applies so long as the card is not marketed as a gift card or gift certificate.

*5(d) Exception*

1. *Additional ATM access.* Some debit cards may be used to withdraw cash from ATMs that are not part of the issuer's designated ATM network. An electronic debit card transaction may still qualify for the exemption under §§ 235.5(b) or (c) with a respect to a card for which a fee may be imposed for a withdrawal from an ATM that is outside of the issuer's designated ATM network as long as the card complies with the condition set forth in § 235.5(d)(2) for withdrawals within the issuer's designated ATM network. The condition with respect to ATM fees does not apply to cards that do not provide ATM access.

SECTION 235.6 PROHIBITION ON CIRCUMVEN- TION, EVASION, AND NET COMPENSATION

1. *No applicability to exempt issuers or electronic debit transactions.* The prohibition against circumventing or evading the inter- change transaction fee restrictions or against net compensation does not apply to issuers or electronic debit transactions that qualify for an exemption under § 235.5 from the interchange transaction fee restrictions.

*6(a) Prohibition of Circumvention or Evasion*

1. *Finding of circumvention or evasion.* A finding of evasion or circumvention will depend on all relevant facts and circumstances. Although net compensation may be one form of circumvention or evasion prohibited under § 235.6(a), it is not the only form.

2. *Examples of circumstances that may constitute circumvention or evasion.*

The following examples do not constitute per se circumvention or evasion, but may warrant additional supervisory scrutiny to determine whether the totality of the facts and circumstances constitute circumvention or evasion:

i. A payment card network decreases network processing fees paid by issuers for electronic debit transactions by 50 percent and increases the network processing fees charged to merchants or acquirers with respect to electronic debit transactions by a similar amount. Because the requirements of this subpart do not restrict or otherwise establish the amount of fees that a network may charge for its services, the increase in network fees charged to merchants or acquirers and decrease in fees charged to issuers is not a per se circumvention or evasion of the interchange transaction fee standards, but may warrant additional supervisory scrutiny to determine whether the facts and circumstances constitute circumvention or evasion.

ii. An issuer replaces its debit cards with prepaid cards that are exempt from the interchange limits of §§ 235.3 and 235.4. The exempt prepaid cards are linked to its customers' transaction accounts and funds are swept from the transaction accounts to the prepaid accounts as needed to cover transactions made. Again, this arrangement is not per se circumvention or evasion, but may warrant additional supervisory scrutiny to determine whether the facts and circumstances constitute circumvention or evasion.

*6(b) Prohibition of Net Compensation*

1. *Net compensation.* Net compensation to an issuer through the use of network fees is prohibited.

2. *Consideration of payments or incentives provided by the network in net compensation determination.*

i. For purposes of the net compensation determination, payments or incentives paid by a payment card network to an issuer with respect to electronic debit transactions or debit card related activities could include, but are not limited to, marketing incentives;

SA 22

**Federal Reserve System**                                          **Pt. 235, App. A**

payments or rebates for meeting or exceeding a specific transaction volume, percentage share, or dollar amount of transactions processed; or other payments for debit card related activities. For example, signing bonuses paid by a network to an issuer for the issuer's debit card portfolio would also be included in the total amount of payments or incentives received by an issuer from a payment card network with respect to electronic debit transactions. A signing bonus for an entire card portfolio, including credit cards, may be allocated to the issuer's debit card business based on the proportion of the cards or transactions that are debit cards or electronic debit transactions, as appropriate to the situation, for purposes of the net compensation determination.

ii. Incentives paid by the network with respect to multiple-year contracts may be allocated over the life of the contract.

iii. For purposes of the net compensation determination, payments or incentives paid by a payment card network with respect to electronic debit transactions or debit card-related activities do not include interchange transaction fees that are passed through to the issuer by the network, or discounts or rebates provided by the network or an affiliate of the network for issuer-processor services. In addition, funds received by an issuer from a payment card network as a result of chargebacks, fines paid by merchants or acquirers for violations of network rules, or settlements or recoveries from merchants or acquirers to offset the costs of fraudulent transactions or a data security breach do not constitute incentives or payments made by a payment card network.

3. *Consideration of fees paid by an issuer in net compensation determination.*

i. For purposes of the net compensation determination, fees paid by an issuer to a payment card network with respect to electronic debit transactions or debit card related activities include, but are not limited to, membership or licensing fees, network administration fees, and fees for optional network services, such as risk management services.

ii. For purposes of the net compensation determination, fees paid by an issuer to a payment card network with respect to electronic debit transactions or debit card-related activities do not include network processing fees (such as switch fees and network connectivity fees) or fees paid to an issuer processor affiliated with the network for authorizing, clearing, or settling an electronic debit transaction.

4. *Example of circumstances not involving net compensation to the issuer.* The following example illustrates circumstances that would not indicate net compensation by the payment card network to the issuer:

i. Because of an increase in debit card transactions that are processed through a payment card network during a calendar year, an issuer receives an additional volume-based incentive payment from the network for that period. Over the same period, however, the total network fees (other than processing fees) the issuer pays the payment card network with respect to debit card transactions also increase so that the total amount of fees paid by the issuer to the network continue to exceed incentive payments by the network to the issuer. Under these circumstances, the issuer does not receive net compensation from the network for electronic debit transactions or debit card related activities.

SECTION 235.7  LIMITATIONS ON PAYMENT
CARD RESTRICTIONS

1. *Application of small issuer, government-administered payment program, and reloadable card exemptions to payment card network restrictions.* The exemptions under §235.5 for small issuers, cards issued pursuant to government-administered payment programs, and certain reloadable prepaid cards do not apply to the limitations on payment card network restrictions. For example, debit cards for government-administered payment programs, although exempt from the restrictions on interchange transaction fees, are subject to the requirement that electronic debit transactions made using such cards must be capable of being processed on at least two unaffiliated payment card networks and to the prohibition on inhibiting a merchant's ability to determine the routing for electronic debit transactions.

*7(a) Prohibition on Network Exclusivity*

1. *Scope of restriction.* Section 235.7(a) requires a debit card subject to the regulation to be enabled on at least two unaffiliated payment card networks. This paragraph does not, however, require an issuer to have two or more unaffiliated networks available for each method of cardholder authentication. For example, it is sufficient for an issuer to issue a debit card that operates on one signature-based card network and on one PIN-based card network, as long as the two card networks are not affiliated. Alternatively, an issuer may issue a debit card that is accepted on two unaffiliated signature-based card networks or on two unaffiliated PIN-based card networks. *See also,* comment 7(a)–7.

2. *Permitted networks.* i. A smaller payment card network could be used to help satisfy the requirement that an issuer enable two unaffiliated networks if the network was willing to expand its coverage in response to increased merchant demand for access to its network and it meets the other requirements for a permitted arrangement, including taking steps reasonably designed to enable it to process the electronic debit transactions

SA 23

that it would reasonably expect to be routed to it. If, however, the network's policy or practice is to limit such expansion, it would not qualify as one of the two unaffiliated networks.

ii. A payment card network that is accepted only at a limited category of merchants (such as a particular grocery store chain, merchants located in a particular shopping mall, or a single class of merchants, such as grocery stores or gas stations) would not satisfy the rule.

iii. One of the steps a network can take to form a reasonable expectation of transaction volume is to consider factors such as the number of cards expected to be issued that are enabled on the network and expected card usage patterns.

3. *Examples of prohibited network restrictions on an issuer's ability to contract.* The following are examples of prohibited network restrictions on an issuer's ability to contract with other payment card networks:

i. Network rules or contract provisions limiting or otherwise restricting the other payment card networks that may be enabled on a particular debit card, or network rules or contract provisions that specify the other networks that may be enabled on a particular debit card.

ii. Network rules or guidelines that allow only that network's (or its affiliated network's) brand, mark, or logo to be displayed on a particular debit card, or that otherwise limit the ability of brands, marks, or logos of other payment card networks to appear on the debit card.

4. *Network logos or symbols on card not required.* Section 235.7(a) does not require that a debit card display the brand, mark, or logo of each payment card network over which an electronic debit transaction may be processed. For example, this rule does not require a debit card that is enabled for two or more unaffiliated payment card networks to bear the brand, mark, or logo for each card network.

5. *Voluntary exclusivity arrangements prohibited.* Section 235.7(a) requires the issuance of debit cards that are enabled on at least two unaffiliated payment card networks, even if the issuer is not subject to any rule of, or contract or other agreement with, a payment card network requiring that all or a specified minimum percentage of electronic debit transactions be processed on the network or its affiliated networks.

6. *Affiliated payment card networks.* Section 235.7(a) does not prohibit an issuer from including an affiliated payment card network among the networks that may process an electronic debit transaction with respect to a particular debit card, as long as at least two of the networks that are enabled on the card are unaffiliated. For example, an issuer may offer debit cards that are accepted on a payment card network for signature debit

transactions and on an affiliated payment card network for PIN debit transactions as long as those debit cards may also be accepted on another unaffiliated payment card network.

7. *Application of rule regardless of form factor.* The network exclusivity provisions in § 235.7(a) require that all debit cards be enabled on at least two unaffiliated payment card networks for electronic debit transactions, regardless of whether the debit card is issued in card form. This applies to any supplemental device, such as a fob or token, or chip or application in a mobile phone, that is issued in connection with a plastic card, even if that plastic card fully complies with the rule.

*7(b) Prohibition on Routing Restrictions*

1. *Relationship to the network exclusivity restrictions.* An issuer or payment card network is prohibited from inhibiting a merchant's ability to route or direct an electronic debit transaction over any of the payment card networks that the issuer has enabled to process an electronic debit transaction for that particular debit card. This rule does not permit a merchant to route the transaction over a network that the issuer did not enable to process transactions using that debit card.

2. *Examples of prohibited merchant restrictions.* The following are examples of issuer or network practices that would inhibit a merchant's ability to direct the routing of an electronic debit transaction that are prohibited under § 235.7(b):

i. Prohibiting a merchant from encouraging or discouraging a cardholder's use of a particular method of debit card authorization, such as rules prohibiting merchants from favoring a cardholder's use of PIN debit over signature debit, or from discouraging the cardholder's use of signature debit.

ii. Establishing network rules or designating issuer priorities directing the processing of an electronic debit transaction on a specified payment card network or its affiliated networks, or directing the processing of the transaction away from a specified network or its affiliates, except as a default rule in the event the merchant, or its acquirer or processor, does not designate a routing preference, or if required by state law.

iii. Requiring a specific payment card network based on the type of access device provided to the cardholder by the issuer.

3. *Merchant payments not prohibited.* A payment card network does not restrict a merchant's ability to route transactions over available payment card networks in violation of § 235.7(b) by offering payments or other incentives to encourage the merchant to route electronic debit card transactions to the network for processing.

4. *Real-time routing decision not required.* A merchant need not make network routing

SA 24

**Federal Reserve System**                                    **Pt. 238**

decisions on a transaction-by-transaction basis. A merchant and its acquirer or processor may agree to a pre-determined set of routing choices that apply to all electronic debit transactions that are processed by the acquirer or processor on behalf of the merchant.

5. *No effect on network rules governing the routing of subsequent transactions.* Section 235.7 does not supersede a network rule that requires a chargeback or return of an electronic debit transaction to be processed on the same network that processed the original transaction.

### 7(c) Effective Date

1. *Health care and employee benefit cards.* Section 235.7(c)(1) delays the effective date of the network exclusivity provisions for certain debit cards issued in connection with a health care or employee benefit account to the extent such cards use (even if not required) transaction substantiation or qualification authorization systems at point of sale to verify that the card is only used for eligible goods and services for purposes of qualifying for favorable tax treatment under Internal Revenue Code requirements. Debit cards that may qualify for the delayed effective date include, but may not be limited to, cards issued in connection with flexible spending accounts established under section 125 of the Internal Revenue Code for health care related expenses and health reimbursement accounts established under section 105 of the Internal Revenue Code.

SECTION 235.8  REPORTING REQUIREMENTS AND RECORD RETENTION

[Reserved]

SECTION 235.9  ADMINISTRATIVE ENFORCEMENT

[Reserved]

SECTION 235.10  EFFECTIVE AND COMPLIANCE DATES

[Reserved]

[76 FR 43466, July 20, 2011, as amended at 76 FR 43467, July 20, 2011; 77 FR 46280, Aug. 3, 2012]

SA 25

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of October, 2013, two copies of the foregoing Brief for Defendant-Appellant were served on the following counsel by First Class U.S. Mail, postage prepaid, and that service was also made electronically through the Court's CM/ECF system:

Shannen W. Coffin, Esq.
Douglas Kantor, Esq.
Linda C. Bailey, Esq.
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
scoffin@steptoe.com
dkantor@steptoe.com
lbailey@steptoe.com

*Counsel for Plaintiffs-Appellees*

Seth P. Waxman, Esq.
Wilmer Cutler Pickering Hale
   and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
seth.waxman@wilmerhale.com

*Counsel for Amici Curiae*

  /s/  Joshua P. Chadwick
Joshua P. Chadwick
Board of Governors of the
   Federal Reserve System
Washington, D.C.  20551
Telephone:  (202) 263-4835
Facsimile:  (202) 736-5615
joshua.p.chadwick@frb.gov

*Counsel for Defendant-Appellant*