# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

NACS, et al.,

*Plaintiffs-Appellees*,

*v.*

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the District of Columbia, Hon. Richard J. Leon

---

## BRIEF FOR AMICI CURIAE THE CLEARING HOUSE ASSOCIATION L.L.C., AMERICAN BANKERS ASSOCIATION, CONSUMER BANKERS ASSOCIATION, CREDIT UNION NATIONAL ASSOCIATION, THE FINANCIAL SERVICES ROUNDTABLE, INDEPENDENT COMMUNITY BANKERS OF AMERICA, MID-SIZE BANK COALITION OF AMERICA, NATIONAL ASSOCIATION OF FEDERAL CREDIT UNIONS, AND NATIONAL BANKERS ASSOCIATION IN SUPPORT OF NEITHER PARTY AND REVERSAL

---

NOAH A. LEVINE
ALAN SCHOENFELD
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800

H. RODGIN COHEN
MATTHEW A. SCHWARTZ
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004

SETH P. WAXMAN
  *Counsel of Record*
ALBINAS PRIZGINTAS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

PAUL SALTZMAN
ROB HUNTER
THE CLEARING HOUSE ASSOCIATION L.L.C.
450 West 33rd Street
New York, NY  10001

*(Additional counsel listed on signature pages)*

October 21, 2013

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### Parties and Amici

All parties, intervenors, and amici in this case and the case below are listed in the Defendant-Appellant's Certificate as to Parties, Rulings, and Related Cases.

### Rulings Under Review

Reference to the ruling under review is listed in the Defendant-Appellant's Certificate as to Parties, Rulings, and Related Cases.

### Related Cases

This case was not previously before this Court or any court other than the District Court below.  Counsel are unaware of any related cases currently pending in this Court or any other court.

### Statutory and Regulatory Provisions Involved

Pertinent federal statutes and regulations are presented in the addendum to this brief.

i

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, none of the amici curiae has a parent corporation or publicly-held corporation that owns 10% or more of its stock.

Pursuant to D.C. Circuit Rule 26.1(b), amici identify below their general nature and purpose, insofar as relevant to this litigation:

### American Bankers Association

The American Bankers Association ("ABA") is the principal national trade association of the financial services industry in the United States. Founded in 1875, the ABA is the voice for the nation's $13 trillion banking industry and its 2 million employees. ABA members are located in each of the fifty States and the District of Columbia, and include financial institutions of all sizes and types, both large and small.

### The Clearing House Association L.L.C.

Established in 1853, The Clearing House is the nation's oldest banking association and payments company. Its members include the world's largest commercial banks, which employ 1.4 million people in the United States and hold more than half of all U.S. deposits. The Clearing House is a nonpartisan advocacy organization representing through regulatory comment letters, amicus briefs and white papers the interests of its owner banks on a variety of systemically important

banking issues.  The Clearing House frequently represents the interests of the banking industry as amicus curiae in litigation concerning a variety of systemically important banking issues, including recent cases in the United States Supreme Court, the United States Courts of Appeals for the First, Second, Third, Fifth, Eighth, Ninth, Eleventh, and Federal Circuits, and numerous United States District Courts.  The Clearing House Payments Company provides payment, clearing, and settlement services to its member banks and other financial institutions, clearing almost $2 trillion daily.

### Consumer Bankers Association

The Consumer Bankers Association ("CBA") is the only national financial trade group focused exclusively on retail banking and personal financial services—banking services geared toward consumers and small businesses.  As the recognized voice on retail banking issues, CBA provides leadership, education, research, and federal representation on retail banking issues.  CBA members include most of the nation's largest bank holding companies as well as regional and super-community banks that collectively hold two-thirds of the industry's total assets.

### Credit Union National Association

The Credit Union National Association ("CUNA") is the largest advocacy organization representing our nation's state and federal credit unions, which serve

more than 94 million members.  Credit unions are member owned, democratically controlled financial cooperatives that provide a range of financial services to consumers and small businesses.  CUNA advocates for credit unions before Congress, federal agencies and in the courts while meeting credit unions' needs for education, training, compliance, and additional resources, all in partnership with state credit union leagues.  CUNA also provides support on state issues and sponsors a number of councils to enhance educational and networking opportunities for credit union representatives.

### The Financial Services Roundtable

The Financial Services Roundtable ("Roundtable") represents 100 of the largest integrated financial services companies providing banking, insurance, and investment products and services to the American consumer.  Member companies participate through the Chief Executive Officer and other senior executives nominated by the CEO.  Roundtable member companies provide fuel for America's economic engine, accounting directly for $92.7 trillion in managed assets, $1.2 trillion in revenue, and 2.3 million jobs.

### Independent Community Bankers of America

The Independent Community Bankers of America ("ICBA"), the nation's voice for nearly 7,000 community banks of all sizes and charter types, is dedicated exclusively to representing the interests of the community banking industry and its

membership through effective advocacy, best-in-class education and high-quality products and services.

ICBA members operate approximately 23,600 locations nationwide, employ almost 300,000 Americans and hold more than $1.2 trillion in assets, $1 trillion in deposits and $750 billion in loans to consumers, small business and the agricultural community.

### Mid-Size Bank Coalition of America

Founded in 2010, the Mid-Size Bank Coalition of America ("MBCA"), with now 45 member banks, was formed for the purpose of better representing mid-size banks within the overall banking industry, and to educate lawmakers about the financial regulatory issues and policies affecting their ability to compete fairly and to more fully support and contribute to the growth of the U.S. economy. As a group, MBCA's 45 member banks do business through more than 6,900 branches in 44 states, Washington D.C. and three U.S. territories. MBCA's member banks' combined assets currently exceed $800 billion—with the average member size being approx. $17.5 billion—and, together, employ approximately 130,000 people. Member banks have nearly $600 billion in deposits and total loans of more than $500 billion.

**National Association of Federal Credit Unions**

Founded in 1967, the National Association of Federal Credit Unions ("NAFCU") exclusively represents the interests of federal credit unions before the federal government. Membership in NAFCU is direct; no state or local leagues, chapters or affiliations stand between NAFCU members and its headquarters in Arlington, Virginia. NAFCU provides its members with representation, information, education, and assistance to meet the constant challenges that cooperative financial institutions face in today's economic environment. NAFCU represents nearly 800 federal credit unions, accounting for 63.9 percent of total FCU assets and 58 percent of all FCU member-owners. NAFCU represents many smaller credit unions with limited operations as well as many of the largest and most sophisticated credit unions in the nation, including 82 out of the 100 largest FCUs.

**National Bankers Association**

Founded in 1927, the National Bankers Association is the trade association for the nation's 103 minority and women-owned banks. Its members include banks owned by African-Americans, Native-Americans, American-Indians, East-Indians, Hispanic-Americans, Asian-Americans, and women. Its members are located in 29 States and two territories spanning 60 cities and the District of Columbia. In the aggregate, its members have assets of more than $31 billion and

service more than 3 million depositors.  The purposes of the National Bankers

Association include serving as an advocate for its members on legislative and

regulatory matters concerning and affecting its members and the communities they

serve.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................. x

INTEREST OF AMICI CURIAE .........................................................1

INTRODUCTION ...............................................................................2

STATEMENT ......................................................................................3

    A.    Electronic Debit Transactions ................................................3

    B.    The Durbin Amendment........................................................4

        1.    Interchange Fees .........................................................5

        2.    Network Non-Exclusivity ...........................................6

    C.    The Board's Rulemaking ......................................................6

        1.    Proposed Rule .............................................................6

        2.    The Final Rule.............................................................7

    D.    The Proceedings Below.........................................................8

SUMMARY OF ARGUMENT .............................................................9

ARGUMENT .....................................................................................12

I.    THE DURBIN AMENDMENT MANDATES AN INTERCHANGE FEE
    THAT COVERS THE COST INCURRED BY AN ISSUER WITH
    RESPECT TO AN ELECTRONIC DEBIT TRANSACTION PLUS A
    REASONABLE RETURN ...................................................................12

    A.    The Durbin Amendment Mandates An Interchange Fee
        That Covers The Cost Incurred By An Issuer With
        Respect To An Electronic Debit Transaction......................12

        1.    The district court's limited view of costs is flawed.................14

        2.    The statute provides for inclusion of all four
            categories of costs rejected by the district court ......................17

B.    The Durbin Amendment Mandates That Interchange Fees Allow For A Reasonable Rate Of Return ...........................................19

1.    The Durbin Amendment does not limit interchange fees to cost alone .....................................................................19

2.    Capping interchange fees below costs would raise serious constitutional concerns ................................................21

II.    THE DURBIN AMENDMENT DOES NOT REQUIRE ISSUERS TO ENABLE MULTIPLE NETWORKS FOR EACH METHOD OF AUTHORIZATION ................................................................................23

III.    THE DISTRICT COURT'S INTERPRETATION WOULD HARM CONSUMERS AND SERIOUSLY DISRUPT A SYSTEM RELIED UPON BY MILLIONS OF CONSUMERS AND MERCHANTS .........................................28

A.    A Below-Cost Fee Cap Is Contrary To The Public Interest ....................................................................................28

B.    A Network Non-Exclusivity Rule In Accordance With The District Court's Decision Would Require Massive, Disruptive Change In The Electronic Debit-Card Payment System ..............................................................30

CONCLUSION ....................................................................................32

RULE 32 CERTIFICATION

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES*

## CASES

Page(s)

*Aetna Casualty & Surety Co. v. Commissioner*, 263 N.E.2d 698 (Mass. 1970) ...................................................................21

*Bath Iron Works Corp. v. Department of Labor*, 506 U.S. 153 (1993)...................14

*Brown v. Plata*, 131 S. Ct. 1910 (2011)....................................................17

*Bruesewuitz v. Wyeth LLC*, 131 S. Ct. 1068 (2011) ....................................15

*Calfarm Insurance Co. v. Deukmejian*, 771 P.2d 1247 (Cal. 1989)........................21

*Clark v. Martinez*, 543 U.S. 371 (2005) ..................................................22

*Coregis Insurance Co. v. American Health Foundation, Inc.*, 241 F.3d 123 (2d Cir. 2001)........................................................13

*Duquesne Light Co. v. Barasch*, 488 U.S. 299 (1989) .............................................21

* *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945 (D.C. Cir. 2007) ............................20

*Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027 (D.C. Cir. 2002) .................14

*FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944).............................................21

*Guaranty National Insurance Co. v. Gates*, 916 F.2d 508 (9th Cir. 1990) ........................................................................21

* *In re Permian Basin Area Rate Cases*, 390 U.S. 747 (1968) ..................................21

*Michigan Bell Telephone Co. v. Engler*, 257 F.3d 587 (6th Cir. 2001) ............21, 22

*Moshea v. NTSB*, 570 F.3d 349 (D.C. Cir. 2009) ....................................................13

*TCF National Bank v. Bernanke*, 643 F.3d 1158 (8th Cir. 2011) ..........................22

*Western Resources, Inc. v. FERC*, 9 F.3d 1568 (D.C. Cir. 1993) ...........................14

---

\*        Authorities chiefly relied upon are marked with an asterisk.

x

*Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457
(2001) ....................................................................................28

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...........................................21

## STATUTES AND REGULATIONS

7 U.S.C.
§211 .......................................................................................20
§940f .....................................................................................19

15 U.S.C.
§717c......................................................................................20
* §1693*o*-2 .............................................. 5, 6, 8, 10, 12, 13, 16, 17, 23, 24, 25

Dodd-Frank Wall Street Reform and Consumer Protection Act,
Pub. L. No. 111-203, 124 Stat. 1375 (2010) ......................................4

12 C.F.R.
§235.3 .....................................................................................7
§235.7 .....................................................................................8

## LEGISLATIVE MATERIALS

156 Cong. Rec. S5926 (daily ed. July 15, 2010) ..................................27

## ADMINISTRATIVE MATERIALS

75 Fed. Reg. 81,722 (Dec. 28, 2010).........................................6, 7, 18, 30

76 Fed. Reg. 43,394 (July 20, 2011).........................................4, 7, 17, 18

## OTHER AUTHORITIES

*Bank Fees Survey Mid-2012, at* http://www.money-rates.com/
research-center/bank-fees/mid-2012.htm. ....................................29

*Durbin Statement on His Debit Card Swipe Fee Amendment* (May 13,
2010), *at* http://www.durbin.senate.gov/public/index.cfm/
pressreleases?ID=506e66c9-13bd-455c-ba21-d749148b5d5e......................15

*Webster's Third New International Dictionary* (2002) ......................13, 20

# INTEREST OF AMICI CURIAE

Amici are an unprecedented coalition of every major nationwide bank and credit union trade association.  This case concerns the Federal Reserve Board's Final Rule issued under the Durbin Amendment.  The Board's rule regulates (i) the interchange fees that debit-card issuers may receive for debit-card transactions, and (ii) the number of networks that issuers must enable on a debit card for the processing of such transactions.  The decision below, which would require the Board to issue a new rule capping interchange fees far below issuers' transaction costs, puts amici's members—most of which issue debit cards and receive interchange fees—at great risk, given their collective investment of billions of dollars to develop and maintain an efficient, convenient, and secure debit-card payments system.  Amici's members thus have a direct and vital stake in this litigation.

As reported in amici's October 18, 2013 Representation of Consent, all parties have consented to the filing of this brief.[1]

---

[1]     No party's counsel authored this brief in whole or in part, and no person—other than amici or their counsel—contributed money that was intended to fund preparing or submitting this brief.

1

## INTRODUCTION

Amici do not defend the Board's Final Rule.  That rule is flawed, but for reasons diametrically opposite of those advanced by Plaintiffs-Appellees (the "merchants") in this lawsuit.

The Durbin Amendment provides for interchange fees that cover the cost incurred by a debit-card issuer with respect to an electronic debit-card transaction, plus a reasonable return.  The Board, however, promulgated a Final Rule that, while an improvement over its first proposal, improperly sets interchange fees equal to only a portion of the issuer's transaction cost and thus fails to incorporate a reasonable rate of return above that cost.

Not content with the multibillion-dollar windfall the Final Rule grants them, the merchants sued to force an even further reduction in interchange fees.  The district court's adoption of the merchants' reading of the statute is contrary to the statute's text and structure, gives undue weight to selective pre- and post-enactment statements of a single Senator, and ignores decades of Supreme Court and Circuit precedent requiring courts to read statutes in this context to afford regulated parties a reasonable rate of return.  The district court's ruling thus is not only erroneous, but also gives rise to serious constitutional questions.

The district court's construction of the statute's network-non-exclusivity provision is also wrong, as it rests on a textually implausible reading that would

impose complex and burdensome technological requirements, and enormous costs, on debit-card issuers that Congress could not and did not intend.

## STATEMENT

### A.    Electronic Debit Transactions

Thanks to the investment by the financial institutions represented by amici, debit cards have become the primary form of non-cash payment for millions of Americans and tens of thousands of merchants. Nearly 530 million cards were used to conduct nearly 47 billion transactions in 2011 alone. Consumers benefit from this efficient, prompt, convenient, secure, and widely-accepted method of payment. Merchants, in turn, are able to accept customers' preferred method of payment to facilitate service in stores, at unattended locations, and online, which in turn attracts more customers and increases merchants' sales and profits. Debit transactions also enable both consumers and merchants to limit the safety and security risks—*e.g.*, theft, fraud—associated with cash and check transactions.[2]

These myriad benefits are why so many merchants voluntarily accept debit cards for the price of interchange fees. Before the Board's Final Rule, merchants paid average debit-interchange fees of only 1.15% per transaction. Those fees

---

[2]      Under the electronic debit-card payments system, issuers, rather than merchants, bear the risk of insufficient customer funds in the deposit account and bear most of the risk of fraud. That is not the case for checks, where merchants retain those risks themselves—risks that cost merchants billions of dollars each year. In 2009, for example, the total value of checks returned unpaid was *$127 billion*, an amount that dwarfs the costs of merchants' annual interchange fees.

compensated issuers for the many costs they incur in providing the electronic debit payment option.  Maintaining and updating the debit-payments system to enhance functionality, increase security, and provide innovative products requires issuers to expend substantial resources.  Issuers also incur the costs of authorizing, clearing, and settling electronic debit transactions—such as the costs of software, hardware, labor, network processing fees, and transaction monitoring—as well as other costs, such as billing and collection, data processing, consumer data protection, dispute handling, and fraud prevention.  Issuers further bear the majority of the costs of fraud losses and credit losses on debit-card transactions, which amount to billions of dollars each year.  *See* 76 Fed. Reg. 43,394, 43,397 (July 20, 2011).  Issuers created the electronic debit-card system, and continue to provide electronic debit services, on the reasonable understanding that they may earn revenue to cover their substantial costs plus a reasonable return.

## B.    The Durbin Amendment

The Durbin Amendment was enacted as a last-minute addition to the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, §1075, 124 Stat. 1376, 2068-2074 (2010).  There were no hearings on the Amendment and mere minutes of total debate in Congress.

### 1.    Interchange Fees

The interchange-fee mandate of the Durbin Amendment is set forth in subsection (a)(2), which directs that "[t]he amount of any interchange transaction fee … shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C. §1693*o*-2(a)(2).  The statute then directs the Federal Reserve Board to promulgate regulations establishing "standards for assessing whether the amount of any interchange transaction fee" meets subsection (a)(2)'s reasonable-and-proportional-to-cost mandate.  *Id*. §1693*o*-2(a)(3)(A).

Congress instructed the Board, in developing these standards, to "consider[]" certain matters, such as "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction."  15 U.S.C. §1693*o*-2(a)(4)(B)(i).  Congress also instructed the Board that it must not "consider[]" "other costs incurred by an issuer which are not specific to a particular electronic debit transaction."  *Id*. §1693*o*-2(a)(4)(B)(ii).  These two instructions, read together, leave a third category of costs unaddressed: costs that *are* specific to particular debit transactions but that are *not* "incremental … authorization, clearance, [and] settlement" costs ("ACS costs").  The third category was necessary, given Congress's ultimate direction to the Board in subsection (a)(3) to establish standards for assessing whether an interchange fee is

5

"reasonable and proportional to," broadly, "the cost incurred by the issuer with respect to the transaction." *Id*. §1693*o*-2(a)(3)(A).

### 2.    Network Non-Exclusivity

The Amendment also addresses exclusivity arrangements among payment-card networks (*e.g.*, Visa or MasterCard) and issuers, through which those parties agree that the issuer will not include competing networks on its cards. The statute directs the Board to promulgate regulations prohibiting networks and issuers from restricting—by "contract, requirement, condition, penalty, or otherwise"—the number of networks on which an electronic debit transaction may be processed to either a single network or to an affiliated group of networks. 15 U.S.C. §1693*o*-2(b)(1)(A).

### C.    The Board's Rulemaking

### 1.    Proposed Rule

The Board proposed two alternative interchange-fee regulations, both of which would have imposed severely below-cost price caps. *See* 75 Fed. Reg. 81,722 (Dec. 28, 2010). Under either alternative, interchange fees, which in 2009 averaged 44 cents per transaction, would have been capped at no more than 12 cents—a reduction of more than 70%, resulting in approximately $12 billion of revenue losses annually to issuers. *See id.* at 81,737-81,738. Both alternatives centered around a proposed definition of "allowable" costs that was narrowly

6

limited to only certain average variable costs an issuer incurs for authorizing, clearing, and settling transactions. *Id*. at 81,734. As the Board acknowledged, its proposed definition excluded much of the cost an issuer incurs with respect to an electronic debit transaction, including, *e.g.*, fraud losses. *Id*. at 81,734-81,735.

The Board also proposed two alternatives for implementing the non-exclusivity prohibition. Alternative A would have required issuers affirmatively to enable two unaffiliated networks on each debit card. 75 Fed. Reg. at 81,749. Alternative B would have required issuers to enable two unaffiliated networks for each authorization method—*e.g.*, two unaffiliated PIN networks and two unaffiliated signature networks. *Id*.

### 2.    The Final Rule

The Board received more than 11,000 comments on its proposed rule, from every affected constituency, including consumers and consumer groups, government agencies, merchants and their trade groups, and financial institutions and their trade groups. *See* 76 Fed. Reg. at 43,402. After studying those comments, the Board issued a revised rule in July 2011.

The Final Rule caps interchange fees at "no more than the sum of … 21 cents" plus, to account for potential fraud losses, an *ad valorem* component of "5 basis points" of a transaction's value. 12 C.F.R. §235.3(b). The 21-cent cap was based on only "certain costs incurred" by issuers. 76 Fed. Reg. at 43,404. The

cap does not provide separately for a reasonable rate of return above the allowed
subset of transaction costs.

Regarding network non-exclusivity, the Final Rule requires issuers to enable
two unaffiliated networks on each card.  The Board thus read the statute's direction
to *prohibit* network-exclusivity restrictions to authorize instead the *imposition* of
an affirmative obligation on issuers to negotiate agreements with, and enable,
unaffiliated networks to process transactions.  12 C.F.R. §235.7(a)(2).

### D.     The Proceedings Below

The merchants filed this lawsuit to force the Board both to further reduce
interchange fees beyond the Final Rule's already below-cost cap and to require
issuers to enable additional unaffiliated networks on each card.  The district court
agreed with the merchants across the board and vacated the Final Rule.

Regarding the interchange-fee rule, the court disagreed with the Board that
the statute leaves open the third category of costs that are specific to particular
electronic debit transactions but are not incremental ACS costs.  In the court's
view, the "considerations" provision in 15 U.S.C. §1693*o*-2(a)(4)(B) "*bifurcate[d]*
the entire universe of costs*" with a supposedly "clear intent to separate costs that
must be included in the interchange transaction fee standard and 'other costs' that
must be excluded."  JA 65 (emphasis added).  The court supported its conclusion
with repeated references to Senator Durbin's floor statements as well as a personal

comment letter Senator Durbin submitted to the Board during the rulemaking process.  JA 67-68, 71-73, 79-80.  Because the Final Rule allows for more than just incremental ACS costs, the court held the rule invalid.

The district court did not explain how its restrictive reading squared with Congress's overriding mandate in subsection (a)(2) that interchange fees be "reasonable and proportional" to, broadly, "the cost incurred by the issuer with respect to the transaction."  Nor did the court address the serious constitutional issues raised by its construction.

As to network non-exclusivity, the district court held that the statute's prohibition requires issuers affirmatively to "provide merchants with multiple unaffiliated networks for each debit card transaction."  JA 38.  The court again relied on some of Senator Durbin's floor statements and his post-enactment comment letter.  Because the Final Rule did not, in the court's view, ensure routing choice across an unaffiliated network for every authorization method, the court held the rule invalid.

## SUMMARY OF ARGUMENT

Contradicting the Durbin Amendment's text, the Final Rule imposes below-cost caps on interchange fees and fails to provide for a reasonable return.  The district court's decision, if affirmed, would make things *significantly* worse:  It compounds the Board's legal error through a construction that would require deep

9

cuts—amounting to many billions of dollars each year—into issuers' remaining interchange-fee revenues.

First, the court misinterpreted the statute to set an interchange-fee cap equivalent to only *part* of "the cost incurred by the issuer with respect to the transaction," 15 U.S.C. §1693*o*-2(a)(2)—specifically, only average variable ACS costs. Had Congress intended to place such a limit, it would have said so directly. But Congress did not. To the contrary, the statute states clearly that the full "*cost*" incurred by an issuer "*with respect to*" an electronic debit transaction may be recovered through an interchange fee.

Second, the district court also ignored another aspect of the Durbin Amendment's overarching interchange-fee mandate. The statute does not provide merely for recovery of an issuer's transaction cost. It also provides that the interchange fee shall be *reasonable and proportional to* that transaction cost. In choosing that language, Congress invoked the established constitutional principle that price regulation may not deprive one of the right to earn a reasonable return. The district court's construction, which would call for deeply below-cost price caps, would flagrantly violate that principle.

Third, the district court's decision is also wrong on network non-exclusivity. The statute directs the Board to issue regulations *prohibiting* networks and issuers from imposing certain restrictions on the number of networks available to process

an electronic debit transaction.  The Final Rule instead *requires* issuers affirmatively to negotiate new contracts with unaffiliated networks so as to *enable* multiple networks on a debit card.  That construction already departs from the statute.  The district court's interpretation departs further.  According to the court, issuers must enable *additional* networks on their debit cards—two unaffiliated networks for every method of authorization so that every transaction, regardless of a merchant's self-imposed restrictions, can be routed over more than one network. There is no statutory mandate for that requirement, and it is implausible to believe that Congress, in enacting a straightforward prohibition, intended the Board to require issuers to spend hundreds of millions of dollars developing complex technology that did not (and does not) yet exist—especially where those expenditures are not recoverable under the district court's construction of the statute.

Finally, the district court's constructions would gravely harm all participants in the electronic debit-card system through reduced services, diminished investment in innovation, increased fees to consumers, and disruptive technological changes—all with no tangible offsetting economic benefit.

11

# ARGUMENT

## I. THE DURBIN AMENDMENT MANDATES AN INTERCHANGE FEE THAT COVERS THE COST INCURRED BY AN ISSUER WITH RESPECT TO AN ELECTRONIC DEBIT TRANSACTION PLUS A REASONABLE RETURN

The district court ignored the Durbin Amendment's overarching interchange-fee mandate, interpreting the statute to prohibit an issuer from receiving an interchange fee sufficient to cover its full cost with respect to an electronic debit transaction—not to mention a reasonable rate of return. In the court's view, only *part* of the issuer's cost is recoverable—the issuer's "variable" ACS costs. JA 68, 78. The statutory text forecloses that interpretation. Even if the text were not clear, the canon of constitutional avoidance would require reversal.

### A. The Durbin Amendment Mandates An Interchange Fee That Covers The Cost Incurred By An Issuer With Respect To An Electronic Debit Transaction

Congress directed that the "amount of any interchange transaction fee" an issuer receives "shall be reasonable and proportional to *the cost incurred by the issuer with respect to the transaction*." 15 U.S.C. §1693*o*-2(a)(2) (emphasis added). Congress did not authorize the Board to vary this mandate by regulation. Quite the contrary: When the statute directs the Board to promulgate an interchange-fee regulation, it refers specifically to subsection (a)(2) and instructs the Board to implement that provision by promulgating "standards for assessing"

12

whether an interchange fee is "reasonable and proportional to *the cost incurred by the issuer with respect to the transaction*." *Id.* §1693*o*-2(a)(3)(A) (emphasis added). Subsections (a)(2) and (a)(3) thus employ a common and clear terminology.

The phrase "with respect to" is straightforward in ordinary usage, meaning "in relation to." *Webster's Third New International Dictionary* 1934 (2002); *see also Coregis Ins. Co. v. American Health Found., Inc.*, 241 F.3d 123, 128 (2d Cir. 2001) (Sotomayor, J.) (equating "related to" and "with respect to"). These phrases have an unmistakably broad scope; they are not words of limitation, but words of expansion. *See Moshea v. NTSB*, 570 F.3d 349, 353 (D.C. Cir. 2009). Thus, subsections (a)(2) and (a)(3) provide, at minimum, for an interchange fee that covers the cost incurred by an issuer in relation to an electronic debit transaction. This baseline includes not only the operational costs for authorizing, clearing, and settling transactions, but also, for example, the substantial capital investments (including maintenance costs and depreciation charges) that issuers reasonably incur to make each electronic debit transaction possible.

The district court ignored subsections (a)(2) and (a)(3), focusing its attention on subsection (a)(4), and missing the proverbial forest for the trees. Subsection (a)(4) sets forth certain "[c]onsiderations" for the Board to take into account when fulfilling its statutory mandate: to promulgate "standards for assessing whether the

13

amount of any interchange transaction fee … is reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C. §1693*o*-2(a)(3)(A).  That mandate—and not any subsidiary "consideration"—controls.  *Cf. Western Resources, Inc. v. FERC*, 9 F.3d 1568, 1579 (D.C. Cir. 1993).

### 1.    The district court's limited view of costs is flawed

Even considering subsection (a)(4) in a vacuum, the district court fundamentally misunderstood the statute.  In the court's view, subsection (a)(4) "bifurcate[s] the universe of costs into incremental ACS costs includable in the interchange transaction fee standard and all other costs to be excluded."  JA 67; *see* JA 73 ("Incremental ACS costs of individual transactions incurred by issuers may be considered.  That's it!").  There is no such bifurcation.

To reach its flawed conclusion, the district court wrongly deferred to Senator Durbin—repeatedly relying on his floor statements, as well as a post-enactment comment letter—for the *Senator's* take on what "*Congress* intended."  JA 67 (emphasis added); *see also* JA 68, 71-73.  The Supreme Court has long instructed courts to "give no weight to a single reference by a single Senator during floor debate."  *Bath Iron Works Corp. v. Director, Office of Workers' Comp. Programs*, 506 U.S. 153, 166 (1993).  That admonition is especially apt here, where the court endorsed Senator Durbin's view over the contrary meaning reflected in the statute's plain text, *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1043

(D.C. Cir. 2002), and did so in reliance too on the Senator's *post*-enactment views, set forth in a comment letter to the Board, *Bruesewuitz v. Wyeth LLC*, 131 S. Ct. 1068, 1081 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation.").

The district court's reliance on Senator Durbin's statements for confirmation of an apparent congressional purpose to bifurcate all costs into allowable and excluded costs, *see* JA 67, wrongly ignores the overall statutory context in which the subsection (a)(4) "considerations" provision appears. The floor statement relied on by the district court states:

> Paragraph (a)(4) … makes clear that the cost to be considered by the Board … is the incremental cost incurred by the issuer for its role in the authorization, clearance, or settlement of a particular electronic debit transaction, *as opposed to other costs incurred by an issuer which are not specific to the authorization, clearance, or settlement of a particular electronic debit transaction.*

*Id.* (quoting Senator Durbin). Whatever Senator Durbin may have meant to convey in that statement—which, in the end, merely parrots subsection (a)(4)(B)[3]—the statute's direction to the Board about what it may "consider" does

---

[3]     Other comments by Senator Durbin at the time of enactment undermine the view that subsection (a)(4)(B) had anything to do with interchange fee caps. As he then stated, his "amendment would *not* have the Federal Reserve set interchange prices." *Durbin Statement on His Debit Card Swipe Fee Amendment* (May 13, 2010) (emphasis added), *available at* http://www.durbin.senate.gov/public/ index.cfm/pressreleases? ID=506e66c9-13bd-455c-ba21-d749148b5d5e. Rather, the Board would simply "oversee the debit interchange fees set by card networks to ensure that they are 'reasonable and proportional' to cost." *Id.*

not, and cannot, trump subsection (a)(2)'s mandate.  Particularly because there was no legislative debate, that statutory mandate is the only reliable evidence of what Congress intended.

If Congress had meant to limit interchange fees to *only* incremental ACS costs, Congress would have said so directly in subsection (a)(2).  It would have stated plainly that the amount of any fee shall be "limited to the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction."  But Congress did not do that, either in subsection (a)(2) or even in subsection (a)(4).  The subsidiary "[c]onsiderations" in subsection (a)(4) were not meant to override the subsection (a)(2) mandate; they were meant only to assist the Board in assessing the reasonableness and proportionality provided for in subsections (a)(2) and (a)(3).

The only costs the statute prohibits the Board from "consider[ing]" are certain "other costs incurred by an issuer which are not specific to a particular electronic debit transaction."  15 U.S.C. §1693*o*-2(a)(4)(B)(ii).  That phrase does not support the narrow price cap imposed by the district court.  Rather, the phrase simply reinforces what subsections (a)(2) and (a)(3)(A) already provide—*i.e.*, that a cost is allowable so long as it is "with respect to [an electronic debit] transaction."  *Id.* §1693*o*-2(a)(2), (a)(3)(A).  Only "other costs" not specifically related "to a particular electronic debit transaction" are excluded.  *Id.* §1693*o*-

16

2(a)(4)(B)(ii).  The statutory term "particular" refers to one specific transaction, as

distinct from another transaction.  *See Brown v. Plata*, 131 S. Ct. 1910, 1940

(2011).  By using "particular," Congress clarified that an interchange fee may

include the cost necessary to effect a distinct debit-card transaction, and thus only

the amount for a single transaction, but that the fee may not include costs that

would be incurred by an issuer regardless of whether it was effecting any

electronic debit transactions.

## 2.  The statute provides for inclusion of all four categories of costs rejected by the district court

The district court further erred in holding that four costs incurred by an

issuer may not be recovered.  Each is a "cost incurred by the issuer with respect to

the transaction," 15 U.S.C. §1693*o*-2(a)(2), and therefore allowable.  The costs are

also incremental ACS costs, so they are proper even under the district court's

cramped reading of the statute.

(1) Transaction monitoring permits an issuer to confirm that a card is valid

and to authenticate the cardholder for purposes of authorizing a particular

transaction.  *See* 76 Fed. Reg. at 43,431-43,432.  This function is integral to each

debit-card transaction, during which, for example, an issuer "may flag a transaction

as suspicious and decline the authorization request or require the merchant to

verify the transaction with the issuer before deciding whether to approve or deny

the transaction." *Id.* at 43,431. The cost is indisputably transaction-specific and is related to authorization.

(2) Fraud losses, as defined by the Board, include "those losses incurred by the issuer, other than losses related to nonsufficient funds, that are not recovered through chargebacks to merchants or debits to or collections from customers." 76 Fed. Reg. at 43,431. These losses, as the Board recognized, arise from the authorization, clearing, or settlement of particular transactions, and most commonly result from counterfeit-card fraud, lost-and-stolen-card fraud, and card-not-present fraud. *See id.* Any fraud loss is transaction-specific.

(3) Issuers pay a network processing fee for each debit-card transaction processed for the issuer over that network. 75 Fed. Reg. at 81,735. An issuer cannot authorize, clear, or settle a particular electronic debit-card transaction without incurring the fee. *Id.* Each such cost is indisputably specific to a particular transaction.

(4) Fixed ACS costs are allowable too. The standard economic definition of incremental cost, as even the Board recognized, is "the difference between the cost incurred by a firm if it produces a particular quantity of a good and the cost incurred by that firm if it does not produce the good at all." 75 Fed. Reg. at 81,735. Here, that includes every cost related to authorizing, clearing, or settling a transaction—whether fixed or variable—that an issuer would not have incurred but

18

for the provision of debit-card transaction services.  It therefore includes fixed costs specifically attributable to authorizing, clearing, and settling functions.  Such costs, divided and allocated to each individual transaction, are incremental and transaction-specific.  *See supra* pp. 16-17.

### B.    The Durbin Amendment Mandates That Interchange Fees Allow For A Reasonable Rate Of Return

The district court, in concluding that an issuer can only recover variable ACS costs, held that this narrow restriction operated as a "*ceiling*," JA 78—*i.e.*, no other costs, and no reasonable return.  Not only does that interpretation contravene the plain statutory text, but it also raises serious constitutional concerns.

### 1.    The Durbin Amendment does not limit interchange fees to cost alone

Had Congress intended to require the Board to set interchange fees equivalent to transaction cost alone, or certain transaction costs alone, it would have done so explicitly in subsection (a)(2).  But Congress did not use terms like "limited to" or "equal to," which it typically employs to limit—*i.e.*, impose a "ceiling" on—the permissible level of fees, rates, or prices.[4]  Rather, Congress used the phrase "reasonable and proportional," which requires allowance of an interchange fee that covers transaction cost *plus* a reasonable and proportional rate of return above that cost.

---

[4]    *See, e.g.*, 7 U.S.C. §940f(c)(2) ("The amount of the fee paid shall be *equal to* the modification cost[.]" (emphasis added)).

This reading is clear from the text's ordinary meaning and the consistent interpretation of similar text in federal statutes.  The ordinary meaning of a "reasonable" fee is one that is "moderate" or "that allows a fair profit."  *Webster's Third New International Dictionary* 1892.  An interchange fee would not be reasonable if the government compelled firms to set the fee at a level that precludes a reasonable return or, worse, precludes the recovery of even the costs of providing the relevant service.  Congress's pairing of the term "reasonable" with the words "and proportional to" confirms this reading of the statute.  "Proportional" in this context means "corresponding in size, degree, or intensity" to, or "regulated or determined in size or degree with reference to," *id.* at 1819, the costs of the issuer.  By no means can the statute be fairly read—as the district court evidently reads it—to say that no profit is permitted, *i.e.*, that the industry must provide this critical service at a loss.

The phrase "reasonable and proportional" evokes the established interpretation of the similar phrase "just and reasonable" in federal ratemaking statutes.  *See, e.g.*, 7 U.S.C. §211(a); 15 U.S.C. §717c(a).  For decades Congress has used the term "reasonable," frequently paired with "just" or "fair," in ratemaking statutes.  And courts have construed those to mean that the rate in question must "yield[] sufficient revenue to cover all proper costs … plus a specified return on invested capital."  *ExxonMobil Oil Corp. v. FERC*, 487 F.3d

20

945, 951 (D.C. Cir. 2007) (per curiam); *see, e.g.*, *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 770 (1968).

### 2.    Capping interchange fees below costs would raise serious constitutional concerns

The district court's construction is particularly infirm because it raises serious constitutional issues.  *See Zadvydas v. Davis*, 533 U.S. 678, 689 (2001).

The Due Process and Takings Clauses forbid the government from dictating a price at an amount that has a "confiscatory" effect—a price so low as to be "inadequate to compensate current equity holders for the risk associated with their investments."  *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307, 312 (1989).  Although the government may limit returns, it is "plain that the 'power to regulate is not a power to destroy.'"  *Permian Basin*, 390 U.S. at 769.  The Court thus has long declared that where the government regulates prices, it must at minimum "enable [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed."  *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 605 (1944)

Following this constitutional requirement, courts have routinely held that a price-control regulation that precludes a reasonable return is unconstitutional.  *See, e.g.*, *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 595-596 (6th Cir. 2001); *Guaranty Nat'l Ins. Co. v. Gates*, 916 F.2d 508, 515 (9th Cir. 1990); *Calfarm Ins. Co. v. Deukmejian*, 771 P.2d 1247, 1255-1256 (Cal. 1989); *Aetna Cas. & Sur. Co.*

21

*v. Commissioner*, 263 N.E.2d 698, 703 (Mass. 1970). For example, in *Michigan Bell*, the Sixth Circuit concluded that a statute abolishing a fee charged to consumers by telephone companies and freezing their rates was facially unconstitutional. The law at issue deemed a rate impermissibly low only if it was less than the "'total service long run incremental cost of providing the service.'" 257 F.3d at 594. Because that formula guaranteed only that the companies would recover their costs, the court held that the law "clearly" "does not guarantee the constitutionally-required fair and reasonable rate of return." *Id.* at 595; *see id.* at 596 ("merely" covering costs without "consider[ing] the need for a return on investment" is "inadequate under well-established due process standards").

The district court's interpretation of the Durbin Amendment "clearly" does not guarantee "the constitutionally-required fair and reasonable rate of return." *Michigan Bell*, 257 F.3d at 595. To the contrary, the court imposed a "*ceiling*" on interchange fees to include only variable ACS costs—"[t]hat's it!" JA 73, 78.[5]

---

[5]     To be sure, this Court need not adjudicate the constitutionality of the Amendment, because the issue is whether the statute can and must be interpreted to avoid a serious constitutional issue. *See Clark v. Martinez*, 543 U.S. 371, 379-382 (2005). For that reason, the decision in *TCF National Bank v. Bernanke*, 643 F.3d 1158 (8th Cir. 2011), does not undermine amici's argument regarding the proper interpretation of the statutory language of the Durbin Amendment. Moreover, the Eighth Circuit's decision is wrong. Firms are "not required to subsidize their regulated services"—here, providing electronic debit functionality to merchants— "with revenues generated from unregulated services." 257 F.3d at 594.

## II.   THE DURBIN AMENDMENT DOES NOT REQUIRE ISSUERS TO ENABLE MULTIPLE NETWORKS FOR EACH METHOD OF AUTHORIZATION

The Durbin Amendment directs the Board to issue regulations "providing that an issuer or payment card network *shall not* … , by contract, requirement, condition, penalty, or otherwise, *restrict* the number of payment card networks on which an electronic debit transaction may be processed" to one network.  15 U.S.C. §1693*o*-2(b)(1)(A) (emphasis added).  Congress thus called for the Board to *prohibit* issuers and networks from undertaking certain *restrictive* conduct—*i.e.*, entering into arrangements or other conduct restricting the number of networks available for processing debit-card transactions.  Familiar with the difference between prohibitions ("thou shalt not do X") and affirmative obligations ("thou shalt do Y"), Congress unquestionably opted for the former.

Nonetheless, the Board promulgated a Final Rule that *affirmatively* obligates issuers to negotiate new network relationships to *enable* multiple networks on each debit card—in effect, a "must carry" rule that exceeds the narrow prohibition Congress envisioned.  The district court then went even further, concluding that issuers must enable multiple networks not only on each debit card, but for each method by which a debit transaction may be authorized by the cardholder (*e.g.*, for a debit card that supports signature and PIN authorization methods, two unaffiliated networks that support signature and two that support PIN).  JA 83-84. That conclusion is based on a misunderstanding of the statutory text and a deeply

23

implausible view of what Congress could have intended in enacting a straightforward prohibition.

Fundamentally, the district court's construction contravenes the statute's plain text. The statute prevents "issuer[s]" and "network[s]" from restricting the number of networks "on which an electronic debit transaction may be processed." An "electronic debit transaction" is defined as any "transaction in which a person uses a debit card." 15 U.S.C. §1693o-2(c)(5). And "debit card" is, in turn, defined to mean "any card, or other payment code or device, issued or approved for use through a payment card network to debit an asset account … *whether authorization is based on signature, PIN, or other means*." *Id.* §1693o-2(c)(2)(A) (emphasis added). The court apparently believed that, because the "debit card" definition references multiple methods of authorization, "electronic debit transaction" must be interpreted so that each *method* represents a discrete *transaction*, such that issuers must enable at least two unaffiliated networks for each method of authorization a merchant might offer. In effect, it rewrote the statute as requiring two unaffiliated networks "on which an electronic debit transaction *using each particular method of authorization* may be processed." But the statute imposes no such requirement. Indeed, the "whether" clause in the "debit card" definition makes clear that the non-exclusivity of "electronic debit transaction" processing has no connection whatsoever to the transaction authorization method. This is

confirmed by the statutory non-exclusivity provision, which makes no reference to signature or PIN networks but simply "payment card networks." *Id.* §1693*o*-2(b)(1)(A).

Moreover, the district court's reading improperly conflates merchants' self-imposed restrictions on their own routing choices (which the statute does not address) with issuer- and network-imposed restrictions (which the statute prohibits). It is *merchants* who make the decision whether to offer PIN, signature, or other authorization methods to their customers. Under the Final Rule, so long as a merchant does not refuse to support PIN and signature authorization, that merchant will have multiple unaffiliated network options whenever a consumer presents a debit card with PIN and signature capability. If a merchant chooses not to support certain authorization methods enabled on a debit card, it is the merchant—not the issuer or the network—that "restricts" the networks on which the transaction can be processed.

On this point, the district court's reasoning followed from a clear misunderstanding of how the payments system works. The court's holding—that the Final Rule contravenes the statute in not requiring two unaffiliated networks for each method of authorization—necessarily rests on an assumption that, for certain transactions, only one method of authorization (*e.g.*, PIN or signature) is feasible. But that is wrong. To use the examples the district court cited, JA 41,

PIN authorization *can* be used and "easily processed" for hotel and car-rental transactions.  But those merchants choose not to offer PIN authorization, presumably because hotel and car rental companies do not want to require customers to pay an amount that may exceed the ultimate transaction value and therefore may require a partial refund at the transaction's close.  The point is that any restrictions on the method of authorization are self-imposed by the merchant. It is not a network or issuer restriction, and thus is irrelevant under the Durbin Amendment.

The district court sought to bolster its position with a misguided foray into legislative history, citing a single, ambiguous, pre-enactment statement from Senator Durbin, which, in the district court's view, gave "explicit[] confirm[ation] that Congress wanted subsection (b)(1)(A) to ensure the availability of at least two competing networks for each method of cardholder authentication on which an electronic debit transaction may be processed."  JA 86.  Reliance on that statement from a lone legislator was error for the reasons discussed above.  *See supra* pp.14-15.  But even more significantly, the court ignored another statement by Senator Durbin that was directly to the contrary—demonstrating the inherent unreliability of floor statements as a tool of statutory construction.

Senator Durbin assured the Senate that his amendment was "intended only to serve as [a] restriction[] on payment card networks to prohibit them from engaging

26

in certain anticompetitive practices." 156 Cong. Rec. S5926 (daily ed. July 15,

2010). Senator Durbin then made the same point in his comment letter to the

Board (which the district court only selectively quoted), stating that "the

amendment was drafted to prohibit a negative scenario—exclusivity

arrangements—and was not drafted to affirmatively require what the non-exclusive

world must look like." Durbin Comment Letter 11 (Feb. 22, 2011).[6] He similarly

noted that "[t]his was not intended to be a 'must carry' provision whereby issuers

would be required to enable their cards with all networks, but rather a restriction on

the ability of networks and issuers to inhibit a merchant's ability to direct the

transaction over any of the networks that the issuer has enabled the card to use."

*Id.* at 12.

Indeed, to the extent that snippets of legislative history are relevant at all,

they confirm that Congress did not contemplate the district court's interpretation of

the non-exclusivity provision. Responding to the Board's two proposed

alternatives for implementing the statute's non-exclusivity provision,

Representative Gregory Meeks, a "chief negotiator[]" of the non-exclusivity

provision, wrote to Chairman Bernanke "to clarify that when the routing provisions

were negotiated in conference, the intent was to allow for two unaffiliated

---

[6]     All comment letters cited in this brief may be found at the Board's website:
http://www.federalreserve.gov/apps/foia/ViewAllComments.aspx?doc_id=R-
1404&doc_ver=1.

networks per debit card; there was absolutely no discussion or contemplation of the second option offered by the proposed rule which would require a minimum of four networks to be enabled per debit card." Meeks Comment Letter (Feb. 21, 2011).

Finally, the district court's desired regime would require massive change to payment systems at nearly every level. Networks, issuers, acquirers, and merchants would need to retrofit their systems (with technological improvements yet to be developed), and issuers would need to reissue hundreds of millions of debit cards—all to the tune of hundreds of millions of dollars in costs. *See infra* Section III.B. Congress could not have intended, in crafting a straightforward prohibition on certain restrictive conduct it deemed anticompetitive, to impose such a regime on debit-card issuers. *Cf. Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) ("Congress … does not, one might say, hide elephants in mouseholes.").

## III. THE DISTRICT COURT'S INTERPRETATION WOULD HARM CONSUMERS AND SERIOUSLY DISRUPT A SYSTEM RELIED UPON BY MILLIONS OF CONSUMERS AND MERCHANTS

### A.    A Below-Cost Fee Cap Is Contrary To The Public Interest

Before the Durbin Amendment, the electronic debit-card payments system brought widespread benefits to consumers and merchants alike. In the decade preceding the Amendment, no form of non-cash payment grew at a more rapid

pace.  Issuers benefited too, allowing them to attract customers and offer new and existing customers an array of free and low-cost banking services.  Under the district court's construction, millions of consumers, particularly low-income consumers who benefit from a variety of free banking products and services (like free checking), would likely receive reduced services and increased fees.  The severely below-cost fee cap envisioned by the district court would leave issuers no choice but to institute such measures.  *See* TCH et al. Comment Letter 43-44 (Feb. 22, 2011).  Indeed, a semi-annual survey of bank fees conducted after the Final Rule went into effect found that checking-account fees increased in the first half of 2012, while the requirements for opening and maintaining accounts—*e.g.*, carrying a minimum balance—became more restrictive.[7]  Under the district court's construction, even consumers who can still obtain accounts with debit cards would suffer as issuers likely would be forced to restrict card use for large and particularly risky transactions as a result of their inability to recover the costs of fraud losses.  *Id.* at 44.

Absent revenues from interchange fees reflecting true costs, issuers will be forced to make difficult decisions about where to spend their capital, choosing, for example, between innovation in the debit-card payments system and free or

---

[7]     *Bank Fees Survey Mid-2012*, MoneyRates.com, *available at* http://www.money-rates.com/research-center/bank-fees/mid-2012.htm.

reduced-cost consumer banking services.  Issuers would have scant incentive and little ability to invest in improved maintenance and security of the debit-card payments system.  The precedent of below-cost price controls in this area would blunt the entrepreneurial motivation to innovate by increasing uncertainty about the ability to recover, in the future, the costs of significant capital investments and to earn a reasonable return on those investments.

The only beneficiaries of the district court's decision are the merchants, who will receive an unjustified windfall.  There is no credible evidence that the Durbin Amendment has resulted or will result in any benefit for the American consumer. There is thus no reason to believe merchants will pass along the economic benefit from reduced interchange fees to consumers in the form of lower prices, improved service, or otherwise.  Neither the Durbin Amendment, the Board's Final Rule, nor the district court's decision requires it.

## B.     A Network Non-Exclusivity Rule In Accordance With The District Court's Decision Would Require Massive, Disruptive Change In The Electronic Debit-Card Payment System

As the Board recognized during its rulemaking, because existing technology could not support the routing of signature transactions over multiple networks, the Board's proposed Alternative B would have required massive change from all players in the payments system, including merchants.  *See* 75 Fed. Reg. at 81,749. The district court ignored the Board's expert view and cautionary note and adopted

30

an impractical reading of the statute. The technology required to satisfy the district court's decision does not currently exist—neither for routing of signature transactions over multiple signature networks nor for cross-routing of dual-message signature transactions over single-message PIN networks. Developing and implementing the solutions necessary to satisfy the court's decision would raise a long list of complex and costly challenges. Moreover, any such change would likely require years to develop and implement—again, at considerable cost, none of which would be recoverable under the district court's construction of the statute. This requirement also would dampen incentives for issuers and networks to innovate regarding authorization, as every new authorization method would need to be available from at least two unaffiliated networks before it could be provided to debit-card issuers.

*     *     *

The point of enumerating the likely impacts of the district court's decision on the debit-card payments industry is not to persuade this Court that any particular rule is good policy. Rather, the point is that Congress could not have contemplated rules that would deprive issuers of their basic transaction costs and a reasonable return and that simultaneously impose on issuers costly and impractical burdens, thereby depriving consumers of accessible and effective debit-card usage. These

31

are absurd intentions to attribute to Congress, especially where the plain text and structure of the statute point to a more sensible result.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be reversed.

Respectfully submitted,

/s/  Seth P. Waxman

NOAH A. LEVINE
ALAN SCHOENFELD
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800

SETH P. WAXMAN
   *Counsel of Record*
ALBINAS PRIZGINTAS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000
seth.waxman@wilmerhale.com

*Counsel for Amici Curiae*

H. RODGIN COHEN
MATTHEW A. SCHWARTZ
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004

PAUL SALTZMAN
ROB HUNTER
THE CLEARING HOUSE ASSOCIATION L.L.C.
450 West 33rd Street
New York, NY  10001

DAWN CAUSEY
NESSA FEDDIS
AMERICAN BANKERS ASSOCIATION
1120 Connecticut Avenue, NW
Washington, DC  20036

STEVEN I. ZEISEL
JEFFREY BLOCH
CONSUMER BANKERS ASSOCIATION
1225 Eye Street, NW, Suite 550
Washington, DC  20005

ERIC L. RICHARD
CREDIT UNION NATIONAL ASSOCIATION
601 Pennsylvania Avenue, NW
Washington, DC  20004

RICHARD M. WHITING
THE FINANCIAL SERVICES
    ROUNDTABLE
1001 Pennsylvania Avenue, NW,
Suite 500
Washington, DC  20004

KAREN M. THOMAS
INDEPENDENT COMMUNITY BANKERS OF
    AMERICA
1615 L Street, NW, Suite 900
Washington, DC  20036

NEIL B. MARTIN
MID-SIZE BANK COALITION OF
    AMERICA
555 South Flower Street
18th Floor
Los Angeles, CA  90071

CARRIE R. HUNT
NATIONAL ASSOCIATION OF FEDERAL
    CREDIT UNIONS
3138 10th Street North
Arlington, VA  22201

MICHAEL GRANT
NATIONAL BANKERS ASSOCIATION
1513 P Street, NW
Washington, DC  20005

Dated:  October 21, 2013

## RULE 32 CERTIFICATION

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because:

This brief contains 6,961 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

2.      This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

/s/  Seth P. Waxman
SETH P. WAXMAN

October 21, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of October, 2013, I electronically filed the foregoing Brief for Amici Curiae The Clearing House Association L.L.C., American Bankers Association, Consumer Bankers Association, Credit Union National Association, The Financial Services Roundtable, Independent Community Bankers of America, Mid-Size Bank Coalition of America, National Association of Federal Credit Unions, and National Bankers Association in Support of Neither Party and Reversal with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system:

KATHERINE H. WHEATLEY
JOSHUA PAUL CHADWICK
YVONNE FACCHINA MIZUSAWA
BOARD OF GOVERNORS OF THE FEDERAL
   RESERVE SYSTEM
20th and C Street, NW
Washington, DC  20551

SHANNEN W. COFFIN
LINDA C. BAILEY
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC  20036

/s/  Seth P. Waxman
SETH P. WAXMAN

# ADDENDUM

# ADDENDUM
## TABLE OF CONTENTS

Page

15 U.S.C. §1693*o*-2.................................................................................A1

12 C.F.R. §235.3 ......................................................................................A6

12 C.F.R. §235.7 ......................................................................................A7



other proceeding against a remittance transfer provider, the extent to which the provider had established and maintained policies or procedures for compliance, including policies, procedures, or other appropriate oversight measures designed to assure compliance by an agent or authorized delegate acting for such provider.

**(g) Definitions**

As used in this section—

(1) the term ''designated recipient'' means any person located in a foreign country and identified by the sender as the authorized recipient of a remittance transfer to be made by a remittance transfer provider, except that a designated recipient shall not be deemed to be a consumer for purposes of this chapter;

(2) the term ''remittance transfer''—

(A) means the electronic (as defined in section 106(2) of the Electronic Signatures in Global and National Commerce Act (15 U.S.C. 7006(2))) transfer of funds requested by a sender located in any State to a designated recipient that is initiated by a remittance transfer provider, whether or not the sender holds an account with the remittance transfer provider or whether or not the remittance transfer is also an electronic fund transfer, as defined in section 1693a of this title; and

(B) does not include a transfer described in subparagraph (A) in an amount that is equal to or lesser than the amount of a small-value transaction determined, by rule, to be excluded from the requirements under section 1693d(a) of this title;

(3) the term ''remittance transfer provider'' means any person or financial institution that provides remittance transfers for a consumer in the normal course of its business, whether or not the consumer holds an account with such person or financial institution; and

(4) the term ''sender'' means a consumer who requests a remittance provider to send a remittance transfer for the consumer to a designated recipient.

(Pub. L. 90–321, title IX, §919, as added and amended Pub. L. 111–203, title X, §§1073(a)(4), 1084(1), July 21, 2010, 124 Stat. 2060, 2081.)

REFERENCES IN TEXT

The Electronic Signatures in Global and National Commerce Act, referred to in subsec. (a)(3)(B), is Pub. L. 106–229, June 30, 2000, 114 Stat. 464, which is classified principally to chapter 96 (§7001 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 7001 of this title and Tables.

Chapter 2 of title I of Public Law 91–508, referred to in subsec. (e)(2)(A), is chapter 2 (§§121–129) of title I of Pub. L. 91–508, Oct. 26, 1970, 84 Stat. 1116, which is classified generally to chapter 21 (§1951 et seq.) of Title 12, Banks and Banking. For complete classification of chapter 2 of title I of the Act to the Code, see Tables.

PRIOR PROVISIONS

A prior section 919 of Pub. L. 90–321 was renumbered section 921 and is classified to section 1693p of this title.

Another prior section 919 of Pub. L. 90–321 was renumbered section 922 and is classified to section 1693q of this title.

AMENDMENTS

2010—Pub. L. 111–203, §1084(1), substituted ''Bureau'' for ''Board'' wherever appearing.

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by section 1084(1) of Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

EFFECTIVE DATE

Section effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as a note under section 5301 of Title 12, Banks and Banking.

**§ 1693o–2. Reasonable fees and rules for payment card transactions**

**(a) Reasonable interchange transaction fees for electronic debit transactions**

**(1) Regulatory authority over interchange transaction fees**

The Board may prescribe regulations, pursuant to section 553 of title 5, regarding any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction, to implement this subsection (including related definitions), and to prevent circumvention or evasion of this subsection.

**(2) Reasonable interchange transaction fees**

The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction.

**(3) Rulemaking required**

**(A) In general**

The Board shall prescribe regulations in final form not later than 9 months after July 21, 2010, to establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction.

**(B) Information collection**

The Board may require any issuer (or agent of an issuer) or payment card network to provide the Board with such information as may be necessary to carry out the provisions of this subsection and, in issuing rules under subparagraph (A) and on at least a bi-annual basis thereafter, shall disclose such aggregate or summary information concerning the costs incurred, and interchange transaction fees charged or received, by issuers or payment card networks in connection with the authorization, clearance or settlement of electronic debit transactions as the Board considers appropriate and in the public interest.

**(4) Considerations; consultation**

In prescribing regulations under paragraph (3)(A), the Board shall—

(A) consider the functional similarity between—

(i) electronic debit transactions; and

(ii) checking transactions that are required within the Federal Reserve bank system to clear at par;

(B) distinguish between—

(i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and

(ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2); and

(C) consult, as appropriate, with the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Director of the Office of Thrift Supervision, the National Credit Union Administration Board, the Administrator of the Small Business Administration, and the Director of the Bureau of Consumer Financial Protection.

**(5) Adjustments to interchange transaction fees for fraud prevention costs**

**(A) Adjustments**

The Board may allow for an adjustment to the fee amount received or charged by an issuer under paragraph (2), if—

(i) such adjustment is reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions involving that issuer; and

(ii) the issuer complies with the fraud-related standards established by the Board under subparagraph (B), which standards shall—

(I) be designed to ensure that any fraud-related adjustment of the issuer is limited to the amount described in clause (i) and takes into account any fraud-related reimbursements (including amounts from charge-backs) received from consumers, merchants, or payment card networks in relation to electronic debit transactions involving the issuer; and

(II) require issuers to take effective steps to reduce the occurrence of, and costs from, fraud in relation to electronic debit transactions, including through the development and implementation of cost-effective fraud prevention technology.

**(B) Rulemaking required**

**(i) In general**

The Board shall prescribe regulations in final form not later than 9 months after July 21, 2010, to establish standards for making adjustments under this paragraph.

**(ii) Factors for consideration**

In issuing the standards and prescribing regulations under this paragraph, the Board shall consider—

(I) the nature, type, and occurrence of fraud in electronic debit transactions;

(II) the extent to which the occurrence of fraud depends on whether authorization in an electronic debit transaction is based on signature, PIN, or other means;

(III) the available and economical means by which fraud on electronic debit transactions may be reduced;

(IV) the fraud prevention and data security costs expended by each party involved in electronic debit transactions (including consumers, persons who accept debit cards as a form of payment, financial institutions, retailers and payment card networks);

(V) the costs of fraudulent transactions absorbed by each party involved in such transactions (including consumers, persons who accept debit cards as a form of payment, financial institutions, retailers and payment card networks);

(VI) the extent to which interchange transaction fees have in the past reduced or increased incentives for parties involved in electronic debit transactions to reduce fraud on such transactions; and

(VII) such other factors as the Board considers appropriate.

**(6) Exemption for small issuers**

**(A) In general**

This subsection shall not apply to any issuer that, together with its affiliates, has assets of less than $10,000,000,000, and the Board shall exempt such issuers from regulations prescribed under paragraph (3)(A).

**(B) Definition**

For purposes of this paragraph, the term ''issuer'' shall be limited to the person holding the asset account that is debited through an electronic debit transaction.

**(7) Exemption for government-administered payment programs and reloadable prepaid cards**

**(A) In general**

This subsection shall not apply to an interchange transaction fee charged or received with respect to an electronic debit transaction in which a person uses—

(i) a debit card or general-use prepaid card that has been provided to a person pursuant to a Federal, State or local government-administered payment program, in which the person may only use the debit card or general-use prepaid card to transfer or debit funds, monetary value, or other assets that have been provided pursuant to such program; or

(ii) a plastic card, payment code, or device that is—

(I) linked to funds, monetary value, or assets which are purchased or loaded on a prepaid basis;

(II) not issued or approved for use to access or debit any account held by or for the benefit of the card holder (other than a subaccount or other method of recording or tracking funds purchased or loaded on the card on a prepaid basis);

(III) redeemable at multiple, unaffiliated merchants or service providers, or automated teller machines;

(IV) used to transfer or debit funds, monetary value, or other assets; and

(V) reloadable and not marketed or labeled as a gift card or gift certificate.

**(B) Exception**

Notwithstanding subparagraph (A), after the end of the 1-year period beginning on the effective date provided in paragraph (9), this subsection shall apply to an interchange transaction fee charged or received with respect to an electronic debit transaction described in subparagraph (A)(i) in which a person uses a general-use prepaid card, or an electronic debit transaction described in subparagraph (A)(ii), if any of the following fees may be charged to a person with respect to the card:

(i) A fee for an overdraft, including a shortage of funds or a transaction processed for an amount exceeding the account balance.

(ii) A fee imposed by the issuer for the first withdrawal per month from an automated teller machine that is part of the issuer's designated automated teller machine network.

**(C) Definition**

For purposes of subparagraph (B), the term ''designated automated teller machine network'' means either—

(i) all automated teller machines identified in the name of the issuer; or

(ii) any network of automated teller machines identified by the issuer that provides reasonable and convenient access to the issuer's customers.

**(D) Reporting**

Beginning 12 months after July 21, 2010, the Board shall annually provide a report to the Congress regarding —

(i) the prevalence of the use of general-use prepaid cards in Federal, State or local government-administered payment programs; and

(ii) the interchange transaction fees and cardholder fees charged with respect to the use of such general-use prepaid cards.

**(8) Regulatory authority over network fees**

**(A) In general**

The Board may prescribe regulations, pursuant to section 553 of title 5, regarding any network fee.

**(B) Limitation**

The authority under subparagraph (A) to prescribe regulations shall be limited to regulations to ensure that—

(i) a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction; and

(ii) a network fee is not used to circumvent or evade the restrictions of this subsection and regulations prescribed under such subsection.

**(C) Rulemaking required**

The Board shall prescribe regulations in final form before the end of the 9-month period beginning on July 21, 2010, to carry out the authorities provided under subparagraph (A).

**(9) Effective date**

This subsection shall take effect at the end of the 12-month period beginning on July 21, 2010.

**(b) Limitation on payment card network restrictions**

**(1) Prohibitions against exclusivity arrangements**

**(A) No exclusive network**

The Board shall, before the end of the 1-year period beginning on July 21, 2010, prescribe regulations providing that an issuer or payment card network shall not directly or through any agent, processor, or licensed member of a payment card network, by contract, requirement, condition, penalty, or otherwise, restrict the number of payment card networks on which an electronic debit transaction may be processed to—

(i) 1 such network; or

(ii) 2 or more such networks which are owned, controlled, or otherwise operated by —

(I) affiliated persons; or

(II) networks affiliated with such issuer.

**(B) No routing restrictions**

The Board shall, before the end of the 1-year period beginning on July 21, 2010, prescribe regulations providing that an issuer or payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person who accepts debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions.

**(2) Limitation on restrictions on offering discounts for use of a form of payment**

**(A) In general**

A payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person to provide a discount or in-kind incentive for payment by the use of cash, checks, debit cards, or credit cards to the extent that—

(i) in the case of a discount or in-kind incentive for payment by the use of debit cards, the discount or in-kind incentive does not differentiate on the basis of the issuer or the payment card network;

(ii) in the case of a discount or in-kind incentive for payment by the use of credit cards, the discount or in-kind incentive does not differentiate on the basis of the issuer or the payment card network; and

(iii) to the extent required by Federal law and applicable State law, such dis-

count or in-kind incentive is offered to all prospective buyers and disclosed clearly and conspicuously.

**(B) Lawful discounts**

For purposes of this paragraph, the network may not penalize any person for the providing of a discount that is in compliance with Federal law and applicable State law.

**(3) Limitation on restrictions on setting transaction minimums or maximums**

**(A) In general**

A payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability—

(i) of any person to set a minimum dollar value for the acceptance by that person of credit cards, to the extent that—

(I) such minimum dollar value does not differentiate between issuers or between payment card networks; and

(II) such minimum dollar value does not exceed $10.00; or

(ii) of any Federal agency or institution of higher education to set a maximum dollar value for the acceptance by that Federal agency or institution of higher education of credit cards, to the extent that such maximum dollar value does not differentiate between issuers or between payment card networks.

**(B) Increase in minimum dollar amount**

The Board may, by regulation prescribed pursuant to section 553 of title 5, increase the amount of the dollar value listed in subparagraph (A)(i)(II).

**(4) Rule of construction**

No provision of this subsection shall be construed to authorize any person—

(A) to discriminate between debit cards within a payment card network on the basis of the issuer that issued the debit card; or

(B) to discriminate between credit cards within a payment card network on the basis of the issuer that issued the credit card.

**(c) Definitions**

For purposes of this section, the following definitions shall apply:

**(1) Affiliate**

The term "affiliate" means any company that controls, is controlled by, or is under common control with another company.

**(2) Debit card**

The term "debit card"—

(A) means any card, or other payment code or device, issued or approved for use through a payment card network to debit an asset account (regardless of the purpose for which the account is established), whether authorization is based on signature, PIN, or other means;

(B) includes a general-use prepaid card, as that term is defined in section 1693l–1(a)(2)(A) of this title; and

(C) does not include paper checks.

**(3) Credit card**

The term "credit card" has the same meaning as in section 1602 of this title.

**(4) Discount**

The term "discount"—

(A) means a reduction made from the price that customers are informed is the regular price; and

(B) does not include any means of increasing the price that customers are informed is the regular price.

**(5) Electronic debit transaction**

The term "electronic debit transaction" means a transaction in which a person uses a debit card.

**(6) Federal agency**

The term "Federal agency" means—

(A) an agency (as defined in section 101 of title 31); and

(B) a Government corporation (as defined in section 103 of title 5).

**(7) Institution of higher education**

The term "institution of higher education" has the same meaning as in 1001[1] and 1002 of title 20.

**(8) Interchange transaction fee**

The term "interchange transaction fee" means any fee established, charged or received by a payment card network for the purpose of compensating an issuer for its involvement in an electronic debit transaction.

**(9) Issuer**

The term "issuer" means any person who issues a debit card, or credit card, or the agent of such person with respect to such card.

**(10) Network fee**

The term "network fee" means any fee charged and received by a payment card network with respect to an electronic debit transaction, other than an interchange transaction fee.

**(11) Payment card network**

The term "payment card network" means an entity that directly, or through licensed members, processors, or agents, provides the proprietary services, infrastructure, and software that route information and data to conduct debit card or credit card transaction authorization, clearance, and settlement, and that a person uses in order to accept as a form of payment a brand of debit card, credit card or other device that may be used to carry out debit or credit transactions.

**(d) Enforcement**

**(1) In general**

Compliance with the requirements imposed under this section shall be enforced under section 1693o of this title.

**(2) Exception**

Sections 1693m and 1693n of this title shall not apply with respect to this section or the requirements imposed pursuant to this section.

---

[1] So in original. Probably should be preceded by "sections".

(Pub. L. 90–321, title IX, §920, as added Pub. L. 111–203, title X, §1075(a)(2), July 21, 2010, 124 Stat. 2068.)

### PRIOR PROVISIONS

A prior section 920 of Pub. L. 90–321 was renumbered section 921 and is classified to section 1693p of this title.

Two other prior sections 920 of Pub. L. 90–321 were renumbered section 922 and are classified to sections 1693q and 1693r of this title.

### EFFECTIVE DATE

Section effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as a note under section 5301 of Title 12, Banks and Banking.

## § 1693p. Reports to Congress

(a) Not later than twelve months after the effective date of this subchapter and at one-year intervals thereafter, the Bureau shall make reports to the Congress concerning the administration of its functions under this subchapter, including such recommendations as the Bureau deems necessary and appropriate. In addition, each report of the Bureau shall include its assessment of the extent to which compliance with this subchapter is being achieved, and a summary of the enforcement actions taken under section 1693o[1] of this title. In such report, the Bureau shall particularly address the effects of this subchapter on the costs and benefits to financial institutions and consumers, on competition, on the introduction of new technology, on the operations of financial institutions, and on the adequacy of consumer protection.

(b) In the exercise of its functions under this subchapter, the Bureau may obtain upon request the views of any other Federal agency which, in the judgment of the Bureau, exercises regulatory or supervisory functions with respect to any class of persons subject to this subchapter.

(Pub. L. 90–321, title IX, §921, formerly §918, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3740; amended Pub. L. 97–375, title II, §209(a), Dec. 21, 1982, 96 Stat. 1825; renumbered §919, Pub. L. 111–24, title IV, §401(1), May 22, 2009, 123 Stat. 1751; renumbered §920, renumbered §921, and amended Pub. L. 111–203, title X, §§1073(a)(3), 1075(a)(1), 1084(1), July 21, 2010, 124 Stat. 2060, 2068, 2081.)

### REFERENCES IN TEXT

For effective date of this subchapter, referred to in subsec. (a), see section 921 of Pub. L. 90–321, set out as an Effective Date note under section 1693 of this title.

Section 1693o of this title, referred to in subsec. (a), was in the original ''section 917 of this title'', and was translated as meaning section 918 of title I of Pub. L. 90–321 to reflect the probable intent of Congress and the renumbering of section 917 of title I of Pub. L. 90–321 as section 918 by Pub. L. 111–24, title IV, §401(1), May 22, 2009, 123 Stat. 1751.

### CODIFICATION

Renumbering of section 918 of Pub. L. 90–321 as section 919 by section 401(1) of Pub. L. 111–24 was executed prior to the renumberings of section 919 of Pub. L. 90–321 as section 920 and then as section 921 by sections 1073(a)(3) and 1075(a)(1) of Pub. L. 111–203 as the probable intent of Congress, notwithstanding section 403 of Pub. L. 111–24, set out as an Effective Date note under section 1693f–1 of this title and section 4 of Pub. L. 111–203, set out as an Effective Date note under section 5301 of Title 12, Banks and Banking, which provided that the renumbering by Pub. L. 111–24 was effective 15 months after May 22, 2009, and the renumberings by Pub. L. 111–203 were effective 1 day after July 21, 2010.

### PRIOR PROVISIONS

Two prior sections 921 of Pub. L. 90–321 were renumbered section 922 and are classified to sections 1693q and 1693r of this title.

Another prior section 921 of Pub. L. 90–321 was renumbered section 923 and is classified as an Effective Date note under section 1693 of this title.

### AMENDMENTS

2010—Pub. L. 111–203, §1084(1), substituted ''Bureau'' for ''Board'' wherever appearing.

1982—Subsec. (a). Pub. L. 97–375 struck out requirement that the Attorney General make a report on the same terms as the Board, and that such report also contain an analysis of the impact of this subchapter on the operation, workload, and efficiency of the Federal courts, and substituted ''necessary and appropriate'' for ''necessary or appropriate''.

### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by section 1084(1) of Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## § 1693q. Relation to State laws

This subchapter does not annul, alter, or affect the laws of any State relating to electronic fund transfers, dormancy fees, inactivity charges or fees, service fees, or expiration dates of gift certificates, store gift cards, or general-use prepaid cards, except to the extent that those laws are inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency. A State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection afforded by this subchapter. The Bureau shall, upon its own motion or upon the request of any financial institution, State, or other interested party, submitted in accordance with procedures prescribed in regulations of the Bureau, determine whether a State requirement is inconsistent or affords greater protection. If the Bureau determines that a State requirement is inconsistent, financial institutions shall incur no liability under the law of that State for a good faith failure to comply with that law, notwithstanding that such determination is subsequently amended, rescinded, or determined by judicial or other authority to be invalid for any reason. This subchapter does not extend the applicability of any such law to any class of persons or transactions to which it would not otherwise apply.

(Pub. L. 90–321, title IX, §922, formerly §919, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3741; renumbered §920 and amended Pub. L. 111–24, title IV, §§401(1), 402, May 22, 2009, 123 Stat. 1751, 1754; renumbered §921, renumbered §922, and amended Pub. L. 111–203, title X, §§1073(a)(3), 1075(a)(1), 1084(1), July 21, 2010, 124 Stat. 2060, 2068, 2081.)

---

[1] See References in Text note below.

**§ 235.3 Reasonable and proportional interchange transaction fees.**

(a) *In general.* The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the electronic debit transaction.

(b) *Determination of reasonable and proportional fees.* An issuer complies with the requirements of paragraph (a) of this section only if each interchange transaction fee received or charged by the issuer for an electronic debit transaction is no more than the sum of—

(1) 21 cents and;

(2) 5 basis points multiplied by the value of the transaction.

**§ 235.4 Fraud-prevention adjustment.**

(a) *In general.* If an issuer meets the standards set forth in paragraph (b) of this section, it may receive or charge an additional amount of no more than 1 cent per transaction to any interchange transaction fee it receives or charges in accordance with § 235.3.

(b) *Issuer standards.* To be eligible to receive the fraud-prevention adjustment, an issuer shall—

(1) Develop and implement policies and procedures reasonably designed to—

(i) Identify and prevent fraudulent electronic debit transactions;

(ii) Monitor the incidence of, reimbursements received for, and losses incurred from fraudulent electronic debit transactions;

(iii) Respond appropriately to suspicious electronic debit transactions so as to limit the fraud losses that may occur and prevent the occurrence of future fraudulent electronic debit transactions; and

(iv) Secure debit card and cardholder data; and

(2) Review its fraud-prevention policies and procedures at least annually, and update them as necessary to address changes in prevalence and nature of fraudulent electronic debit transactions and available methods of detecting, preventing, and mitigating fraud.

(c) *Certification.* To be eligible to receive or charge a fraud-prevention adjustment, an issuer that meets the standards set forth in paragraph (b) of this section must certify such compliance to its payment card networks on an annual basis.

[76 FR 43486, July 20, 2011]

**§ 235.5 Exemptions.**

(a) *Exemption for small issuers*—(1) *In general.* Except as provided in paragraph (a)(3) of this section, §§ 235.3, 235.4, and 235.6 do not apply to an interchange transaction fee received or charged by an issuer with respect to an electronic debit transaction if—

(i) The issuer holds the account that is debited; and

(ii) The issuer, together with its affiliates, has assets of less than $10 billion as of the end of the calendar year preceding the date of the electronic debit transaction.

(2) *Determination of issuer asset size.* A person may rely on lists published by the Board to determine whether an issuer, together with its affiliates, has assets of less than $10 billion as of the end of the calendar year preceding the date of the electronic debit transaction.

(3) *Change in status.* If an issuer qualifies for the exemption in paragraph (a)(1) in a particular calendar year, but, as of the end of that calendar year no longer qualifies for the exemption because at that time it, together with its affiliates, has assets of $10 billion or more, the issuer must begin complying with §§ 235.3, 235.4, and 235.6 no later than July 1 of the succeeding calendar year.

(b) *Exemption for government-administered programs.* Except as provided in paragraph (d) of this section, §§ 235.3, 235.4, and 235.6 do not apply to an interchange transaction fee received or charged by an issuer with respect to an electronic debit transaction if—

(1) The electronic debit transaction is made using a debit card that has been provided to a person pursuant to a Federal, State, or local government-administered payment program; and

(2) The cardholder may use the debit card only to transfer or debit funds, monetary value, or other assets that have been provided pursuant to such program.

**Federal Reserve System** §235.7

(c) *Exemption for certain reloadable prepaid cards*—(1) *In general.* Except as provided in paragraph (d) of this section, §§235.3, 235.4, and 235.6 do not apply to an interchange transaction fee received or charged by an issuer with respect to an electronic debit transaction using a general-use prepaid card that is—

(i) Not issued or approved for use to access or debit any account held by or for the benefit of the cardholder (other than a subaccount or other method of recording or tracking funds purchased or loaded on the card on a prepaid basis);

(ii) Reloadable and not marketed or labeled as a gift card or gift certificate; and

(iii) The only means of access to the underlying funds, except when all remaining funds are provided to the cardholder in a single transaction.

(2) *Temporary cards.* For purposes of this paragraph (c), the term "reloadable" includes a temporary non-reloadable card issued solely in connection with a reloadable general-use prepaid card.

(d) *Exception.* The exemptions in paragraphs (b) and (c) of this section do not apply to any interchange transaction fee received or charged by an issuer on or after July 21, 2012, with respect to an electronic debit transaction if any of the following fees may be charged to a cardholder with respect to the card:

(1) A fee or charge for an overdraft, including a shortage of funds or a transaction processed for an amount exceeding the account balance, unless the fee or charge is imposed for transferring funds from another asset account to cover a shortfall in the account accessed by the card; or

(2) A fee imposed by the issuer for the first withdrawal per calendar month from an ATM that is part of the issuer's designated ATM network.

§235.6 **Prohibition on circumvention, evasion, and net compensation.**

(a) *Prohibition of circumvention or evasion.* No person shall circumvent or evade the interchange transaction fee restrictions in §§235.3 and 235.4.

(b) *Prohibition of net compensation.* An issuer may not receive net compensa-

tion from a payment card network with respect to electronic debit transactions or debit card-related activities within a calendar year. Net compensation occurs when the total amount of payments or incentives received by an issuer from a payment card network with respect to electronic debit transactions or debit card-related activities, other than interchange transaction fees passed through to the issuer by the network, during a calendar year exceeds the total amount of all fees paid by the issuer to the network with respect to electronic debit transactions or debit card-related activities during that calendar year. Payments and incentives paid by a network to an issuer, and fees paid by an issuer to a network, with respect to electronic debit transactions or debit card related activities are not limited to volume-based or transaction-specific payments, incentives, or fees, but also include other payments, incentives or fees related to an issuer's provision of debit card services.

§235.7 **Limitations on payment card restrictions.**

(a) *Prohibition on network exclusivity*—(1) *In general.* An issuer or payment card network shall not directly or through any agent, processor, or licensed member of a payment card network, by contract, requirement, condition, penalty, or otherwise, restrict the number of payment card networks on which an electronic debit transaction may be processed to less than two unaffiliated networks.

(2) *Permitted arrangements.* An issuer satisfies the requirements of paragraph (a)(1) of this section only if the issuer allows an electronic debit transaction to be processed on at least two unaffiliated payment card networks, each of which does not, by rule or policy, restrict the operation of the network to a limited geographic area, specific merchant, or particular type of merchant or transaction, and each of which has taken steps reasonably designed to enable the network to process the electronic debit transactions that the network would reasonably expect will be routed to it, based on expected transaction volume.

63

**A7**

**§ 235.8**                                    **12 CFR Ch. II (1–1–12 Edition)**

(3) *Prohibited exclusivity arrangements by networks.* For purposes of paragraph (a)(1) of this section, a payment card network may not restrict or otherwise limit an issuer's ability to contract with any other payment card network that may process an electronic debit transaction involving the issuer's debit cards.

(4) *Subsequent affiliation.* If unaffiliated payment card networks become affiliated as a result of a merger or acquisition such that an issuer is no longer in compliance with paragraph (a) of this section, the issuer must add an unaffiliated payment card network through which electronic debit transactions on the relevant debit card may be processed no later than six months after the date on which the previously unaffiliated payment card networks consummate the affiliation.

(b) *Prohibition on routing restrictions.* An issuer or payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person that accepts or honors debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions.

(c) *Compliance dates*—(1) *General.* Except as otherwise provided in paragraphs (c)(2), (c)(3), and (c)(4) of this section, the compliance date of paragraph (a) of this section is April 1, 2012.

(2) *Restrictions by payment card networks.* The compliance date of paragraphs (a)(1) and (a)(3) of this section for payment card networks is October 1, 2011.

(3) *Debit cards that use transaction qualification or substantiation systems.* Issuers shall comply with the requirements of paragraph (a) of this section by April 1, 2013, for electronic debit transactions using debit cards that use point-of-sale transaction qualification or substantiation systems for verifying the eligibility of purchased goods or services.

(4) *General-use prepaid cards.* Issuers shall comply with the requirements of paragraph (a) of this section with respect to general-use prepaid cards as set out below.

(i) With respect to non-reloadable general-use prepaid cards, the compliance date is April 1, 2013. Non-reloadable general-use prepaid cards sold prior to April 1, 2013 are not subject to paragraph (a) of this section.

(ii) With respect to reloadable general-use prepaid cards, the compliance date is April 1, 2013. Reloadable general-use prepaid cards sold prior to April 1, 2013 are not subject to paragraph (a) of this section unless and until they are reloaded, in which case the following compliance dates apply:

(A) With respect to reloadable general-use prepaid cards sold and reloaded prior to April 1, 2013, the compliance date is May 1, 2013.

(B) With respect to reloadable general-use prepaid cards sold prior to April 1, 2013, and reloaded on or after April 1, 2013, the compliance date is 30 days after the date of reloading.

**§ 235.8  Reporting requirements and record retention.**

(a) *Entities required to report.* Each issuer that is not otherwise exempt from the requirements of this part under § 235.5(a) and each payment card network shall file a report with the Board in accordance with this section.

(b) *Report.* Each entity required to file a report with the Board shall submit data in a form prescribed by the Board for that entity. Data required to be reported may include, but may not be limited to, data regarding costs incurred with respect to an electronic debit transaction, interchange transaction fees, network fees, fraud-prevention costs, fraud losses, and transaction value, volume, and type.

(c) *Record retention.* (1) An issuer subject to this part shall retain evidence of compliance with the requirements imposed by this part for a period of not less than five years after the end of the calendar year in which the electronic debit transaction occurred.

(2) Any person subject to this part having actual notice that it is the subject of an investigation or an enforcement proceeding by its enforcement agency shall retain the records that pertain to the investigation, action, or proceeding until final disposition of the matter unless an earlier time is allowed by court or agency order.